## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| In re: | Chapter 11 |
|---|---|
| AIO US, INC., *et al.*, | Case No. 24-11836 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Related Docket No. 814** |

## <u>MEMORANDUM OPINION</u>

The Supreme Court held in *Truck Insurance* that an insurer is a "party in interest" in a bankruptcy case filed by its insured and therefore has a right, under § 1109(b) of the Bankruptcy Code, to "appear and be heard" in connection with confirmation of a plan of reorganization – even where the plan purports to be "insurance neutral."[1]  At the same time, the Court observed that the term "party in interest" is not intended to "include literally every conceivable entity that may be involved in or affected by the chapter 11 proceedings."[2]   The Court further emphasized that a party in interest does not have a "veto" over what happens in a proceeding and that courts retain the authority to "control participation in a proceeding."[3]

In substance, *Truck Insurance* resolved the fairly easy question whether the inclusion of "neutrality" language in a plan is sufficient to shut down all participation in a bankruptcy case by an insurer that is going to be asked to pay the claims that

---

[1] *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024).

[2] *Id.* at 284.

[3] *Id.* n.5.

are ultimately allowed in the case. A unanimous Supreme Court held that the answer to that question is no. But the case certainly need not be read to say that an insurer has an unlimited right to be heard on every and any issue that might arise in a its insured's bankruptcy case. In this Court's view, the question a bankruptcy court faces after *Truck Insurance* is fundamentally the same one that many bankruptcy courts faced before it – how to calibrate an insurer's right to participate and be heard in its insured's bankruptcy case so as to permit the insurer to protect its legitimate interests, without permitting an insurer (or any party in interest, for that matter) to weaponize its procedural rights so that they can be used for tactical advantage in other disputes.

In this case, London Market Insurers objected to (a) the debtors' solicitation procedures which provide for the temporary allowance of claims asserted by various talc claimants and (b) the debtors' proposed confirmation schedule. The debtors assert rights in insurance policies issued by the London Market Insurers. After hearing argument from the parties, the Court said that it would overrule the London Market Insurers' objections. The Court has since entered an order approving the disclosure statement and solicitation procedures.[4]

In fairness, it was less than perfectly clear – even to the Court itself – whether the *reason* the Court rejected London Market Insurers' arguments was because they lacked standing to raise them or because the arguments were, on the merits,

---

[4] D.I. 1047.

unpersuasive. This Memorandum Opinion is intended, for the benefit of the record, to provide greater clarity in that regard.

For the reasons described below, the Court concludes that the London Market Insurers are entitled to be heard with respect to the timing of the confirmation hearing. It bears emphasis that a number of recent Supreme Court opinions have changed the landscape of the law of standing. In light of those cases, the standing of a party to *object* to relief sought by another party does not raise a question of Article III standing. The Constitution's "Case" or "Controversy" requirement is met if the party that is *seeking* relief – the one that is invoking the court's jurisdiction – has Article III standing. The Supreme Court has also abrogated the concept of "prudential standing," explaining that the question whether the party invoking a particular right should be permitted to do so is ultimately a question of statutory construction, not a "prudential" matter left to a court's discretion. So the *only* standing question the Court needs to confront is whether the London Market Insurers have statutory standing to object to confirmation under § 1109(b). They do. The Court overrules their objection on the merits, however, because it is satisfied that the proposed schedule is appropriate.

The London Market Insurers' right to be heard with respect to the temporary allowance of claims for voting purposes presents a closer question. But when confronted with a close question of a party's right to challenge relief being sought by another party, this Court believes that the more prudent course is to consider the objections on the merits. That is particularly so when the underlying objection is one

that bears on the basic fairness and integrity of the bankruptcy process.  For that reason, the Court addresses the London Market Insurers' objection to temporary allowance on the merits.  The Court did believe it appropriate, in light of concerns that have arisen in other talc cases, to require certain clarifications in the proposed solicitation materials.  The debtors and the Committee, in response to the Court's concerns, readily agreed to make those changes.  With that, the Court is satisfied that the solicitation procedures and the proposed mechanism of allowing claims for voting purposes are appropriate.  The London Market Insurers' objection to temporary allowance for voting purposes is thus overruled on the merits.

## Factual and Procedural Background

The debtors in these bankruptcy cases are U.S. holding companies that, at the time the case was filed in August 2024, owned the shares of various non-debtor entities that comprised the international operations of Avon, a business that manufactures and markets beauty, fashion, and home products.[5]  The debtors had spun off their U.S.-based operations in 2016.[6]  The bankruptcy cases were filed, at least in part, on account of the debtors' talc liabilities arising out of their former U.S. operations.[7]  During these cases, the debtors sold their assets (which were principally the shares of the non-debtor foreign entities) to their parent corporation.  That sale was part of a global settlement, reached after extensive negotiations with the Official

---

[5] D.I. 12 ¶ 7.  The Court relies on this first-day declaration solely for the purposes of setting forth the uncontested background for the current disputes.

[6] *Id.* ¶ 8.

[7] *Id.* ¶ 11.

Committee of Unsecured Creditors, that also resolved potential estate causes of action against the parent arising out of prepetition intercompany transactions. This Court approved the settlement and sale transactions in December 2024.[8]

After the sale was approved, the parties began negotiations over the terms of a chapter 11 plan through which the proceeds of the sale and any other available estate assets (including any insurance that may be available) would be liquidated and distributed to creditors. The debtors filed a plan in February 2025 which they amended in April 2025.[9] Along with the amended plan and disclosure statement, the debtors filed a motion seeking approval of the disclosure statement and solicitation procedures.[10] A number of insurers, including the London Market Insurers, objected on various grounds.[11] The debtors resolved most of those objections and filed an amended plan, disclosure statement, and proposed solicitation procedures order to reflect the terms of those resolutions.[12] Those changes resolved all of the objections except for two objections asserted by the London Market Insurers.

As far as the schedule goes, the debtors are now proposing to set the confirmation hearing for July 21, 2025, providing for a period of more than 60 days after the approval of the disclosure statement to litigate any confirmation issues. The London Market Insurers seek an additional six months.

---

[8] *See* D.I. 581, 582.

[9] D.I. 812, 965.

[10] D.I. 814.

[11] D.I. 1020, 1021, 1022.

[12] D.I. 1027, 1028, 1029, 1030.

With respect to the solicitation procedures, as is not uncommon in mass tort cases, the bar date order in this case did not require talc claimants to file proofs of claim.  Rather, the parties' expectation is that, after confirmation, the trust will liquidate the talc personal injury claims.[13]  The bar date order was entered on notice to all parties in interest, including the London Market Insurers, and without any such party raising any objection thereto.

The proposed solicitation procedures provide that, for voting purposes only, claims for mesothelioma are temporarily allowed at $10,000 per claim while claims for other diseases are temporarily allowed at $20 per claim.  No claimant has objected to these procedures.  The London Market Insurers, however, contend that the temporary allowance mechanism is inappropriate and argue that claimants who have not filed proofs of claim should not be permitted to vote on the plan.

The debtors and the Committee each filed replies in support of the solicitation procedures and confirmation schedule, challenging both the London Market Insurers' standing and defending their timeline and procedures on the merits.[14]  The Court heard argument on May 19, 2025.  The Court indicated that it would overrule the London Market Insurers' objections, but noted that it would likely, for the benefit of the record, explain its rationale for doing so in a subsequent Memorandum Opinion.

---

[13] *See* D.I. 482 ¶ 2(a) ("The General Bar Date shall not apply to … Talc Claims … against any of the Debtors."); *id*. ¶ 5(a) ("The following entities are exempt from any requirement to file a Proof of Claim before any Bar Date pursuant to this Order…. [a] any person holding or asserting a Talc Claim").

[14] D.I. 1031, 1035.

The Court thereafter entered an order approving the disclosure statement and solicitation procedures.[15]

## Jurisdiction

The relief the debtors seek, approval of a disclosure statement and solicitation procedures, arises under § 1125 of the Bankruptcy Code and is therefore a matter within the district court's "arising under" jurisdiction set forth in 28 U.S.C. § 1334(b). As a part of the confirmation process, this is a core matter under 28 U.S.C. § 157(b)(2)(L). It has been referred from the district court to this Court under 28 U.S.C. § 157(a) and the district court's February 29, 2012 standing order of reference.

## Analysis

### I.    The London Market Insurers have standing to raise the objections they assert.

Courts have long struggled to sort through which parties may appear and be heard to object to relief sought in a bankruptcy case. In light of recent Supreme Court authority, this Court is persuaded that, despite the fact that some courts and litigants continue addressing issues of constitutional and prudential standing, those concepts are no longer applicable. Rather, the only question is whether the party objecting is a "party in interest" under § 1109(b). That statutory standard, at least as it has been construed by the courts, does impose limits on standing. Only parties with a stake in a dispute – not strangers to it – may participate in litigation. But even when no party with standing has raised an objection to the relief sought, a court may still engage

---

[15] D.I. 1047.

the question whether the relief sought is appropriate. And engaging that question is of particular importance when the underlying question bears on the integrity of the bankruptcy process, as it does here. The Court will therefore reach the merits of the London Market Insurers' objections.

### A. None of this has anything to do with Article III of the Constitution.

The Committee argues that no matter how broadly party in interest may be defined in § 1109(b) of the Bankruptcy Code, the Court is required first to address the question whether the London Market Insurers have Article III standing.[16] It is true that there are some courts that have viewed the question this way. For example, the Third Circuit's *en banc* decision in *Global Industrial Technologies* engaged the question whether the insurers who objected to confirmation there were facing an Article III "injury in fact." The court ultimately concluded that the insurers there "have Article III standing."[17]

As will be described below, however, the reasoning of Supreme Court decisions issued in the years after *Global Industrial Technologies* demonstrates that the "standing" analysis that a bankruptcy court confronts when a party objects to relief sought by another party is just a *statutory* question of whether the objector is a "party in interest." Article III of the Constitution has nothing to do with this. Despite these more recent cases, however, some bankruptcy courts continue to address the issue (as

---

[16] D.I. 1035 at 6.

[17] *In re Global Indus. Technologies, Inc.*, 645 F.3d 201, 211-212 & n.25 (3d Cir. 2011) (*en banc*).

the Committee urges here) as one of federal constitutional law.[18]  That analysis cannot be squared with the more recent Supreme Court authority.[19]

As a starting point, it bears note that *Truck Insurance* itself never even discusses the question of Article III standing.[20]  It is well established, of course, that the absence of a plaintiff with Article III standing would deprive a federal court of subject-matter jurisdiction over the dispute.[21]  And the Supreme Court has also explained that "courts, including this Court, have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."[22]  One would therefore have expected, if the Supreme Court believed that the question of insurer standing to object to confirmation implicated Article III of the Constitution, for the Court to have considered and addressed that question before turning to the statutory issue.  It is unsurprising, though, that it did not, because the Court's more recent cases make clear that only the party invoking the jurisdiction of a federal court – the one that is *seeking* relief –

---

[18] *See In re Roman Catholic Diocese of Syracuse*, 665 B.R. 866, 875 (Bankr. N.D.N.Y. 2024) (engaging Article III standing analysis).

[19] It bears note that in a recent decision, the Fourth Circuit held that the requirements of Article III do not apply at all to cases in bankruptcy courts, which are themselves non-Article III courts.  *See Kiviti v. Bhatt.*, 80 F.4th 520 (4th Cir. 2023).  But in a thoughtfully reasoned opinion, the Tenth Circuit Bankruptcy Appellate Panel correctly explained that because the bankruptcy judges serve as a "unit of the district court," 28 U.S.C. § 151, and the bankruptcy court's jurisdiction is wholly derivative of the district court's, *id.* § 157, it makes little sense to say that the bankruptcy court can exercise jurisdiction that cannot be exercised by the district court.  *See In re Pettine*, 655 B.R. 196, 206-212 (B.A.P. 10th Cir. 2023).

[20] 602 U.S. 268.

[21] *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992) (describing the requirement of Article III standing as a limitation on the "jurisdiction" of the federal courts).

[22] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

needs to have Article III standing.  The question of who may be heard to *oppose* the relief sought poses no constitutional issue.

The constitutional standing requirement stems from the fact that Article III of the Constitution limits the authority of the federal courts to resolving "Cases" and "Controversies."[23]  The point is that federal courts may not act in the absence of a live dispute between parties with a concrete stake in the matter.  "[F]ederal courts do not issue advisory opinions about the law" or "operate as an open forum for citizens to press general complaints about the way in which government goes about its business."[24]  Under principles of Article III constitutional standing, for "a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute."[25]

Questions of Article III standing typically arise in regular two-party litigation.  When one party sues another, the doctrine of constitutional standing provides that a federal court should not resolve the dispute unless the plaintiff – the party who is invoking the court's jurisdiction – can establish that it has a live grievance with the defendant that can be redressed by a favorable ruling from the court.  These principles do not map perfectly to an *in rem* dispute like a bankruptcy case, where a court is charged with distributing a *res* among competing claimants.  But the

---

[23] *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 371 (2024).

[24] *Id.* (citations and internal quotations omitted).

[25] *Id.* (citations omitted).

Article III analysis that applies when a debtor files a motion to approve a disclosure statement and solicitation procedures must focus on whether the movant – the debtor – has a concrete stake in the relief it is seeking. That is the party that is invoking the court's jurisdiction and therefore bears the burden of establishing constitutional standing.[26]

Here, there is no question that the debtors have standing to seek the relief for which they are asking. The approval of a disclosure statement and solicitation procedures is a statutorily required step in the process of obtaining confirmation of a chapter 11 plan.[27] And a debtor-in-possession is under a statutory duty, where practicable, to seek to confirm a plan.[28] Accordingly, the movants have a sufficiently concrete stake in obtaining approval of the disclosure statement and solicitation procedures to satisfy the requirements of Article III.

The point of the more recent Supreme Court cases is that this is sufficient to satisfy the Article III requirement that the court have before it a live "Case" or

---

[26] *Id.* at 379 (explaining that it is the plaintiff that has the burden of establishing its standing). *See also Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ("The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing [each of the elements of standing]"). To say that it is the party that invokes the jurisdiction of the bankruptcy court that must have Article III standing perhaps raises the question of the definition of the "proceeding" in which the court must satisfy itself that the party invoking its jurisdiction has such Article III standing. In this regard, the Supreme Court has observed that "disputes in bankruptcy are generally classified as either 'adversary proceedings,' essentially full civil lawsuits carried out under the umbrella of the bankruptcy case, or "contested matters," an undefined catchall for all other issues parties dispute." *Bullard v. Blue Hills Bank*, 575 U.S. 496, 505 (2015) (citing Fed. R. Bankr. P. 7001). While this Court need not definitively resolve that question here, it seems to reason that the party invoking the court's jurisdiction in any such dispute (the plaintiff or the movant, as the case may be) should also be required to demonstrate its Article III standing to do so.

[27] *See* 11 U.S.C. § 1125.

[28] *See id.* §§ 1106(a)(5), 1107(a).

"Controversy."[29]  Nothing else is required.  How and whether the court will consider an *opposition* to the relief being sought therefore does not present an Article III question.

The best analogy may well be to a third-party's intervention in a lawsuit that is otherwise between a plaintiff and a defendant – a question the Supreme Court has recently addressed.    There, the Court has made clear that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."[30]  For that reason, "an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing."[31]  It necessarily follows that an intervenor that seeks the *same* relief as an existing party need not establish its separate constitutional standing.

The Supreme Court accordingly found that the Third Circuit had erred in requiring a party that sought to intervene as an appellant to establish Article III standing when it was seeking the same relief as the federal government, which was already an appellant in the case.[32]  In *Little Sisters*, the Supreme Court held that the Department of Health and Human Services properly authorized exemptions from the

---

[29] *See generally, Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014); *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019); *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657 (2020); *Truck Insurance*, 602 U.S. 268.

[30] *Town of Chester, NY v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (internal quotations and citations omitted).

[31] *Id.* at 440.

[32] *See Little Sisters*, 591 U.S.at 674 n.6.

contraceptive coverage requirement of the Affordable Care Act for employers with religious and conscientious objections to providing coverage for contraception.

The case that became *Little Sisters* began as a lawsuit brought by Pennsylvania and New Jersey against the federal government, contending that the regulations providing for religious exemptions were procedurally invalid under the Administrative Procedure Act.[33]  A district court ruled in favor of the states and enjoined the rules from going into effect.[34]  The federal government appealed to the Third Circuit.[35]  On appeal, Little Sisters sought to intervene as an appellant to argue in support of the regulations.  The Third Circuit, however, found that Little Sisters lacked standing to intervene because, in a case that Little Sisters had filed in a district court in Colorado, the district court had entered a permanent injunction barring the enforcement of the regulations against Little Sisters.[36]  The Third Circuit thus viewed Little Sisters' effort to intervene in the New Jersey and Pennsylvania case as, in effect, moot.  The Supreme Court held that this was "error."[37]

As the Court explained, "[u]nder our precedents, at least one party must demonstrate Article III standing for each claim for relief.  An intervenor of right must independently demonstrate Article III standing if it pursues relief that is broader than or different from the party invoking a court's jurisdiction."  But in this case, the

---

[33] *Id.* at 672-673.

[34] *Id.* at 673.

[35] *Id.* at 673-674.

[36] *See Pennsylvania v. President United States*, 930 F.3d 543, 559 n.6 (3d Cir. 2019).

[37] *Little Sisters*, 591 U.S. at 674 n.6 (citing *Town of Chester*, 581 U.S. at 663).

Court noted, the "[f]ederal [g]overnment clearly had standing to invoke the Third Circuit's appellate jurisdiction," and Little Sisters was seeking the *same* relief as the federal government – a dissolution of the injunction entered by the district court. "The Third Circuit accordingly erred by inquiring into the Little Sisters' independent Article III standing."[38]    Otherwise put, the Third Circuit had a live "Case" or "Controversy" before it when the federal government appealed from the district court's adverse judgment.  Once that requirement is satisfied, the Article III analysis is complete.  To the extent an intervenor is merely asking for the same relief, no further Article III standing is required.

For essentially the same reason, the Court has found that standing is not necessary to intervene as a defendant.  Only the party that is "invoking a court's jurisdiction" is required to establish standing.[39]    Thus, the Virginia House of Delegates was free to *defend* against a lawsuit alleging that the State of Virginia had improperly gerrymandered the drawing of state legislative districts.  But once the State of Virginia (the party with standing) chose not to appeal an adverse ruling, the House of Delegates lacked standing to seek Supreme Court review.[40]

The lesson of these cases is that so long as the party that is invoking the court's jurisdiction has a concrete stake in the relief it is seeking, the constitutional requirements are satisfied.  What matters is that the court's resolution of the dispute

---

[38] *Id*.

[39] *Virginia House of Delegates*, 587 U.S. at 663.

[40] *Id*.

would provide appropriate relief to a party that is entitled to seek it. If that requirement is met, the court's opinion will neither be advisory nor will it be addressing a generalized grievance. That is all that Article III of the Constitution requires when it limits the federal judicial power to hearing "Cases" and "Controversies."[41]

The debtors' motion to approve a disclosure statement and solicitation procedures presents a case or controversy, since the debtors have a concrete stake in obtaining the relief they seek. In objecting to that relief, the London Market Insurers are essentially in the position of a defendant. They are not the party that is invoking this Court's jurisdiction by seeking relief. It would be no more appropriate to inquire into their Article III standing than it was for the Third Circuit to require that Little Sisters demonstrate standing to participate as an appellant or would have been for the district court to require the Virginia House of Delegates to demonstrate its standing to defend the drawing of legislative districts. To be sure, the London Market Insurers do need to be "parties in interest" under § 1109(b) of the Bankruptcy Code to appear and be heard in this Court. But in light of the Supreme Court authority described above, it is simply incorrect to say that a party objecting to relief in bankruptcy court needs to show that it has Article III standing.

---

[41] *See also Scotts Valley Band of Pomo Indians v. Burgum*, No. 25-009958, 2025 WL 1178598, at *2 n.3 (D.D.C. Apr. 23, 2025) (suggesting that only a "plaintiff or appellant, not an appellee or defendant" is a party that is "invoking the court's jurisdiction" and must demonstrate Article III standing.); *Farmer v. EPA*, 759 F. Supp. 3d 101, 107 n.2 (D.D.C. 2024) ("defendant-intervenors not invoking the court's jurisdiction are not required to demonstrate standing.") (citing *Env't Integrity Project v. Wheeler*, No. 20-1734, 2021 WL 6844257, at *2 (D.D.C. Jan. 27, 2021) (Jackson, J.) and *Childrens' Health Def. v. CDC*, No. 23-431, 2024 WL 3521593, at *5 n.3 (D.D.C. July 24, 2024)).

### B.    "Prudential standing" is no longer a thing.

The Committee further argues that the doctrine of "prudential standing" imposes a "further requirement" that the London Market Insurers cannot satisfy.[42] Like the Committee's contention that the London Market Insurers must demonstrate Article III standing, that is a point that was once true but no longer is.

In *Lexmark*, the Supreme Court explained that its prior cases had suggested that in addition to the requirement that a plaintiff have Article III standing, there was a further requirement that a plaintiff demonstrate "prudential" standing. That doctrine was "not derived from Article III" and had not been "exhaustively defined."[43] But the doctrine encompassed "at least three broad principles: the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances … and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."[44]

But in *Lexmark*, the Supreme Court rejected the argument that the requirement that the plaintiff be within the "zone of interests" protected by the statute was a "prudential standing" requirement. The problem with that doctrine, to paraphrase the Supreme Court's analysis, was that it was something that judges just made up. "Whether a plaintiff comes within the 'zone of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether

---

[42] D.I. 1035 at 7.

[43] *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (internal quotation omitted).

[44] *Id.* (internal quotations and citations omitted).

a legislatively conferred cause of action encompasses a particular plaintiff's claim."[45]
The Court emphasized that there is nothing "prudential" about that analysis. "We
do not ask whether in our judgment Congress *should* have authorized [the plaintiff's]
suit, but whether Congress in fact did so."[46] There either is or is not a cause of action
on the merits. But if there is, a court "cannot limit a cause of action that Congress
has created merely because 'prudence' dictates."[47]

    *Lexmark* accordingly marked the death knell of the "prudential standing"
doctrine.[48] Whether the plaintiff is within the "zone of interests" still matters. But
it is part of the merits analysis, not a "prudential standing" requirement. As the
Third Circuit put the point in *Wilson Armetale*, *Lexmark* "excised 'prudential' or
'statutory' additions to the 'irreducible constitutional minimum of standing.'"[49]

    Otherwise put, Congress has specified who may appear and be heard in a
bankruptcy case – any "party in interest" within the meaning of § 1109(b) of the
Bankruptcy Code. As will be described below, that definition, while broad, is not

---

[45] *Id.* at 127.

[46] *Id.* at 128 (emphasis in original).

[47] *Id.*

[48] *See also Potter v. Cozen & O'Connor*, 46 F.4th 148, 156 (3d Cir. 2022) (applying *Lexmark*).
The *Lexmark* decision also eliminated "generalized grievances" from the category of
prudential standing, explaining that this requirement was in fact part of the Article III
standing analysis. *Lexmark*, 572 U.S. at 127 n.3. At least as a technical matter, the Court's
decision left open the question whether the "associational standing" doctrine might survive
as a form of prudential standing. *Id.*

[49] *In re Wilson Armetale, Inc.*, 968 F.3d 273, 281 (3d Cir. 2020) (quoting *Lexmark*, 572 U.S. at
125-128 and omitting other internal citations and quotations). It bears note that *Wilson
Armetale* involved a different use of the word "standing" in the bankruptcy context. There,
the court held that creditors had "standing" to pursue fraudulent conveyance actions, despite
the fact that the Bankruptcy Code gives the trustee in bankruptcy the authority to pursue
such claims, after the trustee formally abandoned the claims under § 554.

limitless.  But the lesson of the Supreme Court cases is that this statutory standard is the *only* one that separates those who may participate in a bankruptcy case (at least to raise an objection to the relief sought by another party) from those who may not.  Once an objector is found to be a party in interest, there is no authority for courts to construct further obstacles to the party's participation.

### C.    The term "party in interest" is expansive but not limitless.

Section 1109(b) of the Bankruptcy Code provides that a "party in interest" is entitled to "appear and be heard" on any issue in a bankruptcy case.[50]  *Truck Insurance* explains that this "text is capacious."[51]  The use of this broad language was part of an "effort to encourage and promote greater participation in reorganization cases."[52]  Congress was concerned that "a few insiders, whether representatives of management or major creditors, could use the reorganization process to gain an unfair advantage," and expressly chose the broad language used in § 1109(b) "to serve the policies of inclusion underlying the chapter 11 process."[53]

The Supreme Court has, in other contexts, expressed due concern for the risk that a party may seek to weaponize its procedural rights to participate in litigation to serve some ulterior purpose.  In *Twombly*, for example, the Court noted that if a trial court permits a lawsuit that ought to have been dismissed to proceed, a plaintiff "with a largely groundless claim [could] be allowed to take up the time of a number

---

[50] 11 U.S.C. § 1109(b).

[51] 602 U.S. at 277.

[52] *Id.* at 280 (internal citation and quotation omitted).

[53] *Id.* at 280-281 (ellipses, brackets, and citations omitted).

of other people" in litigation.   Doing so, the Court explained, would permit the plaintiff to drive up the settlement value of a weak lawsuit through the "*in terrorem*" effect of the discovery process.[54]   The Court was sensitive to these same concerns in *Truck Insurance*, emphasizing that "§ 1109(b) provides parties in interest only an opportunity to be heard—not a vote or a veto in the proceedings."[55]   And the Court was also careful to point out that courts retain "equitable discretion to control participation in a proceeding."[56]

Nothing in *Truck Insurance* should be read as an invitation for parties without a legitimate interest in the bankruptcy case to weaponize the right to participate for improper purposes.   Courts have long held, for example, that a disappointed bidder in a bankruptcy auction generally lacks standing to challenge the sale – except to the extent that the challenger calls into question the "intrinsic fairness" of the sale process.[57]   Similarly, the court held in *Indianapolis Downs* that a party who would not be subject to a plan's third-party release lacked standing to object to the release.[58]

---

[54] *Bell Atlantic v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotations and citations omitted).

[55] *Truck Insurance*, 602 U.S. at 282.

[56] *Id.* n.5.

[57] *See, e.g., In re Colony Hill Associates*, 111 F.3d 269, 273-274 (2d Cir. 1997).

[58] *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013).   *See* also *In re Orlando Investors, L.P.*, 103 B.R. 593, 596-97 (Bankr. E.D.Pa. 1989) (same); *In re Johns–Manville Corp.*, 68 B.R. 618, 623 (Bankr. S.D.N.Y. 1986) (objecting party may not raise "the rights of third parties who do not object to confirmation.").

And other cases make clear that a party that is a shareholder of a party in interest is not, by virtue of its equity holding, itself a party in interest.[59]

All of that being said, there is no dispute that the London Market Insurers are "parties in interest" in the bankruptcy case with a right to participate in the confirmation process. That much flows directly from *Truck Insurance*, which held that an insurer was a party in interest entitled to object to confirmation of a plan of reorganization filed by its insured.[60] The London Market Insurers accordingly have standing to object to the proposed timing of the confirmation hearing.

The London Market Insurers' standing to object to the solicitation procedures may present a closer question. As described above, the case law on party-in-interest standing under § 1109(b) limits an objector to asserting its own rights – it may not assert the rights of others. And a case can certainly be made that insurers do not have a legitimate interest in a plan's solicitation and voting procedures, which are intended to protect the interest of creditors and equity holders whose claims or interests may be impaired under the plan. The bankruptcy court in the *Diocese of Camden* case, for example, found that the insurers had standing to object to various

---

[59] *See In re Refco*, 505 F.3d 109, 117 (2d Cir. 2007); *In re Vantage Drilling Int'l*, 603 B.R. 538, 545 (D. Del. 2019). Some of the cases cited above, to be fair, are sprinkled with a discussion of Article III standing principles that are likely overtaken by the subsequent Supreme Court authority discussed in Part I.A. of this Memorandum Opinion. But none of that provides any reason to call into question these courts' sound analysis of the statutory requirement of what it means to be a party in interest under § 1109(b), all of which is entirely consistent with the Supreme Court's discussion in *Truck Insurance*.

[60] *Truck Insurance*, 602 U.S. at 281-282 (the "realignment of the insured's economic incentives [that occurs in a mass tort bankruptcy case] makes participation in the bankruptcy by insurers—who will ultimately be asked to foot the bill for most or all of those claims—critical") (internal citation, quotation, and ellipses omitted).

aspects of the debtors' plan, but *not* the solicitation procedures.  The insurers "are not voting creditors, and their claims are not impaired… [they] therefore … have no legally protected interest in the … solicitation of other creditors."[61]

For this reason, the debtor and the Committee have a fair argument that the London Market Insurers lack standing to object to the debtors' solicitation procedures.  In response, one could certainly make a textual argument that the use of the word "any" in § 1109(b) means that once an objector is found to be a party in interest, that party is entitled to be heard "on *any* issue in a case under this chapter."[62]  That is not, however, the only way to read the text.  In context, another plausible reading of the words of § 1109(b) would be that a party in interest may be heard on any matter on which that party is a party in interest.  That issue, however, need not be resolved here.  For the reasons described in Part I.D, below, aspects of the solicitation procedures bear on the integrity of the bankruptcy process, which this Court is obligated to protect whether or not an objection is filed by a party in interest.  The Court has accordingly reviewed those procedures.  It has no further reason to consider the standing of the London Market Insurers.

### D.    Courts have an independent obligation to ensure the fundamental fairness of their processes.

In a typical case in which it is argued that a plaintiff lacks Article III standing, a court that accepts that argument will dismiss the lawsuit for lack of subject-matter

---

[61] *See In re Diocese of Camden, N.J.,* No. 20-21257, 2022 WL 3369087, at *5 (Bankr. D.N.J. Aug. 12, 2022).

[62] 11 U.S.C. § 1109(b) (emphasis added).

jurisdiction.  But bankruptcy cases are different.  A bankruptcy court exercises, at least in part, *in rem* jurisdiction over a bankruptcy estate.  It needs to administer that estate appropriately.  So when, for example, a plan of reorganization is filed, the court needs to decide whether to confirm the plan.  And it must make that decision whether or not a party in interest with standing asserts an objection.  And even when considering a motion that is uncontested, a bankruptcy court is not a rubber stamp. The court still needs to decide whether granting the relief is appropriate.[63]

Indeed, the Supreme Court in *Espinosa* suggested that bankruptcy courts have an obligation to "make an independent determination" that the requirements imposed by the Bankruptcy Code are met before confirming a plan.[64]  No one reads that sentence in *Espinosa* to mean that bankruptcy courts are required to act as vigilantes who are duty bound to search out and eliminate every technical variance from the requirements in the Bankruptcy Code in every order they enter.  The protections afforded by the Bankruptcy Code are primarily directed to protecting the rights of the parties-in-interest in the bankruptcy case.  Those parties are free to assert their rights, or they may forfeit them by consenting to the entry of an order whose terms may vary from the Bankruptcy Code's strict requirements.  When

---

[63] This point only underscores why the question of "standing" in this context does not implicate a question under Article III of the Constitution.  The presence of Article III jurisdiction is necessary before a federal court may exercise jurisdiction.  When a plaintiff lacks constitutional standing in a two-party lawsuit, the appropriate relief is therefore to dismiss the case for want of jurisdiction.  But no one suggests that, if an *objector* lacks "standing" to be heard, that the court should not consider the merits of the movant's request for relief.

[64] *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 278 (2010).

presented with a proposed order to which no party in interest has objected, this Court's usual practice is to enter the order so long as the Court is satisfied it has subject-matter jurisdiction, the order does not purport to bind parties who lacked notice of the relief sought, the integrity of the bankruptcy process is not implicated, and the relief is not so plainly contrary to law that it could not be entered on a "default" basis.[65]

It is established beyond peradventure, however, that a court's independent obligation to assure itself of the propriety of the orders it is being asked to enter is at its zenith when the basic fairness and integrity of the judicial proceedings are at issue. As described above, while a disappointed bidder in a bankruptcy auction generally lacks standing to object to the sale, the law has long recognized an exception when the objection bears on the "intrinsic fairness" of the sale process.[66] And the Third Circuit made clear in *Congoleum* that questions about the insurer's standing to object must not stand as an obstacle to a bankruptcy court's assuring itself that the integrity of the bankruptcy process was not threatened by a law firm's conflicts of interest.[67]

---

[65] This Court has set forth its views on when a party's failure to object to relief sought in a plan of reorganization may constitute "consent" to the terms of that plan in *In re Arsenal Intermediate Holdings, LLC*, No. 23-10097 (CTG), 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023) and *In re Smallhold*, 665 B.R. 704 (Bankr. D. Del. 2024).

[66] *Colony Hill*, 111 F.3d at 273-274.

[67] *In re Congoleum Corp.*, 426 F.3d 675, 685 (3d Cir. 2005) (finding that insurers had standing to object to the retention of counsel because the question was "an issue based on procedural due process concerns that implicate the integrity of the bankruptcy court proceeding as a whole.").

It is no secret that, in other high-profile cases involving alleged talc related liability, concerns have arisen regarding irregularities in the solicitation process that bear on the basic fairness and integrity of the bankruptcy process.  The Court need not dwell on them here.  They are well described in the courts' decisions in *Imerys* and *Red River Talc.*[68]  In view of these concerns, the Court believed it appropriate to pay particular attention to the solicitation procedures it was being asked to approve here.  To that end, the Court notes that, in response to objections raised by certain insurers, the debtors and the Committee (helpfully) agreed to changes to the solicitation procedures.  For example, the solicitation procedures now require each master ballot to contain a certification under penalty of perjury that each client has provided affirmative consent to the ballot being cast by a lawyer on the client's behalf.[69]  In addition, in response to a point that the Court raised during the May 19, 2025 hearing, the parties agreed to incorporate expressly Judge Lopez's holding in *Red River Talc* – making plain that a standard engagement letter that does not contain an express power of attorney is insufficient to permit an attorney to cast a vote on behalf of a client.[70]

---

[68] *See In re Imerys Talc America, Inc.*, No. 19-10289 (LSS), 2021 WL 4786093, at *11 (Bankr. D. Del. Oct. 13, 2021) (explaining how one firm "simply printed out a list of its clients in excel spreadsheet format and slapped it behind a Master Ballot."); *In re Red River Talc LLC*, No. 24-90505, 2025 WL 1029302, at *23 (Bankr. S.D. Tex. Mar. 31, 2025) (finding that counsel purported to vote on behalf of clients without having the power of attorney required by Bankruptcy Rule 9019(c)).

[69] D.I. 1030-2 at 121 of 161.

[70] May 19, 2025 Hr'g Tr. at 24-26.

As this Court sees it, all of this counsels further against disregarding the London Market Insurers' objections to the solicitation procedures on the ground that the objector lacked standing.  As noted, the debtors amended the solicitation procedures in response to other insurers' objections prior to the hearing, and again to address the Court's *sua sponte* objections.  In light of that context, the Court is not even certain what it would mean to say that the London Market Insurers lack standing to object to the solicitation procedures.  Does it mean that the Court is not *required* to consider their objections?  That it is not *permitted* to consider them?

The truth of the matter is that the Court believes that, in the circumstances of this case, it is duty bound to ensure that the process it is superintending is an appropriate one.  When confronted with questions that implicate the integrity of the bankruptcy process, the Court is inclined to be particularly open to hearing from anyone and everyone who might assist the Court in conducting a fair and appropriate process.  To be sure, courts must be sensitive to the risk that procedural rights may be misused to serve ulterior ends.  But to say that a party may appear and be heard does not mean that the party can hijack the proceeding or make it substantially longer or more expensive.  Trial courts have ample tools to address those concerns. In this Court's view, however, finding that the objector is not a party in interest and lacks standing to appear and be heard would be to wield a blunt instrument in a setting that would be better served by a more surgical approach.

\* \* \*

In sum, for the reasons set forth above, the Court concludes that in view of the most recent authority, the appropriate approach to the question of party-in-interest standing is as follows:

(a)    in a close case, one should err on the side of considering an objection on the merits as opposed to disregarding it on the ground that the objector lacks standing, and employ other tools as appropriate to guard against the potential misuse of the procedural right to be heard for tactical purposes;

(b)    where the objector truly is a stranger to the issue and appears to be pressing the objection for strategic advantage, a court may treat the issue as if the relief sought is uncontested (though even then, the court need not act as a rubber stamp); and

(c)    on matters that bear on the fundamental fairness or integrity of the bankruptcy process, courts should address the merits without regard to whether the issue is presented by a "party in interest" with standing to raise the objection.

Applying those principles here, the Court will not disregard the objections asserted by the London Market Insurers on standing grounds.  Rather, it will consider them on the merits.

## II.    The London Market Insurers' objections are overruled on the merits.

Considering the merits of the London Market Insurers' objections is far easier. *First*, their request for a delay of nearly six months before confirmation will be overruled.  The London Market Insurers have not identified any confirmation issue

that they seek to raise that will require such an extensive delay in the schedule.  As the Court noted during the May 19, 2025 hearing, that ruling is without prejudice to any party's right to seek a continuance if reasonable efforts to obtain appropriate discovery are thwarted.  Based on the record before the Court, however, the Court believes that the schedule as agreed among the debtors, the Committee, and the various other insurers is an appropriate one.

*Second*, the London Market Insurers' objection to the temporary allowance of claims for voting purposes is likewise overruled.  The judgment that proofs of claim are unnecessary in a mass tort case in which claims allowance will be handled on a post-confirmation basis is common in mass tort bankruptcy cases.[71]  To be sure, § 1126(a) provides that the holder of "a claim or interest allowed under § 502" may vote on a plan.[72]  And the paradigmatic way that one asserts a "claim" under the Bankruptcy Code is to file a proof of claim under § 501(a).[73]  The Bankruptcy Rules, though not the Bankruptcy Code itself, expressly contemplate a mechanism by which claims may be temporarily allowed for voting purposes only.[74]  Here, the ballots, in light of the changes that have been made in response to other objections, provide the

---

[71] *See, e.g., In re Quigley Co.*, 346 B.R. 647, 651 (Bankr. S.D.N.Y. 2006) ("[T]he Court ordered the Asbestos PI Claimants holding un-liquidated claims *not* to file proofs of claim in Quigley's bankruptcy.  Quigley argued and the Court agreed that claims management should be undertaken by the Trust because the claims will be channeled into the Trust for final liquidation and payment.") (emphasis in original).

[72] 11 U.S.C. § 1126(a).

[73] *Id.* § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest …. objects").

[74] *See* Fed. R. Bankr. P. 3018(a) ("Notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan.").

principal protections that would otherwise be afforded by the filing of proofs of claim. Beyond making the technical point that the ballot is called a ballot rather than being called a proof of claim, the London Market Insurers have not identified any substantive protection that would be afforded by requiring a proof of claim that is absent under the debtors' solicitation procedures, as proposed.  The Court is accordingly satisfied that the procedures are appropriate.[75]  This objection is therefore overruled.

**Conclusion**

For the foregoing reasons, the Court is satisfied that the solicitation order that was presented by the parties, and entered at D.I. 1047, is appropriate.  The London Market Insurers' objections thereto are accordingly overruled.

Dated: June 6, 2025

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

---

[75] The debtors also argue that the London Market Insurers should be, in effect, estopped from objecting to the solicitation procedures because they raised no objection to the bar date order that excepted talc claimants from the requirement of filing a proof of claim.  That contention has at least some superficial appeal.  When one party adopts a procedure that will raise problems down the road, one might think that the better practice would be to raise the concern on a timely basis rather than lying in wait and then springing a trap.  That said, it is ultimately the debtors' obligation to adopt procedures that will permit them to confirm a plan.  For the reasons described above, the Court concludes that the bar-date order in this case does not present a problem for the debtors' solicitation procedures.  But if it did, the Court does not believe it appropriate to impose on the London Market Insurers a legal obligation to point out to the debtors the consequences of the procedures they have adopted.