IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AIO US, Inc., et al. | Case No. 24-11836 (CTG) |
| Debtors. | (Jointly Administered) |

## INSURERS' OBJECTION TO THE DEBTORS' PLAN OF REORGANIZATION

The insurers listed in the signature blocks below (collectively, "Objecting Insurers" or "Insurers") hereby object to confirmation of the Second Amended Joint Chapter 11 Plan of Liquidation of AIO US, Inc. and Its Debtor Affiliates (Dkt. No. 1048) (the "Plan") on the grounds set forth below.

## TABLE OF CONTENTS

Table of Contents ……..………………………………………………………………....…i

Table of Authorities…………………………………………………………………..ii

INTRODUCTION ………………………………………………………………………...1

FACTUAL BACKGROUND …...………………………………………………………...1

ARGUMENT …..………………………………………………………………………...5

I. THE COURT CANNOT CONFIRM THE PLAN BECAUSE IT IS NOT CONSISTENT WITH § 1141. …..……………………………………………………..6

II. THE PLAN CANNOT BE CONFIRMED BECAUSE IT DOES NOT SATISFY THE GOOD FAITH REQUIREMENT OF § 1129(A)(3). …..………………………..9

    A. The Plan Lacks Any Bankruptcy Purpose …..……………………………12

    B.  Contrary to the Purpose of the Bankruptcy Code, the TDP Permit Inappropriate Windfalls to Talc Claimants, Including Claimants Asserting Invalid and Otherwise Improper Talc Claims. …...…………....14

    C.    Under the TDP, the Debtors Abandon their Defenses and Deprive Insurers of Their Contractual Rights to Defend Against the Talc Claims. …………………………………………………………...……18

    D. The Plan Improperly Seeks To Alter Insurers' Rights. …..…………….……25

        1.  The Plan Purports to Bind Insurers to a Non-Adversarial TDP Process …...……………….……………………………….....25

        2.  The Claim Valuations That the Talc Claimants Unilaterally Selected for the TDP Cannot Constitute a Binding Finding of "Liability" That the Insurers Are Obligated to Pay. ………………27

        3.  The Plan Contains Other Impermissible Findings. …..……………33

        4.  The Plan Deprives the Insurers of Contractual Rights ……………34

    E. The Insurance Neutrality Language Does Not Protect the Insurers' Rights…………………………………………………………………37

    F. The Plan Improperly Extends the Bankruptcy Court's Post-Confirmation Jurisdiction Over Insurance Rights……………….....………………………41

G.  The Plan's Inconsistent Wording is in Bad Faith …………………………43

H.  The Plan Violates 1129(a)(1) By Seeking to Exclude Foreign Claims …...45

III.     THE PLAN CANNOT ASSIGN THE INSURANCE POLICIES. …………...46

A.  The Insurance Rights Transfer is Impermissible under the Bankruptcy
Code ……………………………………………………………………...……46

B.  The Plan Violates Section 365 of the Bankruptcy Code …………………50

IV.     THE PLAN IMPERMISSIBLY EXPANDS THE SCOPE OF THE
LIQUIDATING TRUSTEE'S AUTHORITY. ………………………………..52

A. The Liquidating Trustee Cannot "Allow" Talc Claims Under Section
1123(b)(3)(B). ..…………………………………………………………….52

B. The Bankruptcy Court Cannot Delegate Powers to the Liquidating Trustee
that the Bankruptcy Court Does Not Have. ..….…………………………....56

V.      THE PLAN IMPROPERLY ESTABLISHES AN ASBESTOS TRUST. ……58

VI.     THE PLAN IMPROPERLY DETERMINES WHEN SUBSTANTIAL
CONSUMMATION OCCURS. ..…………………………………………….60

VII.    THE PLAN DID NOT OBTAIN THE NECESSARY VOTES ………………61

A.  All Debtors But API Failed to Obtain the Necessary Vote ………………61

B.  A Plan Cannot be Confirmed on the "Votes" By Holders of
Unfiled Claims …………………………………………………………66

VIII.   RESERVATION OF RIGHTS ……………………………………………..67

X.      CONCLUSION …………………………………………………………67

# TABLE OF AUTHORITIES

## Cases

*85 Flatbush RHO Mezz LLC v. TH Holdco LLC (In re 85 Flatbush RHO Mezz LLC)*,
2022 WL 11820407 (S.D.N.Y. Oct. 20, 2022) ........................................................... 65

*Cadagin v. Johnson & Johnson,* No. 18-L-572 (Ill. Cir. Ct., St. Clair Cty. July 30,
2021) .............................................................................................................................. 22

*Canal Corp v. Finnman (In re Johnson)*, 960 F.2d 396 (4th Cir. 1992) ........................ 54

*Cat Internet Services, Inc. v. Providence Washington Ins. Co.*, 333 F.3d 138 (3d Cir.
2003) .............................................................................................................................. 52

*Central Virginia Community College v. Katz*, 546 U.S. 356 (2006) ............................... 8

*Century Indem Co. v. Congoleum Corp (In re Congoleum Corp.),* 426 F.3d 675 (3rd
Cir. 2005) ...................................................................................................................... 55

*Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 769 F. Supp. 671, 707
(D. Del. 1991) *aff'd* 988 F.2d 414 (3d Cir. 1992) ....................................................... 36

*DB Structured Prod., Inc. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg.
Holdings, Inc.)*, 402 B.R. 87 (Bankr. D. Del. 2009) .................................................... 49

*Evans v. International Ins. Co.*, 168 A.D. 374 (N.Y. App. Div. 1st Dep't 1990) ......... 52

*Exec. Benefits Ins. Agency v. Arkinson*, 573 U.S. 25, 134 S. Ct. 2165, 189 L. Ed. 2d 83
(2014) ............................................................................................................................ 41

*Fed. Kemper Ins. Co. v. Rauscher*, 807 F.2d 345 (3d Cir. 1986) ................................. 42

*Financial Security Assurance v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans
Ltd. P'ship)*, 116 F.3d 790 (5th Cir. 1997) .................................................................. 12

*Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240 (2d Cir. 1999) ................. 46

*Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165 (N.D. Cal. 2016) .......................... 30

*Folger Adam Sec., Inc. v. DeMatteis/Mac Gregor JV*, 209 F.3d 252 (3d Cir. 2000) .... 49

*Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 38 Cal. Rptr. 3d 716 (Cal. App. 2d
Dist. 2006), *as modified on denial of reh'g* (Feb. 17, 2006) ................................. 28, 30

*Gen. Star Nat. Ins. Co. v. Liberty Mut. Ins. Co.*, 960 F2d 377 (3d Cir. 1992) .............. 52

*Halper v. Halper*, 164 F.3d 830 (3d Cir. 1999) ........................................................... 42

*Hammersmith v. TIG Ins. Co.*, 480 F.3d 220 (3d Cir. 2007) ....................................... 52

*Harry L. Sheinman & Sons v. Scranton Life Ins. Co.*, 125 F.2d 442 (3d Cir.1941) ...... 52

*In re 15375 Meml. Corp., 400 B.R. 420 (D. Del. 2009), aff'd sub nom. In re 15375
Meml. Corp. v. Bepco, L.P.*, 589 F.3d 605 (3d Cir. 2009) .......................................... 14

*In re 20 Bayard Views, LLC*, 2011 WL 839536 (Bankr. E.D.N.Y. March 7, 2011) ..... 13

*In re 641 Assocs., Ltd.*, 1993 WL 332646 (E.D. Pa. Aug. 26, 1993) ........................... 36

*In re ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004) ..................................... 13, 19, 20

*In re Am. Cap. Equip., LLC*, 688 F.3d 145 (3d Cir. 2012) .......................................... 13

*In re Am. Home Mortg. Holdings, Inc.*, 402 B.R. 87 (Bankr. D. Del. 2009) ................. 49

*In re Amatex Corp.*, 107 B.R. 856 (E.D. Pa. 1989), *aff'd*, 908 F.2d 961 (3d Cir. 1990)
....................................................................................................................... 22, 25, 32, 35

*In re American Capital Equipment LLC and Skinner Engine Co.*, 688 F.3d 145 (3d Cir.
2012) .............................................................................................................................. 13

*In re Armstrong World Indus., Inc.*, 348 B.R. 136 (D. Del. 2006) ................................. 7

*In re Bedford Springs Hotel, Inc.*, 99 B.R. 302 (Bankr. W.D. Pa. 1989) ..................... 62

*In re Boy Scouts of Am.*, 137 F.4th 126 (3d Cir. 2025) ................................................ 13

*In re Boy Scouts of Am.*, No. 20-10343 (LSS) (Bankr. D. Del.) ............................... 20, 52

*In re Brookstone Holdings Corp*., 2011 WL 13502583 (Bankr. D. Del. Feb. 24, 2011)

.................................................................................................................................... 64

*In re Boy Scouts of Am.*, 642 B.R. 504 (Bankr. D. Del. 2022) ..................................... 34

*In re Buena Vista Oceanside, LLC*, 2015 WL 9957185 (Bankr. W.D. Pa. Sept. 22,

2015) ......................................................................................................................... 43

*In Re Burns and Roe Enters., Inc.*, No. 00-41610 (Bankr. D. N.J. 2006)...................... 55

*In re Cajun Elec. Power Co-op, Inc.*, 230 B.R. 715 (Bankr. M.D. La. 1999) ............... 36

*In re CHS Elecs., Inc.*, 261 B.R. 538 (Bankr. S.D. Fla. 2001)...................................... 14

*In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004)......................... passim

*In re Congoleum Corp*., 426 F.3d 675 (3d Cir. 2005) .................................. 19, 20, 55, 23

*In re Consolidated Land Holdings, LLC*, 2021 WL 3701799 (Bankr. M.D. Fla. Aug. 20,

2021) ......................................................................................................................... 65

*In re Coram Healthcare Corp*., 271 B.R. 228 (Bankr. D. Del. 2001) ........................... 13

*In re Crippin*, 877 F.2d 594 (7th Cir. 1989) ................................................................. 37

*In re D.M. Barber, Inc.*, 13 B.R. 962 (Bankr. N.D. Tex. 1981) .................................... 54

*In re Denario*, 267 B.R. 496 (Bankr. N.D.N.Y. 2001) ................................................. 36

*In re Dennis*, 230 B.R. 244 (Bankr. D. N.J. 1999) ....................................................... 53

*In re Diocese of Camden, New Jersey*, 653 B.R. 309 (Bankr. D.N.J. 2023) ................. 55

*In re Dow Corning Corp.*, 215 B.R. 346 (Bankr. E.D. Mich. 1997) ............................. 58

*In re Dow Corning Corp.*, 244 B.R. 634 (Bankr. E.D. Mich. 1999), aff'd, 255 B.R. 445

(E.D. Mich. 2000), aff'd and remanded, 280 F.3d 648 (6th Cir. 2002) ..................... 46

*In re Dynamic Brokers*, Inc., 293 B.R. 489 (B.A.P. 9th Cir. 2003)............................... 55

*In re Exide Holdings, Inc.*, No. 20-11157-CSS, 2021 WL 3145612 (D. Del. July 26,

2021) ............................................................................................................... 12, 19, 36

*In re Federal-Mogul Glob. Inc*., 684 F.3d 355 (3d Cir. 2012) ..................................... 360

*In re Fleming Cos., Inc.*, 499 F.3d 300 (3d Cir. 2007) .................................................. 49

*In re Gladwell*, 2009 WL 140098 (C.D. Ill Jan. 21, 2009)...................................... 22, 25

*In re Global Indus. Techs., Inc.*, 645 F.3d 201(3d Cir. 2011) ................................. passim

*In re H & L Devs., Inc.*, 178 B.R. 77 (Bankr. E.D. Pa. 1994) ....................................... 62

*In re Italian Cook Oil Corp.*, 190 F.2d 994 (3d Cir. 1951) .......................................... 49

*In re J T Thorpe Co.*, 308 B.R. 782 (Bankr. S.D. Tex. 2003)........................................... 7

*In re JER/Jameson Mezz Borrower II LLC,* 461 B.R. 293 (Bankr. D. Del. 2011) .. 64, 65

*In re John A. Rocco Co.,* Nos. 10-18799 (NLW), 12-01277 (NLW), 2015 Bankr.

LEXIS 1283 (Bankr. D.N.J. Apr. 13, 2015) .............................................................. 42

*In re Jorgensen*, 66 B.R. 104 (9th Cir. B.A.P. 1989) .................................................... 13

*In re Kabbage Inc.*, Case No. 22-10951 (Bankr. D. Del. Mar. 15, 2023)........................ 8

*In re Lloyd E. Mitchell, Inc.*, 2012 Bankr. LEXIS 5531 (Bankr. D. Md. Nov. 29, 2012)

.................................................................................................................................... 22, 25

*In re M. Long Arabians*, 103 B.R. 211 (9th Cir. BAP. 1989).................................. 67, 68

*In re Madison Hotel Assocs.*, 749 F.2d 410 (7th Cir. 1994)........................................... 12

*In re Mastercraft Record Plating, Inc.*, 32 B.R. 106 (Bankr. S.D.N.Y. 1983)............... 54

*In re MF Glob. Holdings Ltd.*, 469 B.R. 177 (Bankr. S.D.N.Y. 2012) ................... 35, 36

*In re NESV Ice, LLC*, 661 B.R. 427 (Bankr. D. Mass. 2024) ........................................ 65

*In re Orosco*, 77 B.R. 246 (Bankr. N.D. Cal. 1987), *aff'd*, 93 B.R. 203 (9th Cir. BAP.

1988) ......................................................................................................................... 67

*In re Pittsburgh Corning Corp.*, 453 B.R. 570 (2011) ...................................... 36, 37, 43

*In re PRS Ins. Grp., Inc.*, 335 B.R. 77 (Bankr. D. Del. 2005) ...................................... 54

*In re Prudential Energy Co.*, 58 B.R. 857 (Bankr. S.D.N.Y. 1986) ............................... 6

*In re Quigley Co.*, 391 B.R. 695 (Bankr. S.D.N.Y. 2008) ............................................ 43

*In re Quigley Co.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) ........................................... 6, 7

*In re Resorts Int'l, Inc.*, 372 F.3d 154 (3d Cir. 2004) .............................................. 41, 43

*In re Silberkraus*, 253 B.R. 890 (Bankr. C.D. Cal. 2000) ............................................ 12

*In re SM 104 Ltd.*, 160 B.R. 202 (Bankr. S.D. Fla. 1993) ............................................ 12

*In re Smith*, 357 B.R. 60 (M.D.N.C. 2006) ...................................................................... 7

*In re South Beach Secs., Inc.*, 606 F.3d 366 (7th Cir. 2010) ......................................... 13

*In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993) ................................................... 37

*In re Surfango, Inc.*, 2009 WL 5184221 (Bankr. D.N.J. Dec. 18, 2009) ....................... 19

*In re Thornhill Bros. Fitness, LLC*, 85 F.4th 321 (5th Cir. 2023) ................................. 49

*In re Tribune Co.*, 464 B.R. 126 (Bankr. D. Del. 2011) ......................................... 63, 66

*In re Vice Group Holding, Inc.*, 652 B.R. 423 (Bankr. S.D.N.Y. 2023) ....................... 52

*In re Walker*, 165 B.R. 994 (E.D. Va. 1994) ................................................................ 12

*In re Woodbridge Group of Cos. LLC*, 592 B.R. 761 (Bankr. D. Del. 2018) ............... 64

*Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114 (3d Cir. 2010) ....... 8

*JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Properties Inc. (In re
    Transwest Resort Properties, Inc.)*, 881 F.3d 724 (9th Cir. 2018) ............................ 65

*Kleiner v. Johnson & Johnson Consumer Inc.*, No. 170102505 (Pa. Comm. Pleas,
    Philadelphia Cty. Sept. 24, 2021) ............................................................................. 22

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd.
    P'ship)*, 115 F.3d 650 (9th Cir. 1997) ......................................................................... 7

*Matter of Gardinier, Inc.*, 55 B.R. 601 (Bankr. M.D. Fla. 1985) ................................. 67

*Mercury Capital Corp. v. Milford Conn. Assocs.*, 354 B.R. 1 (D. Conn. 2006) ........... 13

*Moody v. Amoco Oil Co.*, 734 F.2d 1200 (7th Cir. 1984) ............................................. 37

*Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 677
    F.3d 869 (9th Cir. 2012) ............................................................................................ 37

*National Union Fire Ins. Co. v. Porter Hayden Co.*, No. CCB-03-3408, 2012 WL
    734176 (D. Md. Mar. 6, 2012) .................................................................................. 29

*Nuveen Mun. Tr. v. Withumsmith Brown, P.C.*, 692 F.3d 283 (3d Cir. 2012) .............. 15

*Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228 (3d Cir. 1994) ......................... 42

*Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza)*, 314 F.3d 1070 (9th
    Cir. 2002) .................................................................................................................. 12

*Shalom Torah Ctrs. v. Phila. Indem. Ins. Cos.*, 2011 U.S. Dist. LEXIS 35726 (D.N.J.
    Mar. 31, 2011) .......................................................................................................... 42

*Spokane Law Enf't Fed. Credit Union v. Barker(In re Barker)*, 839 F.3d 1189 (9th Cir.
    2016) ......................................................................................................................... 53

*Spyglass Media Grp., LLC v. Bruce Cohen Prods. (In re Weinstein Co. Holdings LLC)*,
    997 F.3d 497 (3d Cir. 2021) ..................................................................................... 49

*Stern v. Marshall*, 564 U.S. 462 (2011) ................................................................. 42, 43

*Truck Insurance Exchange v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024) ..................... 51

*Union Bank v. Wolas*, 502 U.S. 151 (1991) ................................................................... 15

*UNR Indus., Inc. v. Continental Cas. Co.*, 942 F.2d 1101 (7th Cir. 1991) .................... 29

*Vertiv, Inc. v. Wayne Burt PTE, Ltd.*, 92 F.4th 169 (3d Cir. 2024) .............................. 46

*Wolkowitz v. Redland Ins. Co.*, 5 Cal. Rptr. 95 (Cal. Ct. App. 2003)............................ 30

**Statutes**

28 U.S.C. § 157.......................................................................................................... 41
28 U.S.C. § 157(b)(2)(B) ..................................................................................... 57, 58
28 U.S.C. § 157(b)(2)(O)............................................................................................ 57
28 U.S.C. § 157(b)(4) ................................................................................................. 57
28 U.S.C. § 157(b)(5) ........................................................................................... 57, 58
28 U.S.C. § 157(e) ...................................................................................................... 43
11 U.S.C. § 363 .......................................................................................................... 49
11 U.S.C. § 365 ............................................................................................. 49, 50, 52
11 U.S.C. § 501 .......................................................................................................... 53
11 U.S.C. § 502 ..................................................................................................... 36, 37
11 U.S.C. § 502(a) ......................................................................................... 17, 32, 53
11 U.S.C. § 502(b) ...................................................................................................... 58
11 U.S.C. § 502(b)(1) ................................................................................................. 33
11 U.S.C. § 521(1) ...................................................................................................... 53
11 U.S.C. § 523(a) ...................................................................................................... 10
11 U.S.C. § 524(g) ................................................................................................ passim
11 U.S.C. § 704(a)(5).................................................................................................. 16
11 U.S.C. § 727(a) ........................................................................................................ 7
11 U.S.C. § 727(a)(1)..................................................................................................... 7
11 U.S.C. § 1101(2) .................................................................................................... 61
11 U.S.C. § 1111(a) .................................................................................................... 53
11 U.S.C. § 1122......................................................................................................... 46
11 U.S.C. § 1123(b)(3) .......................................................................................... 55, 56
11 U.S.C. § 1123(b)(3)(B) ............................................................................. 53, 55, 56
11 U.S.C. § 1123(b)(5) ............................................................................................... 55
11 U.S.C § 1126(a) ..................................................................................................... 67
11 U.S.C § 1129(a)(8)                                                                        67
11 U.S.C. § 1129........................................................................................................ 6, 66
11 U.S.C. § 1129(a)(1)........................................................................................... passim
11 U.S.C. § 1129(a)(10)............................................................................... 62, 63, 64, 66
11 U.S.C. § 1129(a)(3)........................................................................................... passim
11 U.S.C. § 1141 ........................................................................................................... 6
11 U.S.C. § 1141(a) ............................................................................................... 31, 33
11 U.S.C. § 1141(d)(3) ................................................................................................. 7
11 U.S.C. § 1141(d)(3)(A)............................................................................................ 7
11 U.S.C. § 1141(d)(3)(B) ............................................................................................ 7
11 U.S.C. § 1141(d)(3)(C)............................................................................................ 7
28 U.S.C. § 1334......................................................................................................... 41
28 U.S.C. § 1334(c)(2)................................................................................................ 57
11 U.S.C. § 1513......................................................................................................... 46
805 I.L.C.S. 5/12.80................................................................................................... 45

**Other Authorities**

4 *Collier on Bankruptcy* (Alan N. Resnick & Henry J. Sommer eds. 15th ed. Rev. 2005)
.................................................................................................................................. 54

7 COLLIER ON BANKRUPTCY (15th ed. rev. 2006)............................................................ 7

Barbara J. Houser, Classification and Treatment of Foreign Claims in U.S. Bankruptcy
    Proceedings, 36 Tex. Intl. L.J. 475 (2001)................................................................. 46

## INTRODUCTION[1]

The Debtors' Plan has no bankruptcy purpose. Although the Debtors are liquidating, the Plan contains injunctions that replicate the effect of the discharge to which they are admittedly not entitled. For the holders of Talc Claims ("Talc Claimants"), essentially no assets are being distributed. While a pittance is going to unsecured creditors, the majority of the assets are going to pay the pre-petition Bond Trustee's fees (despite that claim having no priority) and fund a reserve for trust administrative costs. Where then are claimants to obtain any recovery? The answer, transparently, is from liability insurance, which the Debtors propose to seek based on inflated Talc Claims values to be created under the Plan and TDP drafted by the Committee. General unsecured creditors were similarly invited to share in the proposed capture of insurance based on these values, and the vast majority of general unsecured creditors opted to forgo distributions in exchange for a cut of potential insurance recoveries. None of this is permissible under the Bankruptcy Code. The Court should deny confirmation.

## FACTUAL BACKGROUND

On August 12, 2024, four of the Debtors filed voluntary petitions in this Court seeking relief under chapter 11 of the Bankruptcy Code. Subsequently, on October 25, 2024, the remaining Debtors commenced chapter 11 cases. The Debtors immediately commenced a sale process. In December 2024, the Debtors entered a settlement with Natura Holdings S.a.r.l. and sold

---

[1] Capitalized terms that are not defined herein shall have the meanings ascribed to them in the Plan.

1

substantially all of their assets pursuant to the Sale Order. As shown in the Disclosure Statement, the Debtors estimate that they will have approximately $30 million in cash as of confirmation.[2]

The Debtors state that their "main objective in the chapter 11 cases [is] to propose and consummate a chapter 11 plan that distributes their remaining value to their creditors as soon as reasonably possible and in a fair and efficient manner." Disclosure Statement at 5. Debtors' Plan proposes to create several funds. These are:

- o Priority Reserve Account – a segregated account, funded with cash, to pay (i) Allowed Administrative Expense Claims (excluding Professional Fee Claims), (ii) Allowed Secured Claims, and (iii) Allowed Priority Claims (this amount has not been disclosed);

- o Professional Fee Escrow Account – an interest-bearing account funded by the Debtors in Cash in an amount necessary to satisfy Allowed Professional Fee Claims (this amount has not been disclosed);

- o ALT Operating Reserve Amount – consisting of $15,000,000 or if there is insufficient Effective Date Available Cash to fund any Cash into the GUC Recovery Fund, then the ALT Operating Reserve Amount shall mean all Effective Date Available Cash after the funding of the Professional Fee Escrow Account and the Priority Reserve and the payment of the Unsecured 2043 Notes Fees and Expenses;

- o GUC Recovery Fund – $14,000,000; provided, however, that the GUC Recovery Fund Amount shall be reduced by $1 for every $1 by which (i) the amount of Effective Date Available Cash is lower than $29,000,000 or (ii) the Effective Date Available Cash is insufficient to fund the ALT Operating Reserve by at least $15,000,000, whichever is greater;

- o Special Electing GUC Recovery Fund – means a segregated fund established to make Distributions on account of Allowed Electing General Unsecured Claims, which shall be periodically funded with Post-Effective Date Available Cash pursuant to Section 5.10(ii) of this Plan; and

---

[2] See Disclosure Statement at Ex. B, Liquidation Analysis, p. 4.

o TC Recovery Fund – a segregated fund established to make Distributions on account of Allowed Talc Claims, which shall be periodically funded with Post-Effective Date Available Cash.

Pursuant to § 5.10 of the Plan, Available Cash is allocated to: (a) first, (1) the Professional Fee Escrow Account, (2) the Priority Reserve (3) any Unsecured 2043 Notes Fees and Expenses payable in accordance with Section 12.16(i) of this Plan; (b) second, the ALT Operating Reserve in an amount equal to the ALT Operating Reserve Amount; and (c) third, the GUC Recovery Fund in an amount equal to the GUC Recovery Fund Amount. Discovery may reveal that there are insufficient assets to fund these reserves in the required amounts.[3] It is clear now, however, that the Debtors' current assets are being distributed to creditors only to the extent there are funds in the GUC Recovery Fund after payment of the Unsecured 2043 Notes Fees and Expenses. According to the Balloting Agent, 90.07% of General Unsecured Creditors opted to recover from the Special Electing GUC Recovery Fund. *See* Dkt. 1221, Ex. C.

The TC Recovery Fund and Special Electing GUC Recovery Fund – the funds that *actually* pay all but a handful of creditors – are both to be funded exclusively by Post-Effective Date Available Cash, the source of which is predominantly insurance recoveries and retained causes of action. In short, the Plan does not propose to distribute proceeds from the sale of the Debtors' assets to Talc Creditors – or even most general unsecured creditors. Instead, the Plan proposes to pursue insurance claims and split that recovery among creditors, even if those creditors would not otherwise be entitled to recover from insurance.

To do this, the Plan proposes TDP that were drafted primarily by the Committee without input from any party with a current interest in defending Talc Claims. The result is a trust

---

[3] Certainly, if the Debtors are correct that there will be approximately $30 million available, it is unlikely the Debtors will be able to fully fund the GUC Recovery Fund and the ALT Operating Reserve Amount. After discovery, Insurers may raise additional feasibility issues.

3

distribution procedure that promises to pay Talc Claimants values substantially above those that were paid by the Debtors in the tort system. The TDP also do not have the type of medical or exposure criteria that would prevent the payment of invalid claims. Talc claims continue to be defended in the tort system and the developing science is placing increasing doubt on the validity of such claims.

Compounding these issues, the Plan effectively undercuts Insurers' rights under their policies. The Plan proposes to transfer "Insurance Rights" to the Trust but says nothing of the many obligations that exist under the Policies. For example, the insureds have obligations to provide notice of claims, to assist and cooperate in the defense of claims, and to maintain underlying insurance.[4]  Because the Debtors are liquidating, the Plan's failure to transfer these substantial obligations leaves no party to perform them and is an impermissible modification of contractual terms.

---

[4] Attached as Exhibit A is a general summary of the basic terms and conditions of the insurance policies subscribed or issued by Wellfleet New York Insurance Company, formerly known as Atlanta International Insurance Company, as successor to Drake Insurance Company of New York ("AIIC"); AIG-affiliated underwriting companies including Lexington Insurance Company, AIU Insurance Company, and Granite State Insurance Company; Certain London Market Insurers including Certain Underwriters at Lloyds, London, Tenecom Limited, f/k/a The Yasuda Fire & Marine Ins. Co. of Europe, Ltd., Tenecom Limited, f/k/a Winterthur Swiss Insurance Company, Cavello Bay Reinsurance Limited (as successor in interest to; i) Brittany Insurance Company Limited; and ii) Harper Insurance Limited (fka Turegum Insurance Company), River Thames Insurance Company Limited (as successor in interest to Unionamerica Insurance Company Limited, which was in turn successor in interest to certain business of St Katherine Insurance Company Limited), Accredited Insurance Europe Limited (as successor in interest to Ancon (UK) Insurance Company Limited); Starr Indemnity & Liability Company, as successor in interest to Republic Insurance Company; and Assicurazioni Generali Spa (UK Branch) ("Certain Insurers"; their policies are referred to herein as the "Certain Insurer Policies").  ("Certain Insurers"; their policies are referred to herein as the "Certain Insurer Policies").The Certain Insurers are "obligated to pay by reason of liability: (a) imposed upon the Assured by law, or (b) assumed under contract or agreement…for damages on account of:…Personal Injuries".  Certain Insurers are not required to pay in any other circumstances.

## ARGUMENT

The Debtors' Plan may not be confirmed because they cannot satisfy the requirements of § 1129. The Plan violates § 1129(a)(1) because the provisions are not consistent with the requirements of § 1141 and because the Plan otherwise violates provisions of Title 11.[5] In addition, the Plan Proponents' effective exclusion of the Insurers from the settlement process, development of TDP that are intended to inflate and manufacture liability, and abandonment of successful tort system defenses show that the Plan is not in good faith, as § 1129(a)(3) requires. Among other reasons, the Plan cannot be confirmed because it:

> (1) contains an impermissible discharge;
>
> (2) is not proposed in good faith and is inconsistent with the Code;
>
> (3) contains improper, partial assignments of Insurance Rights;
>
> (4) impermissibly expands the scope of the Liquidating Trustee's Authority;
>
> (5) attempts to establish an asbestos trust;
>
> (6) impermissibly prevents the Insurers from objecting to claims;
>
> (7) impermissibly provides that substantial consummation occurs on the Effective Date; and
>
> (8) failed to obtain the necessary votes in the proper manner.

The Court has an independent obligation to find that the requirements of § 1129 have actually been met before it may confirm a plan.[6] The Plan Proponents bear the burden of proving that all of the § 1129 requirements have been met, and as explained herein, the Plan Proponents

---

[5] *See, e.g.*, *In re Combustion Engineering, Inc.*, 391 F.3d 190, 209 (3d Cir. 2004); *In re Quigley Co.*, 437 B.R. 102, 124 (Bankr. S.D.N.Y. 2010).

[6] *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986).

cannot meet their burden.[7] Because Plan Proponents will be unable to meet their burden, the Plan

may not be confirmed.

## I.    THE COURT CANNOT CONFIRM THE PLAN BECAUSE IT IS NOT CONSISTENT WITH § 1141.

Section 1141(d)(3) of the Bankruptcy Code provides:

> [T]he confirmation of the plan does not discharge a debtor if—
>
>> (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
>> (B) the debtor does not engage in business after consummation of the plan; and
>> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).[8] It is indisputable that the Debtors are liquidating and will not engage in

business following confirmation. The Debtors would not be eligible for a discharge in chapter 7

because they are corporate entities. Nonetheless, the Plan contains injunctions and similar

provisions that are tantamount to a discharge. The Debtors are not reorganizing, and there is no

---

[7] *See, e.g.*, *Combustion Engineering,* 391 F.3d at 243 n.59; *In re Quigley Co.*, 437 B.R. 102, 124 (Bankr. S.D.N.Y. 2010) (plan proponents bear the burden of proving by a preponderance of the evidence that all elements of both § 1129(a) and § 524(g) are satisfied, for a § 524(g) asbestos bankruptcy plan to be confirmed); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 158 (D. Del. 2006) (same); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003). *See also Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997) (plan proponent must satisfy all confirmation requirements by a preponderance of the evidence); *In re Smith*, 357 B.R. 60, 66 (M.D.N.C. 2006) ("At a confirmation hearing, the proponent of a plan 'bears the burdens of both introduction of evidence and persuasion that each subsection of section 1129(a) has been satisfied. 'If nonconsensual confirmation is sought, the proponent of such a plan will have to satisfy the court that the requirements of section 1129(b) are also met'"), quoting 7 COLLIER ON BANKRUPTCY ¶ 1129.02 [4] (15th ed. rev. 2006).

[8] 11 U.S.C. § 1141(d)(3)(A), (B).  For a debtor to be disqualified from a discharge under § 1141(d), it must also be the case that the debtor "would be denied a discharge under section 727(a)," 11 U.S.C. § 1141(d)(3)(C), but a corporate debtor satisfies this requirement because it is ineligible for a discharge under § 727(a), 11 U.S.C. § 727(a)(1).

justification for granting them a discharge, the purpose of which is to enable a reorganizing debtor to make a "fresh start."[9]

This Court has previously rejected injunctions in a liquidating chapter 11 where those injunctions were tantamount to a discharge. *See In re Kabbage Inc.*, Case No. No. 22-10951, Dkt. No. 681 (Bankr. D. Del. Mar. 15, 2023). There, this Court concluded that a plan provision permanently enjoining third parties from suing the debtors, their estates, or a court-appointed "wind-down officer" following confirmation could not be confirmed because it was tantamount to a prohibited discharge of the debts of a liquidating corporation.

Here, the Plan contains a lengthy injunction at Section 10.4 of the Plan, which provides:

(i) Except as otherwise provided in the Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, to the maximum extent permitted under applicable law, all Persons who have held, hold, or may hold Claims or Interests (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are forever barred, estopped, and permanently enjoined after the entry of the Confirmation Order from: (a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing parties mentioned in this subsection (a) or any property of any such transferee or successor; (b) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against any of the Debtors, the Liquidating Debtors, the Estates, the Avon Liquidation Trust, or the Liquidating Trustee, as applicable, or the property of any of the Debtors, the Liquidating Debtors, the Estates, the Avon Liquidation Trust, or the Liquidating Trustee, as applicable, or

---

[9] *See Central Virginia Community College v. Katz*, 546 U.S. 356, 364 (2006); *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 122 (3d Cir. 2010).

any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing parties mentioned in this subsection (b) or any property of any such transferee or successor; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against any of the Debtors, the Liquidating Debtors, the Estates, the Avon Liquidation Trust, the Liquidating Trustee, as applicable, or the property of any of the Debtors, the Liquidating Debtors, the Estates, the Avon Liquidation Trust, the Liquidating Trustee, as applicable, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (c) or any property of any such transferee or successor; (d) asserting any right of setoff, directly or indirectly, against any obligation due from any of the Debtors, the Liquidating Debtors, the Estates, the Avon Liquidation Trust, or the Liquidating Trustee, as applicable, or against the property or interests in property of any of the Debtors, the Liquidating Debtors, the Estates, the Avon Liquidation Trust, or the Liquidating Trustee, as applicable, except (1) as contemplated or Allowed by the Plan or (2) to the extent asserted in a timely filed proof of Claim or timely filed objection to the confirmation of the Plan; and (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to, does not comply with, or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such parties who have held, hold, or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to, and consistent with, the terms of the Plan and the Plan Documents.

(ii) All Persons and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, holding Claims, Liens, Interests, charges, encumbrances, or other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against the Debtors, the Liquidating Debtors, the Avon Liquidation Trust, or the Assets transferred thereto (whether legal or equitable, secured or unsecured, matured or unmatured, contingent, or noncontingent, known or unknown), arising under or out of, in connection with, or in any way relating to the Debtors, the Liquidating Debtors, the Estates' Assets, the operation of the Estates' Assets prior to the Effective Date, or the Trust Formation Transactions, shall be forever barred, estopped, and permanently enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished or released pursuant to the Plan.

(iii) By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim or Allowed Interest shall be bound by the Plan, including the injunctions set forth in this Section 10.4 of the Plan

This broad injunction is similar to, but broader than, the effect of a discharge as specified in § 523(a) of the Bankruptcy Code.

Nor is it the only injunction of this kind. Section 10.8 also contains an injunction barring claims against the Debtors, despite the assertion that the Plan contains no discharge. These injunctions protect not only the ALT but also the Debtors, various trustees, "Released Parties," and "Exculpated Parties." None of these releases and injunctions are appropriate in a liquidating corporate bankruptcy.

This broad injunctive language also improperly attempts to grant a nonconsensual third-party release in violation of *Purdue Pharma*. Despite not meeting the requirements under § 524(g), the Plan attempts to confer the same benefits (a release for non-debtors) through the Plan Injunction on "*any direct or indirect transferee of any property*" of a Debtor or Estate.[10] The Plan does not specify who or what may be a transferee of Estate property. Moreover, the Plan does not limit "transferee" to potential Debtor transferees. Thus, "transferee" could conceivably mean *anyone*, including non-debtors. This exception leaves plenty of room for non-debtor third parties to receive releases in violation of *Purdue Pharma*. Accordingly, the Plan cannot be confirmed under Section 1129(a)(1).

## II. THE PLAN CANNOT BE CONFIRMED BECAUSE IT DOES NOT SATISFY THE GOOD FAITH REQUIREMENT OF § 1129(A)(3).

The Plan does not meet the good faith requirement of 11 U.S.C. § 1129(a)(3) and cannot be confirmed for the following reasons:

(1)    The Plan does not satisfy any bankruptcy purpose;

(2)    Contrary to the purpose of the Bankruptcy Code, the Plan and TDP permit inappropriate windfalls to claimants, including both general

---

[10] Plan, § 10.4 (emphasis added).

9

unsecured claims and claimants asserting invalid or otherwise improper tort claims;

(3)     Under the TDP, the Debtors abandon their defenses and deprive insurers of their contractual rights to defend against the Tort Claims;

(4)     The Plan and TDP attempt to gain a litigation advantage in future coverage litigation by purporting to bind insurers to particular provisions and rulings that are not at issue in the confirmation proceedings;

(5)     The Plan impairs the Insurers' Contractual Rights;

(6)     The Plan contains improper findings intended to influence coverage litigation;

(7)     The Plan's inconsistent wording is in bad faith; and

(8)     The Plan improperly extends the Bankruptcy Court's post-confirmation jurisdiction.

Following the sale of their assets, the Debtors could have easily confirmed a liquidating plan that passed Talc Claims through to the tort system. Instead, the Debtors decided to give talc claimants carte blanche to draft trust distribution procedures despite the fact that no assets were available to pay those claimants. The result of this process is a Plan that is inconsistent with the objectives and purposes of the Bankruptcy Code. As drafted, the Plan and TDP would allow for unsupported and improper claims to receive recovery from the Trust while, at the same time, depriving the Insurers of the ability to defend against those claims in accordance with their insurance policies and applicable law. There is no reason the Debtors should have permitted the claimants to home-cook a trust distribution process, especially where there is no 524(g) trust here requiring a super-majority vote of creditors and, ostensibly, no discharge for the Debtors. Nor can this Court liquidate the tort claims against the Debtors. Nonetheless, the Debtors turned over the TDP to claimant lawyers with the predictable result that the TDP are massively better for those lawyers' clients than the tort system would be. Perhaps that might be acceptable if all that was

happening was that the trust was distributing contributions from the Debtors, but the *only* payments expected from the Trust are to be from assigned insurance rights.

Section 1129(a)(3) of the Bankruptcy Code explicitly conditions confirmation of a Chapter 11 plan on a judicial finding that the plan was "proposed in good faith and not by any means forbidden by law."[11]  In determining whether a plan of reorganization has been proposed in good faith, the bankruptcy court must examine "the totality of the circumstances surrounding the development and proposal of the plan."[12] A court will consider whether the plan "(1) fosters a result consistent with the Code's objectives, (2) the plan has been proposed with honesty and good intentions . . . and (3) there was fundamental fairness in dealing with the creditors."[13]

Debtors bear the burden of establishing good faith and fundamental fairness.[14] The good faith requirement "is designed to prevent abuse of the bankruptcy laws and protect jurisdictional integrity."[15] Thus, for a plan to be proposed in good faith, it must "achieve a result consistent with the objectives and purposes of the Bankruptcy Code,"[16] and exhibit "a fundamental fairness in

---

[11] 11 U.S.C. § 1129(a)(3).

[12] *In re SM 104 Ltd.*, 160 B.R. 202, 244 (Bankr. S.D. Fla. 1993). *See also Sylmar Plaza*, 314 F.3d at 1074-75 (the bankruptcy court must consider the "totality of the circumstances" of a particular case in assessing the debtor's good faith); *Combustion Engineering*, 391 F.3d at 242 n.55 (internal citations omitted) ("Only after analyzing the totality of circumstances surrounding a reorganization plan can the court exercise the informed, independent judgment which is an essential prerequisite for confirmation of a plan.").

[13] *In re Exide Holdings, Inc.*, No. 20-11157-CSS, 2021 WL 3145612, at *11 (D. Del. July 26, 2021) (internal quotation marks omitted).

[14] *In re Silberkraus*, 253 B.R. 890, 902 (Bankr. C.D. Cal. 2000). *See also Financial Security Assurance v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) ("The standard of proof required by the debtor to prove a Chapter 11 plan was proposed in good faith is by a preponderance of the evidence").

[15] *In re Walker*, 165 B.R. 994, 1001 (E.D. Va. 1994) (internal quotes and citations omitted).

[16] *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza)*, 314 F.3d 1070, 1074 (9th Cir. 2002), quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1994). *See also In re*

(Continued...)

11

dealing with one's creditors."[17] Fundamental fairness requires that "the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code."[18] A plan that manufactures liability and sabotages defenses (including at insurers' expense) is not proposed in good faith.[19]

### A.     The Plan Lacks Any Bankruptcy Purpose

The Plan does not satisfy any legitimate bankruptcy purpose. The Third Circuit recently reiterated the good-faith inquiry in its BSA opinion, explaining:

> "[i]n analyzing whether a plan has been proposed in good faith under § 1129(a)(3), 'the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" "[T]wo 'recognized' policies, or objectives" we have previously identified "are 'preserving going concerns and maximizing property available to satisfy creditors.'"[20]

As discussed above, there is no going concern being preserved in this case. The Debtors have liquidated. Nor is the Plan maximizing property available to satisfy creditors. There is a fixed pot of cash being contributed to the trust, but that contribution is earmarked for administration. No current assets of the Debtors are being distributed by the Trust to Talc Claimants. Moreover, to the

---

*South Beach Secs., Inc.*, 606 F.3d 366, 376 (7th Cir. 2010) ("To be in good faith a plan of reorganization must have a true purpose and fact-based hope of either 'preserving [a] going concern' or 'maximizing property available to satisfy creditors'"); *In re 20 Bayard Views, LLC*, 2011 WL 839536, at *9 (Bankr. E.D.N.Y. March 7, 2011) ("A plan is proposed in good faith only if it has 'a legitimate and honest purpose to reorganize the debtor'"), quoting *Mercury Capital Corp. v. Milford Conn. Assocs.*, 354 B.R. 1, 7 (D. Conn. 2006).

[17] *In re Jorgensen*, 66 B.R. 104, 109 (9th Cir. B.A.P. 1986).

[18] *In re ACandS, Inc*., 311 B.R. 36, 43 (Bankr. D. Del. 2004), citing *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001). *See also* Sylmar Plaza, 314 F.3d at 1074 (a plan is proposed in good faith if it "achieves a result consistent with the objectives and purposes of the [Bankruptcy] Code").

[19] *See In re American Capital Equipment*, 688 F.3d 145 (3d Cir. 2012).

[20] *In re Boy Scouts of Am.*, 137 F.4th 126, 166 (3d Cir. 2025) ("*BSA*") (internal citations omitted).

extent cash is being contributed to the ALT Operating Reserve Amount, those funds would be available in a chapter 7 case (or, for that matter, a dismissal). Instead, as discussed above, creditor recoveries are being funded almost exclusively from insurance recoveries.

Insurance assets cannot, however, be maximized in bankruptcy. The Debtors' insurance rights were fixed pre-petition and will be determined under non-bankruptcy law. *Id.* at 164 ("Insurance policies are property of the estate, and bankruptcy law—save for exceptions not relevant here—does not alter rights under those contracts."). Because bankruptcy cannot expand a debtor's rights to insurance, a desire to recover and distribute insurance proceeds is not a sufficient bankruptcy purpose.[21]

The Debtors could easily achieve any legitimate purpose of the Code by converting the case to Chapter 7 or dismissing the case, both of which are common after a Chapter 11 debtor sells all its assets. The real purpose of the Plan is apparent when examined closely: it is intended to increase claimants' recoveries improperly by preventing the defense of claims, increasing the value assigned to claims, and impairing Insurers' rights. To accomplish this, the Debtors have worked with the Committee to obtain improper injunctive relief and sabotage the Debtors' defense of Talc Claims. None of those tactics are appropriate.

---

[21] *See, e.g., In re 15375 Meml. Corp., 400 B.R. 420, 427 (D. Del. 2009), aff'd sub nom. In re 15375 Meml. Corp. v. Bepco, L.P.*, 589 F.3d 605 (3d Cir. 2009) ("With respect to the insurance assets in particular, while it is true that Debtors did not discover these assets or reach out to insurers until after filing for bankruptcy, it was not the bankruptcy that made these things possible."); *In re CHS Elecs., Inc.,* 261 B.R. 538, 544 (Bankr. S.D. Fla. 2001) ("this Court is unaware of any Bankruptcy Code provision or case law that would give a bankruptcy trustee any different status than a non-bankruptcy plaintiff with an unliquidated claim against third-parties which may be covered by insurance proceeds about to be used to settle or satisfy a judgment entered in favor of other plaintiffs…").

B.      **Contrary to the Purpose of the Bankruptcy Code, the TDP Permit Inappropriate Windfalls to Talc Claimants, Including Claimants Asserting Invalid and Otherwise Improper Talc Claims.**

The valuation and payment mechanism established under the TDP delivers results contrary to the objectives and purposes of the Bankruptcy Code. The primary purpose of the Bankruptcy Code is to ensure "equality of distribution among creditors of the debtor."[22] Courts have repeatedly held that "a creditor cannot collect more, in total, than the amount it is owed" from the debtor.[23] But the TDP exceed these limits; they permit an inappropriate windfall to holders of both Talc Claims and unsecured claims.

The Plan proposes to share insurance recoveries with the Special Electing GUC Recovery Fund pursuant to § 5.10(ii) of the Plan, through which insurance proceeds will be paid to general unsecured claims. Such claims are not insured and have no right to recover from insurance. The Debtors propose, however, to inflate the value of Talc Claims and, if they successfully collect from insurers, to share some of that windfall with electing GUC claimants. The resulting TDP are so favorable to claimants that 100% of Talc Claimants voted in favor of the TDP and 90% of unsecured claims elected to seek recovery from the Special Electing GUC Recovery Fund.

Why they did so is not surprising in the context of the TDP drafted by the Committee to maximize the value of Talc Claims with nearly no input from any party interested in defending the claims (such as the Insurers). The Plan and TDP require the payment of Talc Claims even without legal, scientific, or other bases for the proposed exposure criteria or valuation of claims and afford the Insurers no opportunity to exercise their contractual or statutory rights to contest the validity of the talc claims. The TDP also give the Liquidating Trustee broad discretion to "allow" the claims

---

[22] *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991).

[23] *Nuveen Mun. Tr. v. Withumsmith Brown, P.C.*, 692 F.3d 283, 295 (3d Cir. 2012).

and provide minimal transparency regarding the procedure for addressing alternative exposures. Under the TDP, the Liquidating Trustee will "allow" Tort Claims when the claimant provides minimal evidentiary support even if such evidence would be insufficient to prove such claim in other forums. To support their claim, a claimant only needs to have a medical diagnosis and submit an affidavit or sworn statement regarding their "exposure to talc products processed, milled, manufactured, sold, and/or distributed by a Debtor or by another Entity for whose conduct a Debtor has liability ("Debtor Talc Exposure"), but the Claimant shall not be required to provide information with respect to his or her other talc and asbestos exposures."[24] Notably, despite the fact that the TDP propose to pay primarily mesothelioma claims, the TDP have no requirement that a claimant demonstrate that they were exposed to any asbestos whatsoever, much less that an Avon product caused their disease.

The exposure requirements further provide that the Trust shall use a product list to determine if "the Debtor product to which the Claimant alleges exposure contained talc and shall determine, based on all of the details provided by the Claimant with respect to Debtor Talc Exposure, if the extent of the Claimant's exposure to the product was sufficient to be classified as 'regular exposure.'" TDP § 4.4(b). But there is no requirement anywhere that the Talc Claimant demonstrate exposure to asbestos or that such exposure was sufficient to have any sort of causal connection to the Talc Claimants' alleged injury. Expert testimony will show at the confirmation hearing that the prevailing scientific consensus is that talc does not cause mesothelioma. The TDP are designed to evade this scientific consensus to pay claims that otherwise lack viability.

With such lax procedures for reviewing and allowing claims, the Debtors have abdicated their duty under § 704(a)(5) of the Bankruptcy Code; the Debtors have given the Liquidating

---

[24] *See* TDP, §§ 4.3(b) ("Debtor Talc Exposure"), 4.4(b) (setting out required exposure evidence).

Trustee the sole responsibility for "examin[ing] proofs of claim" and disregarding their duty to "object to the allowance of any claim that is improper."  And, as discussed below, the Plan also proposes to do away with the right of interested parties to object to claims under § 502(a).

The Plan and TDP also lack any meaningful procedure to prevent or discover fraud. In the *BSA* case, this Court required, as part of its Confirmation Order, that the trustee adopt a court-approved audit program "to identify fraudulent claims, taking into account factors the Settlement Trustee deems appropriate (and which may include a cost/benefit analysis) and which is independent of the claimant-controlled STAC."[25] Here, the Plan and TDP contain no similarly rigorous requirement. The TDP contain limited audit language, but that language is illusory.[26]  For example, the TDP state that the Trust will participate in a "cross-trust audit program," but the other trusts to be included in such program are to be other trusts that have hired the Claims Processor.[27] But since the Plan does not identify the Claims Processor, no one can tell if the other trusts will have any relevance whatsoever to Talc Claims.

Moreover, any audit program that does not include claims against J&J will be useless because J&J is by far the largest target defendant of talc litigation. Similarly, any effective audit program would necessarily include alternative sources of asbestos exposure. The cross-trust audit program also is illusory because there has been no disclosures of what measures, if any, the Trust will employ to determine whether another entity is primarily (or entirely) liable for a claim, or whether the claimant has pursued claims against other entities in the tort system, all of which may

---

[25] *See* Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) For Boy Scouts of America and Delaware BSA, LLC, *In re Boy Scouts of America*, No. 20-10343 (LSS) at ¶ 19 [Dkt. No. 10316] (Bankr. D. Del. Sept. 8, 2022).

[26] *See* TDP at § 4.7.

[27] *Id.*

suggest that the Trust will pay claims that would not be the Debtors' responsibility in the tort system.[28] There is no indication that the Trust will investigate any of this. To the contrary, the TDP expressly direct the Trust to consider "costs incurred" in investigating claims.[29] There is no similar language directing the Trust to consider the diminution in recoveries that will occur if potentially invalid or insufficient claims are not investigated but rather are accepted and paid.

Rather than promoting the orderly liquidation of claims within the four corners of the Bankruptcy Code (and applicable non-bankruptcy law), the TDP reward holders of invalid or otherwise improper claims with a seat at the table and a share of the spoils. They are nothing short of an invitation to claims that would never be paid outside of the Trust. The Plan therefore fails to "achieve a result consistent with the objectives and purposes of the Bankruptcy Code" and cannot satisfy section 1129(a)(3).[30]

---

[28] Notably, the TDP contain language to prevent this with respect to Other Disease Claims, but not with respect to Mesothelioma Claims. *Compare* TDP § 4.3(c)(2)("The Claimant must also establish to the Trust's satisfaction that the claimant had no significant occupational or industrial exposure (whether direct or bystander) to asbestos or asbestos products or to non-Debtor talc products.") with § 4.3(c)(1) (listing other exposures only as a factor to consider in valuation).

[29] *See* TDP § 6.2 ("Notwithstanding any provisions of this TDP to the contrary, the Liquidating Trustee shall always give appropriate consideration to the cost of investigating and uncovering invalid Talc Claims so that the payment of compensable Talc Claims is not further impaired by such processes with respect to issues related to the validity of the evidence supporting a Talc Claim. The Liquidating Trustee shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the Trust so that compensable Talc Claims are not unduly further impaired by the costs of additional investigation. …").

[30] *Skinner*, 688 F.3d at 158.

**C.    Under the TDP, the Debtors Abandon their Defenses and Deprive Insurers of Their Contractual Rights to Defend Against the Talc Claims.**

The Debtors' Plan and the process by which it was crafted preclude any good faith finding here because they do not promote a result consistent with the well-recognized purposes of the Bankruptcy Code.[31] Courts within the Third Circuit have repeatedly recognized that using the bankruptcy process to increase liability and deprive insurers of their contractual rights to defend against that liability is compelling evidence that a plan is not proposed in good faith.[32] For example, in *Skinner*, the Third Circuit held that a plan in an asbestos mass-tort case was properly deemed "patently unconfirmable" because it was not proposed in good faith under § 1129(a)(3). In particular, the Third Circuit emphasized that (1) the plan provided for tort claims against the debtor to be paid by a trust funded by an assignment of the debtor's rights to insurance and resolved according to procedures that gave the decision-makers "financial[] incentiv[es] to sabotage [the debtor's] own defense" and maximize the claims insurers would be asked to pay, and (2) the TDP would "severely limit[] or eliminat[e] Insurers' ability to take discovery, submit evidence, contest causation, [or] appeal a decision," and otherwise "strip[] Insurers of [their] procedural and

---

[31] *See*, *e.g*., *In re Surfango, Inc.*, 2009 WL 5184221, at *8 (Bankr. D.N.J. Dec. 18, 2009) ("Two relevant inquiries deserve focus: (1) whether the plan serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing value, and (2) whether the plan is proposed to obtain a tactical litigation advantage"); *In re Exide Holdings, Inc.*, No. 20-11157-CSS, 2021 WL 3145612, at *11 (D. Del. July 26, 2021) (internal quotation marks omitted).

[32] *GIT*, 645 F.3d at 212-216; *see also In re Congoleum Corp*., 426 F.3d 675, 692 (3d Cir. 2005) ("careful scrutiny" is required when the "parties … seek the court's imprimatur of a reorganization that will free the debtor of all … [tort] liability"; the "legitimacy of such a transaction is dependent on the stature of the court"); *In re ACandS*, Inc., 311 B.R. 36, 42-43 (Bankr. D. Del. 2004) (denying confirmation of plan under § 1129(a)(3) because plaintiffs' lawyers representing asbestos claimants drafted the plan and trust documents, chose the trustee, and "decided who was going to get what"; "[g]iven the unbridled dominance of the [plaintiffs' lawyers] in the debtor's affairs and actions … and the obvious self-dealing that resulted from control of the debtor, it is impossible to conclude that the plan was consistent with the objectives and purposes of the Bankruptcy Code").

18

substantive rights."[33] The structure of the trust left no doubt that the plan manufactured liability, and did not create an orderly and fair mechanism for resolving the claims against the debtor; accordingly, the bankruptcy court's denial of plan confirmation was entirely appropriate. The same analysis applies here.

The Plan here is fundamentally unfair to the Insurers for the same reasons that the Third Circuit recognized in *Skinner*, namely, that it creates a conflict of interest and permits a form of unlawful bad faith insurance abuse.[34] The "integrity of the bankruptcy proceeding is called into question" when debtors and plaintiffs' lawyers ask a bankruptcy court to approve a plan that would allow invalid or dubious claims, incentivize the so-called defendants not to defend the claims, and then demand insurers pay them while stripping insurers of the protections that their policies and the Bankruptcy Code require.[35]

The Plan gives Insurers—who are expected to pay the Talc Claims—no role at all in the defense or handling of the claims, while at the same time prohibiting the Trust from denying a claim where successful defenses apply. Even the *Skinner* plan gave insurers such an opportunity, if a belated one, to protect their interests, because it allowed insurers to seek review from the bankruptcy court of claims decisions with which they disagreed. The Insurers here have no role at

---

[33] *Id*. at 158-160.

[34] *Id.* at 158.

[35]  *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 212-16 (3d Cir. 2011); *Skinner*, 688 F.3d at 158-161; *See also In re Congoleum Corp*., 426 F.3d at 692 ("careful scrutiny" is required when the "parties . . . seek the court's imprimatur of a reorganization that will free the debtor of all . . . [tort] liability") (emphasis omitted); *In re ACandS, Inc.*, 311 B.R. at 42-43 (denying confirmation of plan under § 1129(a)(3) because plaintiffs' lawyers representing asbestos claimants drafted the plan and trust documents, chose the trustee, and "decided who was going to get what"; "[g]iven the unbridled dominance of the [plaintiffs' lawyers] in the debtor's affairs and actions . . . and the obvious self-dealing that resulted from control of the debtor, it is impossible to conclude that the plan was consistent with the objectives and purposes of the Bankruptcy Code").

all. The Plan and TDP require the allowance and payment of claims without legal, scientific, or other bases for the proposed exposure criteria or valuation of claims without affording the Insurers any opportunity to exercise their contractual rights to contest (or participate at all in) those decisions.

The Plan and TDP establish a system that upsets the delicate (and bargained-for) balance between insurers and insured. The Debtors' decision to abandon their defenses and, equally important, to strip the Insurers of their contractual right to assert those same defenses, in order to enable themselves and their corporate affiliates to walk away from liability for Talc Claims, accelerates and increases liability. Because the Debtors will not face any additional liability for claims channeled to the Trust, the Debtors gave the Committee absolute discretion to maximize recovery for the claimants and then seek coverage from the Insurers. The Plan also proposes to share insurance recoveries with unsecured claimants who otherwise have no entitlement to such proceeds. Like in *Skinner,* the Trust is "financially incentivized to sabotage its own defense" and collude with claimants to access coverage.[36]

Moreover, the TDP "severely limit[] or eliminat[e] [the] [i]nsurers' ability to take discovery, submit evidence, contest causation, or appeal [the] decision" leading to the offending award.[37] The parties resolving the Talc Claims under the TDP lack any incentive to defend the Debtors and/or Trust from liability for inflated, improper, or even fraudulent claims. The only parties that would continue to defend such claims properly are the Insurers, but the TDP do not

---

[36] *Skinner,* 688 F.3d at 158.

[37] *Id.* at 159.

allow them to do so. The Court cannot confirm a Plan that impermissibly modify or limit the Insurers' rights in this manner.[38]

Prohibiting Insurers from exercising their rights to defend the Talc Claims, to obtain cooperation from Debtors on that defense, and to resolve the Talc Claims could not be more prejudicial than here. The Debtors' decisions to abandon their defenses and strip the Insurers of their contractual right to assert those same defenses both accelerates and increases the liability that Insurers will be asked to pay. Talc is not well-established as containing measurable levels of asbestos or other carcinogens—juries regularly return defense verdicts and courts regularly preclude plaintiffs' attorneys from asserting that talc products cause any of the injuries alleged by the tort claimants.[39] The Debtors have maintained that their products are safe and vigorously defended Talc Claims, despite two anomalous verdicts. *See* Disclosure Statement at 52.

The RiverStone Insurers will introduce evidence at confirmation showing that epidemiological science does not support plaintiffs' contention that the talc used in Debtors' products causes mesothelioma, ovarian cancer, or the other diseases compensable by the Trust.

---

[38]*See In re Gladwell*, 2009 WL 140098, * 2 (C.D. Ill. Jan. 21, 2009) ("The owner of an insurance policy cannot obtain greater rights to the proceeds of that policy merely by filing a bankruptcy petition."). "[T]he rights and obligations of the Debtor and [its insurer] under the [insurance] policy are not altered because of the Debtor's Chapter 11 filing." *In re Amatex Corp.*, 107 B.R. 856, 865-866 (E.D. Pa. 1989), *aff'd*, 908 F.2d 961 (3d Cir. 1990); *see also In re Lloyd E. Mitchell, Inc.*, 2012 Bankr. LEXIS 5531, at *20 (Bankr. D. Md. Nov. 29, 2012) ("insurance contracts cannot be re-written" in bankruptcy).

[39] *See e.g., Cadagin v. Johnson & Johnson,* No. 18-L-572 (Ill. Cir. Ct., St. Clair Cty. July 30, 2021) (an Illinois jury ruled in favor of J&J after a three-week trial involving expert testimony presented by both sides, finding that the plaintiff failed to show that J&J talc products caused the plaintiff's decedent's ovarian cancer, which ultimately led to her death); *Kleiner v. Johnson & Johnson Consumer Inc*., No. 170102505 (Pa. Comm. Pleas, Philadelphia Cty. Sept. 24, 2021) (after a six-week trial, the jury issued a defense verdict for J&J despite fact that plaintiff's expert was permitted to testify.). *See also In re Red River Talc, LLC*, Pretrial Brief of Ad Hoc Committee, Dkt. No. 1109 at 5, 7 ("[O]varian cancer tort plaintiffs have fared poorly in the tort system, having their cases dismissed and their increasingly rare trial victories overturned on appeal" and stating that "a decade [has passed] without recovery for talc victims.").

The Debtors abandoned this strong scientific defense because it was more convenient for them to adopt a conciliatory approach once they had obtained releases for their purchasers and related parties. The TDP also contain multiple factors for the Trust to consider when valuing Talc Claims under individual review.[40] But these factors raise more questions than answers. The TDP offer no clear guidelines on how these factors are weighted or considered when Talc Claims are valued or what relevance they have in the tort system or otherwise. The Court should not confirm the Plan when the TDPs valuation methodology is unsupported by any evidence or explanation.

The TDP, however, effectively abandon all the Debtors' defenses and do not allow the Insurers, or any person with an actual interest in the outcome, to assert them. Rather, if a claimant shows a qualifying diagnosis of mesothelioma, for example, and alleges sufficient "Debtor Talc Exposure" to an Avon product, then the Trust must liquidate the claim without any proof of medical causation.[41]  This despite the fact that, in the tort system, the Debtors have disputed both that there is any asbestos in their talc products or that that any causal connection exists between any trace asbestos in talc and mesothelioma.

Nor do the TDP require—or even permit—the Insurers or anyone else, including the Liquidating Trustee, to scrutinize or evaluate a claimant's diagnosis or the so-called "evidence" of each Talc Claimant's alleged exposure to Debtors' talc products. Section 4.4(b) of the TDP provides that a Talc Claimant may credibly demonstrate Regular Exposure to Debtor Cosmetic Talc merely by submitting an affidavit or sworn statement and thereby establish eligibility to receive compensation from the Trust under the Expedited Review protocols.[42] From there, the

---

[40] *See* TDP § 4.3(c)(1).

[41] *See* TDP §4.3(b); 4.3(c)(1).

[42]  *See* TDP § 4.3(b); 4.3(c)(2).

Liquidating Trustee (along with the Insurers) are required to simply assume the validity of the Talc Claimant's exposure allegations and to assume that the alleged duration of exposure is sufficient to cause disease. For individual review, claimants are required to provide interrogatory responses or deposition testimony, but failure to have filed suit before the bankruptcy does not preclude recovery nor does exposure to asbestos or talc from other sources. Moreover, although a claimant is required to submit "details of his or her talc and asbestos exposure history" (TDP at 4.4(b)), there is no requirement that the claimant show that the Debtors' products contained asbestos. In the tort system, the Insurers can and would test these allegations to protect against liability. But the Plan negates any opportunity to do that.

The Plan improperly prevents the Insurers from auditing and reviewing Talc Claims. Under the Plan, "each Talc Claim shall be Allowed or Disallowed pursuant to the Trust Distribution Procedures."[43] While the TDP provide that "Claimants seeking resolution of Talc Claims that are not Pre-Petition Liquidated Claims must file a proof of claim,"[44] the TDP exclude the Insurers from the Talc Claims review process. The TDP state that the "Trust shall provide an initial *confidential* response to the Claimant within three (3) months of receiving the proof of claim form."[45] Further, the TDP provide that "[a]ll submissions to the Trust by a Claimant, including the proof of claim form and material related thereto, shall be treated as made in the course of settlement discussions between the Claimant and the Trust, and intended by the parties *to be confidential* and to be protected by all applicable state and federal privileges…"[46] Hence, the Insurers have no

---

[43] *See* Plan, § 4.4.

[44] TDP at § 4.3(a)(1).

[45] *Id*. (emphasis added).

[46] TDP at § 5.5 (emphasis added).

opportunity to review the evidence for each Talc Claim, conduct any audits, or understand how Talc Claims are assigned values—all is accomplished behind closed doors.

Taken together, the lack of rigorous criteria for validating the Direct Talc Personal Injury Claims, coupled with the Plan's abrogation of the Insurers' rights to defend and resolve those Claims, will create an unequivocal and impactful spike in the value of talc claims against the Trust. The lack of any scrutiny of alleged exposure "evidence" would render nearly any alleged qualifying injury compensable under the TDP.

Most of Debtors' claims were dismissed or settled at values below the TDP values. The Plan and TDP would multiply Debtors' putative liability by orders of magnitude. The Third Circuit in *GIT* made clear that the kind of deal central to this Plan—in which a debtor obtains protection for itself in return for allowing plaintiffs' lawyers to craft procedures designed to pay invalid and inflated claims and send insurers the bill—is anathema to "the integrity of the bankruptcy proceeding."[47] Just as the silica claims in *GIT* were of questionable factual validity due to the manner in which they were diagnosed,[48] the Plan and TDP here attempt to bypass – or ignore entirely – the rights of Insurers to question the factual validity of the claims, including medical evidence, scientific causation assumptions and the range of potential verdicts. The Plan impermissibly modifies or minimizes the Insurers' rights in this manner[49] and are clearly structured

---

[47] *GIT*, 645 F.3d at 214.

[48] *See id*. at 213-14.

[49] *See In re Gladwell*, 2009 WL 140098, * 2 (C.D. Ill Jan. 21, 2009) ("The owner of an insurance policy cannot obtain greater rights to the proceeds of that policy merely by filing a bankruptcy petition."). "[T]he rights and obligations of the Debtor and [its insurer] under the [insurance] policy are not altered because of the Debtor's Chapter 11 filing." *In re Amatex Corp.*, 107 B.R. 856, 865-866 (E.D. Pa. 1989), *aff'd*, 908 F.2d 961 (3d Cir. 1990); *see also In re Lloyd E. Mitchell, Inc.*, 2012 Bankr. LEXIS 5531, at *20 (Bankr. D. Md. Nov. 29, 2012) ("insurance contracts cannot be re-written" in bankruptcy).

to prevent Insurers from resisting inflated claim values in coverage litigation. Instead, the Plan limits Insurers – and all disputes – to an eventual insurance coverage litigation.  But insurers protect their rights, in the first instance, by defending against liability. Here, the  Insurers assert their rights to control and/or associate in the defense against the Talc Claims. Because the Plan deprives the Insurers of the ability to assert defenses that are directly relevant to the handling of the Talc Claims under the Plan, the Plan violates the Insurers' contractual rights, is prejudicial to the Insurers, and cannot be confirmed pursuant to 11 U.S.C. §§ 1129(a)(1) and 1129(a)(3).

### D. The Plan Improperly Seeks To Alter Insurers' Rights.

#### 1. The Plan Purports to Bind Insurers to a Non-Adversarial TDP Process

Section 5.3(v) of the Plan specifically provides that the determinations under the TDP are binding and cannot be challenged in any court.

> Claim Determination. In furtherance of, and consistent with, the purpose of the Avon Liquidation Trust and this Plan, the Liquidating Trustee shall have the power and authority to determine the eligibility, amount, and allowance of Talc Claims pursuant to this Plan and the Trust Distribution Procedures, as applicable. The Liquidating Trustee's determination of eligibility, amount, and allowance of each Talc Claim shall be final and binding, and shall not be subject to any challenge or review of any kind, by any court or other person or entity, except as set forth in this Plan and the Trust Distribution Procedures, as applicable. The allowance of General Unsecured Claims shall be determined according to Article VII of this Plan.

Moreover, because the neutrality language says that the Plan is binding on the Insurers, this provision would arguably prevent an Insurer from challenging a payment by the Liquidating Trustee even if the Insurer believed that the claim was invalid or fraudulent.

The likelihood that Insurers would challenge claim values established by the Trust is high. The TDP contain no meaningful requirement to show causation and, critically, no opportunity to question the evidence presented or raise other defenses. Under the individual review process, mesothelioma claimants could be entitled to as much as $3 million (nearly triple the already high

25

values contained in the Imerys plan) without ever showing that they were exposed to asbestos or that Debtors' products caused their disease.

There is no provision for the Insurers to exercise any role in examining the *bona fides* of the Talc Claims; that role is reserved exclusively to the Trustee, who works under the ultimate supervision of the claimants' representatives. Indeed, there is no requirement that the Insurers be informed of a Talc Claim that might implicate their policies (until, of course, the Trust comes around to the Insurers to demand reimbursement).

Not surprisingly, therefore, there is nothing in the TDP (or any of the other Trust documents) that suggests that there will be any robust defense of the Talc Claims. The TDP provide, for example, that the Liquidating Trustee must accept claimants' unverifiable statements that they have been exposed to a Debtor's product, and cannot dispute, but rather must accept any diagnosis of mesothelioma based upon "a physical examination of the Claimant by the physician providing the mesothelioma diagnosis" or a diagnosis based on pathology reports.[50] As noted above, even where the Trustee arguably has discretion to contest the Claimant's submission, there is no evidence that there will be any meaningful attempt to scrutinize questionable claims. On the contrary, the TDP directs the Trustee to consider the cost of defense first, even if that means paying invalid claims.[51] But even if the Trustee were inclined to mount a serious defense of the talc claims, the TDP does not provide the Insurers with any opportunity to participate in that defense, even if Insurers' involvement would decrease costs. Nor do the TDP provide for the Trustees to provide information or otherwise cooperate with the Insurers – all of which are the Insurers' right under their respective policies. Outside of bankruptcy, an insured agreeing to inflated settlements and

---

[50] *See, e.g.,* TDP § 4.4(a)(i).

[51] *See id.* § 6.2.

attempting to foist that agreement on to insurers is often prosecuted as insurance fraud. The Court should not countenance that structure on a mass scale here.

>    **2.      The Claim Valuations That the Talc Claimants Unilaterally Selected for the TDP Cannot Constitute a Binding Finding of "Liability" That the Insurers Are Obligated to Pay.**

The Plan contains, as a mandatory condition precedent, a finding that:

> (a) The Allowed amount of any Talc Claim shall be the amount determined under the Trust Distribution Procedures. Allowed Talc Claims under the Trust Distribution Procedures shall be legally enforceable against the Avon Liquidation Trust. The amount of any installment payments, initial payments, or payments based on payment percentages established under the Trust Distribution Procedures, as determined or as actually paid by the Avon Liquidation Trust, are not the equivalent of any claimant's Allowed amount of their Talc Claim. For the avoidance of doubt, nothing herein determines whether any Insurance Company is obligated to pay the amount of any Allowed Talc Claim as determined under the Trust Distribution Procedures for an Allowed Talc Claim…

*See* Plan at § 9.1(x); *See also* proposed order, Dkt. # 1143-1, at p. 35, Finding I. This Improper Finding, which the Plan says is binding on the Insurers, serves no bankruptcy purpose. Nothing in the Bankruptcy Code requires it. Further, as discussed below, the Trust has no power to "allow" claims for bankruptcy purposes.

Rather, and despite the last "avoidance of doubt" language, the finding and TDP provision are an obvious attempt by the Plan Proponents to gain an advantage in possible future coverage litigation. Specifically, this language is an effort by the Plan Proponents to avoid a ruling like that in *Fuller Austin*. In *Fuller Austin*, the California high court noted that "No evidence was offered linking these claims to Fuller–Austin's specific products" and held that insurers could be liable, at most, "for the payment sum percentage of asbestos claims against it, as determined under bankruptcy plan, rather than full allowed liquidation value."[52] The *Fuller-Austin* Court further

---

[52] *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 38 Cal. Rptr. 3d 716, 752 (Cal. App. 2d Dist. 2006), *as modified on denial of reh'g* (Feb. 17, 2006).

observed that its insurance policies indemnified Fuller-Austin only "for amounts it is 'obligated to pay' by law." *Id.* at 747. From there, the Court recognized that the trust was only obligated to pay the payment percentage specified in the trust procedures. *Id.* The same is true here.

The Debtors seek to avoid such a ruling by having this Court predetermine that "Allowed Talc Claims under the Trust Distribution Procedures shall be legally enforceable against the Avon Liquidation Trust." *See supra* at 26. That proposed finding is, of course, nonsense. The Debtors are not proposing that a claimant can sue to enforce full payment of a Talc Claim "allowed" by the Trust. To the contrary, § 2.3 of the TDP directly precludes such a result by providing that:

> After the liquidated value of a Talc Claim is determined pursuant to the procedures set forth herein, the amount the Claimant shall ultimately receive shall be based on that value and will depend on, among other things, the Trust's available assets in the TC Recovery Fund, including the Trust's ability to liquidate and recover the proceeds of the Insurance Rights and other causes of action. The amount of any installment payments, as determined or as actually paid by the Trust, are not, as such, the equivalent of any Claimant's liquidated claim value for his or her Talc Claim or the Debtor's liability to the Claimant. For the avoidance of doubt, nothing herein determines whether any Insurance Company is obligated, for any reason, to pay the amount of any allowed Talc Claim as determined under this TDP.

Because the Plan and TDP are internally inconsistent, the most logical conclusion is that the language contained in the Plan documents is intended for use against Insurers in future litigation.[53]

The few decisions that have held insurers liable for the full "settlement values" created by an asbestos trust have done so under different circumstances after finding that those values represent an adjudicated liability of the trust for tort claims.[54] No such determination can possibly

---

[53] Insurers proposed language that would minimize the potential harmful effect of these provisions, but the Debtors refused to accept the Insurers' proposed changes.

[54] *See, e.g., UNR Indus., Inc. v. Continental Cas. Co.*, 942 F.2d 1101, 1106 (7th Cir. 1991) ("UNR's bankruptcy resulted in a judgment or settlement (which one does not matter) against UNR in the amount of $254 million on the asbestos claims."); *National Union Fire Ins. Co. v. Porter Hayden Co.*, No. CCB-03-3408, 2012 WL 734176, at *2 (D. Md. Mar. 6, 2012) (finding that trust was legally obligated to pay entire claim value under Maryland law).

be made here; the Plan and TDP before this Court represent neither a litigated adjudication of the Debtors' liability nor a fair evaluation of that liability, and it would be an absurd result to conclude that Talc Claimants can be their own judge and jury, settling at claim values they select and requiring Insurers to pay claims at those values (especially where the claimant would not receive that payment, which would also be shared with general unsecured claims). The proposed claim values do not represent a determination of the Debtors' liabilities and cannot be binding on the Insurers.

In the absence of an adversarial fact-finding process aimed at finding a debtor's true liability, courts have declined to conclude that the trust's "allowed" claim value is a meritorious representation of liability and have found that such values are not binding on a debtor's insurers.[55] It is not this Court's role to make findings that are not required by the Bankruptcy Code and which are intended to influence the determination of that issue.

Moreover, the Improper Finding requires a premature ruling from the Bankruptcy Court— that the allowed amount of any Talc Claim is the amount determined by the Liquidating Trustee *before* the Liquidating Trustee has made that determination (as noted earlier, the Insurers contend that the Liquidating Trustee cannot "allow" any Talc Claims). The Bankruptcy Code does not

---

[55] *See, e.g., Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 38 Cal. Rptr. 716, 732 (Cal. Ct. App. 2006) (holding in post-confirmation coverage action that the insurers' indemnity obligations should be based on the payment percentage that the debtor was obligated pay, as opposed to the allowed liquidated value of a claim, because "the policies indemnify [the debtor] for amounts it is 'obligated to pay' by law"); *Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165, 1180 (N.D. Cal. 2016) ("*Fuller-Austin* determines the 'obligated to pay' issue, and that [the insurer] is accordingly obligated to pay [the debtor] the trust payment percentage, not the liquidated value"); *Wolkowitz v. Redland Ins. Co.*, 5 Cal. Rptr. 95, 99 (Cal. Ct. App. 2003).

require the Bankruptcy Court to make such a finding—it is irrelevant for confirmation. This language is an attempt by the Debtors to gain an advantage in future coverage litigation.[56]

This finding is also improper because it would effectively result in re-writing the policies. As noted earlier in Section IV above, the Liquidating Trustee can "allow" Talc Claims after receiving proofs of claim and limited evidence from the claimants. The Liquidating Trustee's improper "allowance" violates both the Bankruptcy Code and the insurers' policies. For example, under the Certain Insurer Policies, a covered claim is not paid unless an "Ultimate Net Loss" arises. An Ultimate Net Loss arises when there is a compromise or adjudication.[57] Here, there can be no compromise because the Debtors (the Assureds[58] under the Certain Insurer Policies) will be functionally non-existent following their liquidation. There can also be no adjudication by a court, as the TDP grant the Liquidating Trustee the sole power to determine whether Talc Claims are "allowed."  As such, the Plan and TDP propose to pay Talc Claims even though there is no Ultimate Net Loss—a clear violation of insurers' policies. Ultimately, the inclusion of this language is inappropriate and irrelevant for Plan confirmation.

---

[56] The Insurers here incorporate the arguments from the Riverstone Insurers as if fully set forth herein.

[57] Under the Certain Insurer Policies, "Ultimate Net Loss" means "[T]he total sum which the Assured, or his Underlying Insurers as scheduled, or both, become obligated to pay by reason of personal injuries, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Assured's or of any underlying insurers permanent employees

[58] Assured(s) under the Certain Insurer Policies refers to either Avon Products, Inc. and all subsidiary companies and/or controlled companies as of the time of the policy or later constituted and/or Mallinckrodt, Inc.

The Court cannot confirm a Plan that attempts to prejudge determinations to be made in future coverage litigation.[59] Indeed, in the flawed ADR process envisioned by the Trust documents, the Trustee would be barred from introducing evidence concerning how it arrived at the value of any tort claim processed by the Trust. *See* TDP § 4.5 ("In an arbitration involving any such claim, the Trust shall neither offer into evidence or describe any such model nor assert that any information generated by the model has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration."). Nonetheless, the TDP purport to bind insurers to these "allowed" amounts.

The valuation of a Talc Claim settled by the Trust is not the same as a claim "allowed" through the bankruptcy process. Allowance of claims in a bankruptcy case is governed by Section 502 of the Code. Under that process, a proof of claim properly filed is deemed allowed *unless a party in interest objects*.[60] The objection process under Section 502, therefore, explicitly contemplates an adversarial process whereby parties in interest – including those who may be called upon to pay – can assert objections as to why a claim should not be allowed.[61] Here, there has been no requirement that creditors file proofs of claims so tort claims cannot be allowed automatically. At the same time, the Plan removes the ability of insurers or other parties to object

---

[59] Indeed, the Code provides that the Plan is not binding on non-consenting Insurers. *See* 11 U.S.C. § 1141(a) (providing that confirmation binds the debtor and creditors). A number of the Insurers either have contingent Claims against the Debtors or have not asserted claims at all. It would turn the Code on its head to conclude that the Court's confirmation order does not bind the non-consenting Insurers, but a post-bankruptcy trust's unilateral determination to allow a Claim in a certain amount is fully binding on those same Insurers who are excluded from the Trust's process.

[60] *See* 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.").

[61] *See, e.g., In re Amatex*, 107 B.R. at 865 (noting that objection to timely-filed proof of claim initiates adversary process for resolving disputed claims).

31

to claims under § 502, thereby shielding claims from scrutiny. Instead, Talc Claims are to be evaluated and liquidated exclusively by the Liquidating Trustee according to the Trust Documents, including the TDP.[62] There is no opportunity for judicial review in this or any other court, nor for parties in interest to examine and defend against the Talc Claims. This process is nothing like the allowance process mandated by the Bankruptcy Code. The claims, therefore, are not being "allowed" or "liquidated" through any sort of judicial process.

The lack of scrutiny that the trust process provides, combined with the TDP's surrendering of meritorious pre-petition defenses will give the Trust discretion, if not a broad mandate, to allow and pay invalid claims in direct contravention of the Code's requirement that the court must disallow claims that are "unenforceable against the debtor … under … applicable law."[63] A Talc Claim that is "allowed" by the Trust does not necessarily represent tort liability, and is therefore fundamentally different from a Claim that is determined through the normal tort process.

Moreover, even with respect to Talc Claims that would be valid if pursued in the tort system, the claim values that the TDP assign to each class of claims is the result of unilateral determination by the Committee, not an adversarial process. Here, the values were not negotiated by opposing parties. The Insurers were never permitted to participate, and the Debtors abstained from taking any real role at all.[64]

---

[62] *See* Plan § 4.4, § 7.2.

[63] *See* 11 U.S.C. § 502(b)(1).

[64] Discovery has shown or will show that many key elements in the TDP were the product of unilateral decision making by counsel for the Committee.

### 3.     The Plan Contains Other Impermissible Findings.

The Plan contains other impermissible findings that seek to impair the Insurers' rights. For example, Finding G provides that: "The Plan, the Plan Documents, and the Confirmation Order are binding on all parties-in-interest to the extent provided therein."

This finding conflicts with 11 U.S.C. § 1141(a) which provides that "(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor …". There is no basis to expand this provision to cover any possible "parties-in-interest."  Indeed, this provision can only serve to make mischief in that the Trust will argue that the Insurers are bound by the Plan and TDP despite the alleged neutrality provision. Judge Silverstein refused to make a similar finding in the BSA case, stating: "I will not join in the confusion by entering unnecessary findings or legal conclusions that do not mirror, and arguably contradict, the Code. The res judicata or collateral estoppel effect of any Order I issue confirming the Plan is for a future court to decide in the context of specific litigation." *BSA*, 642 B.R. at 630-631.

The proposed Confirmation Order contains a finding blessing the good faith not just of the solicitation process or Plan, but of the TDP and the negotiation process from which insurers were excluded. Specifically, Finding F provides:

> F. Good Faith. The Plan, including the Trust Distribution Procedures, has been proposed in good faith and not by any means forbidden by law. In so finding, the Bankruptcy Court has considered the totality of the circumstances of the Chapter 11 Cases. The Plan, including the Trust Distribution Procedures, is the result of extensive, good faith, arm's length negotiations among the Debtors and their principal constituencies, including the Creditors' Committee.

If the Debtor is attempting to satisfy § 1129(a)(3) of the Bankruptcy Code, Proposed Finding F should be modified to track the requirements of that statute, which contains no requirement that

33

the Bankruptcy Court opine on the negotiation process or the TDP. This Court, in *In re BSA*, 642 B.R. 504, 625-33 (Bankr. D. Del. 2022), declined to make proposed findings that closely track or are almost identical to these Proposed Findings. *First*, Proposed Finding I seeks to have this Court find that the proposed governance of the Settlement Trusts is "appropriate" and that the TDP are "fair and reasonable."  In *BSA*, this Court declined to make a finding that the TDP were "fair and equitable." *Id.* at 629 ("None of the Coalition's rationales require me to find that the Claims Matrix, Base Matrix Values, Maximum Matrix Values, and Scaling Factors are appropriate and provide for a fair and equitable settlement of Abuse Claims in order to confirm the Plan. I decline to do so.") (quotation omitted).

### 4.      The Plan Deprives the Insurers of Contractual Rights

Standard general liability insurance policies require an insurer to indemnify its insured for judgments entered following an actual trial that the insured is legally obligated to pay and that, subject to policy limits, are within the scope of the policy's coverage.[65] These policies operate on the presumption of a shared interest between the insurer and insured in eliminating or reducing liability. In the absence of that shared interest, the insured does not have the same economic incentive as the insurer to defend claims vigorously, giving rise to moral hazard and the possibility of collusion between the insured and third parties asserting claims.[66] Accordingly, liability policies (such as the policies here) give the insurer the right to assume the defense of claims against the insured, require the insured to cooperate with the insurer in investigating and defending claims, and give the insurer control over the settlement of any claims that may implicate coverage.[67] The

---

[65] In addition, an insurer would be obligated to pay for settlements that the defending insurer consented to, in writing.

[66] *Id.*

[67] *See generally*, Exhibit A.

34

Plan guts these critical contractual protections and maximizes the alleged insureds' liability at the Insurers' expense.

That modification of the insurance policies to the Insurers' detriment is not permitted under the Bankruptcy Code, which requires that any plan be "proposed in good faith and not by any means forbidden by law."[68] This basic rule that the Court may not modify contracts (or non-debtors' rights thereunder) applies in full to insurance policies. "[T]he rights and obligations of the Debtor and [its insurer] under the [insurance] policy are not altered because of the Debtor's Chapter 11 filing."[69] "The filing of a bankruptcy petition does not alter the scope or terms of a debtor's insurance policy,"[70] nor does it permit an insured to "obtain greater rights to the proceeds of [an insurance] policy."[71] A bankruptcy court cannot confirm a plan that "excise[s]" provisions of an insurance policy "because doing so would rewrite the [insurance] [p]olicies and expand the Debtors' rights under them," and "the Court cannot modify those rights pursuant to the Bankruptcy Code."[72]

---

[68] *See* 11 U.S.C. § 1129(a)(3).

[69] *In re Amatex Corp.*, 107 B.R. 856, 865-866 (E.D. Pa. 1989), aff'd, 908 F.2d 961 (3d Cir. 1990); *See also BSA,* at 164 ("Insurance policies are property of the estate, and bankruptcy law—save for exceptions not relevant here—does not alter rights under those contracts.")..

[70] *In re MF Glob. Holdings Ltd.*, 469 B.R. 177, 193 (Bankr. S.D.N.Y. 2012).

[71] *In re Denario*, 267 B.R. 496, 499 (Bankr. N.D.N.Y. 2001).

[72] *MF Glob. Holdings*, 469 B.R. at 193; *see Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 769 F. Supp. 671, 707 (D. Del. 1991) ("Courts do not rewrite contracts to include terms not assented to by the parties."), *aff'd* 988 F.2d 414 (3d Cir. 1992); *In re Exide Holdings, Inc.*, No. 20-11157, 2021 WL 3145612, at *6 (D. Del. July 26, 2021); *In re 641 Assocs., Ltd.*, 1993 WL 332646, at *8 (E.D. Pa. Aug. 26, 1993) ("There is no provision in the Bankruptcy Code allowing a bankruptcy court to disregard state-law contractual rights."); *In re Cajun Elec. Power Co-op, Inc.*, 230 B.R. 715, 737 (Bankr. M.D. La. 1999) (plan was unconfirmable where it sought "improper modification" of supply contracts).

The Third Circuit has held that the Bankruptcy Code expressly preempts only one specific provision of liability insurance policies; namely, consent-to-assignment conditions in insurance policies that are part of the debtor's estate, are unenforceable to the extent those provisions would bar assignment of the debtors' insurance policies to a § 524(g) trust.[73] But the Third Circuit has also repeatedly made clear that unless the Code specifically overrides a particular provision of a policy, basic bankruptcy principles prevent a debtor from stripping insurers of their contractual rights. In *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), the Third Circuit held that insurance neutrality requires a plan to protect "the pre-petition rights and obligations of both the debtor and the insurers under the Plan by preserving for 'any Entity . . . any and all claims, defenses, rights or causes of action' under subject insurance policies and settlements."[74] This derives from the common-sense principle that a debtor should not be able to misuse its bankruptcy proceeding to rewrite prepetition contracts to the detriment of its non-debtor counterparties, while seeking to claim the benefits of the contract without any of its performance obligations.[75]

The Plan before the Court deprives the Insurers of their fundamental rights under their policies by taking the Talc Claims out of the tort system and resolving them exclusively through plaintiff-approved TDP in which the Insurers have no role. Nothing in the Bankruptcy Code or other relevant law inherently prevents insurers from being involved in the settlement of claims

---

[73] *In re Federal-Mogul Glob. Inc.*, 684 F.3d 355 (3d Cir. 2012).

[74] *In re Combustion Eng'g, Inc.*, 391 F.3d at 218; *accord In re Pittsburgh Corning Corp.*, 453 B.R. at 584 ("A plan is considered to be insurance neutral if it neither increases an insurer's pre-petition obligations nor impairs its pre-petition contractual rights under the subject insurance policies").

[75] *See, e.g.*, *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"); *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) ("[B]ankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms."); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984).

with a trust. It is simply the way the Committee constructed this Trust that violates Third Circuit law.

### E.    The Insurance Neutrality Language Does Not Protect the Insurers' Rights.

It is well established in this Circuit that insurance neutrality exists when "the plan, through its 'neutrality provision,' neither increased the insurers' pre-petition obligations nor impaired their pre-petition contractual rights under the subject insurance policies."[76] But the mere presence of insurance neutrality language in a plan does not make it insurance neutral; rather, the test is whether operation of the plan would abrogate or interfere with the insurers' rights or create additional liabilities.[77] As the Third Circuit recently confirmed, "a debtor may not sell property of the estate, such as insurance policies, with greater or fewer rights or obligations than it possessed outside of bankruptcy, and a plan cannot be confirmed when it incorporates provisions that impermissibly impair counterparts' rights." *BSA* at 164-65 (*citing In re Combustion Eng'g*, 391 F.3d at 218).

The Plan here contains token insurance neutrality language that purports to preserve the Insurers' contract rights:

> 5.6 Insurance Provisions. (i) Except for the transfer of rights to the Avon Liquidation Trust pursuant to the Insurance Rights Transfer, or as otherwise

---

[76] *See GIT*, 645 F.3d 201, 211–12 (3d Cir. 2011) (citing *In re Combustion Eng'g, Inc.*, 391 F.3d at 218); *In re Pittsburgh Corning Corp*., 453 B.R. 570, 584 (Bankr. W. D. Pa. 2011) ("we find the Modified Third Amended Plan to be unconfirmable because of the proposed Channeling Injunction and the lack of clarity regarding insurance neutrality").

[77] *See GIT*, 645 F.3d at 213-14 (finding plan's creation of a trust "led to a manifold increase in . . . claims," which "constitutes a tangible disadvantage" sufficient to confer standing on the objecting insurers); *Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 677 F.3d 869, 887 (9th Cir. 2012) (finding plan was not insurance neutral because it "allow[ed] direct actions against [non-settling insurers]," "allow[ed] the trust to pay out claims according to the trust distribution plan and then [] seek indemnification from [non-settling insurers]," "terminate[d] [non-settling insurers]' ability to collect claims from settling insurers," and "affect[ed] the nature of [non-settling insurers]' contracts with [the future claimants' representative]").

provided by the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order, or otherwise, nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy issued by any Insurance Company, or the rights or obligations under any such Insurance Policy to the extent such rights and obligations are otherwise available under applicable law, and the rights and obligations, if any, of any Non-Settling Insurance Company relating to or arising out of the Plan Documents, including the Plan, the Confirmation Order, or any provision thereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law. (ii) No provision of the Plan, other than those provisions contained in the applicable injunctions contained in Article X of the Plan, shall be interpreted to affect or limit the protections afforded to any Settling Insurance Company by the Plan Injunction and the Insurance Entity Injunction. (iii) Nothing in this Section 5.6 of the Plan is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Person.[78]

Although the language of § 5.6 does not differ significantly from the language that the Third Circuit found not to alter insurers' rights, the other provisions that the Third Circuit relied upon to reach that conclusion are not present here. *See In re BSA* at 68-69 (discussing provisions stating that TDP did not impair insurers' rights and clarifying that assignment was subject to insurers' rights). Moreover, as discussed below, unlike the Plan in BSA, this Plan is riddled with findings and conflicting provisions that undercut the purported neutrality language.

At least one Insurer proposed language that would have rendered this provision more acceptable, but the plan proponents rejected those changes entirely. The Debtors' proposed language is an empty promise because (i) the same provision permits the policy terms to be altered by "the Bankruptcy Code, applicable law, the findings made by the Bankruptcy Court in the Confirmation Order, or the findings made by the District Court in the Affirmation Order"[79]; (ii) a multitude of other Plan provisions interfere with, or simply take away, the Insurers' contract rights and (iii) the TDP inflates the Debtors' liability for Talc Claims far beyond what it would be in the

---

[78] *See* Plan, ¶ 5.6.

[79] *Id.*

38

tort system and forces the Insurers to foot the resulting bill, increasing the risk of contesting coverage.

The Third Circuit sitting *en banc* previously addressed precisely this type of scenario in *GIT*. There, the debtors' insurers objected to a plan that provided for a trust to resolve silica claims, to be funded by the assignment of insurance rights. The plan at issue there contained so-called "insurance neutrality" language similar to language in the Plan here; it provided that nothing in the plan would preclude insurers from asserting any rights or defenses under the policies (except for defenses based on the policies' anti-assignment provisions).[80] The Third Circuit held that notwithstanding the plan's language preserving the insurers' coverage defenses, "it cannot fairly be said that the . . . plan is 'insurance neutral.'"[81] To be "insurance neutral," the court explained, a plan must "neither increase[] the insurers' pre-petition obligations nor impair[] their pre-petition contractual rights under the . . . insurance policies."[82] Yet in *GIT*, the court found that the plan's promise of [a] Silica Trust appears to have staggeringly increased—by more than 27 times—the pre-petition liability exposure."[83] Here, the proposed Plan would create (and were intended to create) an explosion of new liability, to be paid for by the Insurers.

While the Plan purports to be insurance neutral, the exceptions within the insurance neutrality provision and other terms of the Plan make clear that the Plan does not protect the Insurer's rights. Among other things, to be truly insurance neutral, and compliant with the

---

[80] *See GIT*, 645 F.3d at 217 (quoting plan provision stating: "nothing in the GIT Plan, the Plan Documents or the Confirmation Order (including any other provision that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, impairing any insurer's legal, equitable or contractual rights under the APG Silica Trust Policies in any respect other than the enforcement of any "anti-assignment" provision(s) in such policies").

[81] *Id.* at 212.

[82] *Id*.

[83] *Id*.

Bankruptcy Code, the Plan would have to: (1) preserve, expressly and unambiguously, and without any exceptions or waffling, the Insurers' ability to raise any and all coverage defenses they wish in post-bankruptcy insurance coverage litigation, and (2) not bind the Insurers to findings or conclusions that are intended to affect coverage issues.

The Plan and TDP contradict any putative "neutrality" language because they:  (i) impair the Insurers' contractual rights to control the defense and settlement of Talc Claims; (ii) abandon the Debtors' tort liability defenses, increasing the quantum of liability by paying Talc Claims that otherwise would not have been paid or would have been paid in lesser amounts in the tort system; (iii) encourage the Liquidating Trustee to seek coverage from the Insurers for the entire Claim "value" set forth in the TDP (which were established unilaterally by the claimants), rather than for the amounts actually paid to claimants; and (iv) impair Insurers' contribution rights against other potentially responsible parties, including Settling Insurance Companies. In addition, the Assureds have multiple obligations under the Insurers' policies. These conditions include the Assured's obligations (i) to assist and co-operate; (ii) allow the Certain Insurers to inspect and audit the Assured's books and records; (iii) give notice of an occurrence; (iv) maintain underlying insurances; (v) pay the amount of the underlying limits on account of such occurrence; (vi) obtain consent from the underwriters before assignment of interest; and (vii) reimburse the Certain Insurers for recovered amounts.[84] The Plan wipes out these obligations—Insurance Neutrality Language does not solve this problem.  In sum, all the above defects are fatal to the Plan in its current form.

---

[84] *See, e.g.,* Exhibit A.

**F.     The Plan Improperly Extends the Bankruptcy Court's Post-Confirmation Jurisdiction Over Insurance Rights**

The Plan has been proposed in bad faith because it extends the Court's post-confirmation non-core jurisdiction beyond what controlling precedent permits.

The Court's jurisdiction is defined in 28 U.S.C. 1334 and 157.[85]  Those statutes extend the Court jurisdiction to all bankruptcy cases, and all civil proceedings arising under Title 11, or arising in, or related to bankruptcy cases. However, the Court does not have the same type of jurisdiction over all such matters. Section 157 "divid[es] all matters that may be referred to the bankruptcy court into two categories: 'core' and 'non-core' proceedings."[86] Core proceedings are matters that "invoke a substantive right provided by title 11" or "by [their] nature could arise only in the context of a bankruptcy case."[87] Although the Court can *hear* both core and non-core proceedings, the Court cannot *determine*, *i.e.*, issue a final order in, non-core proceedings.[88]

It is well-settled that in a declaratory relief action in federal court to determine rights under an insurance policy, "*state law* must determine the substantive rights and duties of the parties to the insurance contract".[89]  Because insurance coverage claims are governed by state law, not by the Bankruptcy Code, the District Court and the Court have both previously recognized such

---

[85] *In re Resorts Int'l, Inc.*, 372 F.3d 154, 161-62 (3d Cir. 2004).

[86] *Exec. Benefits Ins. Agency v. Arkinson*, 573 U.S. 25, 134 S. Ct. 2165, 2171, 189 L. Ed. 2d 83 (2014) (citing 28 U.S.C. § 157).

[87] *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999) (citations and internal quotation marks omitted); *Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228, 1234-35 (3d Cir. 1994) (same)

[88] *Phar-Mor*, 22 F.3d at 1235

[89] *Fed. Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 352 (3d Cir. 1986) (emphasis added).

claims as non-core.[90]  Moreover, matters of private right, "that is, of the liability of one individual to another under the law as defined" cannot be finally determined by bankruptcy courts.[91]

The Plan improperly extends the Bankruptcy Court's post-confirmation jurisdiction. The Debtors' Plan provides that the "Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan… (i)(k) to hear ***and resolve*** disputes related to the Insurance Rights Transfer and/or the Insurance Rights, to the extent permitted under applicable law."[92] Any disputes about the Insurers' policies and rights are non-core matters. Moreover, the Bankruptcy Court's jurisdiction is even more limited following plan confirmation.[93] The Plan attempts to remedy the issue by providing that the Court's jurisdiction over the Insurance Rights Transfer and/or Insurance Rights is "to the extent permitted under applicable law". But this language is no remedy. Language that purports to limit the Bankruptcy Court's jurisdiction to "resolve" disputes over insurance matters only "to the extent permitted under applicable law," hints at potential scenarios where the Bankruptcy Court can resolve insurance issues by a final order. This implication is false. Prevailing case law is clear that the Bankruptcy Court does not have jurisdiction to "resolve" non-core matters. Further, the

---

[90] *See Shalom Torah Ctrs. v. Phila. Indem. Ins. Cos.*, 2011 U.S. Dist. LEXIS 35726, at *6 (D.N.J. Mar. 31, 2011) (finding "courts in this District and elsewhere have held that actions to determine rights to insurance coverage are not core proceedings".); *In re John A. Rocco Co.,* Nos. 10-18799 (NLW), 12-01277 (NLW), 2015 Bankr. LEXIS 1283, *13 (Bankr. D.N.J. Apr. 13, 2015) (finding "[b]ecause the issue of coverage under an insurance policy is a question of state law that routinely arises outside the context of a bankruptcy case, claims for insurance coverage are typically considered non-core".).

[91] *Stern v. Marshall*, 564 U.S. 462, 489 (2011).

[92] *See* Plan, § 11.1(i)(k) (emphasis added).

[93] *See In re Buena Vista Oceanside, LLC*, 2015 WL 9957185, at *5 (Bankr. W.D. Pa. Sept. 22, 2015) ("the jurisdiction of the bankruptcy court decreases following confirmation of a case creating problems with respect to retention of bankruptcy jurisdiction […]"); *Resorts Int'l, Inc.*, 372 F.3d at 168–69 ("the jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan.".)

Bankruptcy Court lacks jurisdiction to resolve matters of private right,[94] like a contractual dispute over insurance policies. The Bankruptcy Court also cannot conduct jury trials absent consent of all parties and the Insurers have the right to a jury trial on the validity of insurance rights.[95] The Insurers do not consent to the Bankruptcy Court conducting a jury trial. Accordingly, because the Bankruptcy Court cannot enter any final orders regarding insurance issues, the Plan's attempt to impermissibly extend the Bankruptcy Court's jurisdiction should be rejected.

### G.    The Plan's Inconsistent Wording is in Bad Faith

The Plan and attached TDP are proposed in bad faith because they include contradictory language.[96]  For instance, § 5.3(v) of the Plan provides that "the Liquidating Trustee shall have the power and authority to determine the eligibility, amount and allowance of the Talc Claims pursuant to this Plan and the Trust Distribution Procedures."[97] Further, the "Liquidating Trustee's determination of eligibility, amount, and allowance of each Talc Claim *shall be final and binding*, and *shall not be subject to any challenge or review of any kind*, by any court or other person or entity…"[98] However, the Plan later requests the Court to find that "nothing herein determines whether any Insurance Company is obligated to pay the amount of any Allowed Talc Claim."[99] The TDP also state that nothing in the TDP "determines whether any Insurance Company is obligated, for any reason to pay the amount of any allowed Talc Claim"[100] despite the Plan's

---

[94] *Stern v. Marshall*, 564 U.S. at 489.

[95] 28 U.S.C. § 157(e).

[96] *See In re Quigley Co.*, 391 B.R. 695, 699-701 (Bankr. S.D.N.Y. 2008); *In re Pittsburgh Corning Corp*., 453 B.R. 570, 587 (Bankr. W.D. Pa. 2011) (holding ambiguous language in plan sufficient basis to object a plan's lack of good faith.).

[97] *See* Plan, § 5.3(v).

[98] *Id.* (emphasis added).

[99] Plan, § 9.1(x)(a).

[100] TDP, § 2.3

contrary language in § 5.3(v) noted earlier. These provisions are in conflict. It is unclear how the Insurers are not obligated to pay the amount of an "allowed" Talc Claim when the Plan provides that the allowance is "final and binding."

The TDP are further problematic with respect to its purported effect on statutes of limitation and repose. The TDP provide, in part, that with respect to Talc Claims not filed in the tort system "prior to the Initial Debtor Petition Date," the Trust will consider the applicable federal or state statute of limitation in effect when the Talc Claim was filed with the Trust. [101] However, the TDP also provide that for Talc Claims "diagnosed after the Initial Debtor Petition Date," claims may be filed "irrespective of the application of any relevant federal or state statute of limitation or repose." [102] Such Talc Claims may be filed within 3 years after the diagnosis date or 3 years after the Initial Claims Filing Date, whichever date is later. [103] These provisions appear contradictory. Moreover, these provisions may run afoul of state law, resulting in claims that are otherwise barred. [104] Accordingly, the TDPs are proposed in bad faith because the provisions are inconsistent and may result in Talc Claims being paid that would otherwise be barred under state law.

There are similar contradictions as to the claim objection language. Under the Plan, "[u]nless a claim has been expressly Allowed pursuant to the terms of this Plan, nothing contained in this Plan shall be construed to waive a Debtor's or other Person's right to object on *any basis to any Claim*." [105] The Plan, however, states that "[e]xcept as otherwise provided herein, objections

---

[101] *See* TDP § 4.1.

[102] *Id*.

[103] *Id*.

[104] For example, in Illinois, a liquidated company cannot be sued more than five years after the date of liquidation. 805 I.L.C.S. 5/12.80.

[105] Plan, § 3.8 (emphasis added).

44

to Claims against the Debtors may be interposed and prosecuted only by the Liquidating Trustee."[106]  Moreover, the Plan notes that "[o]bjections to any Talc Claims shall be interposed, prosecuted or other administered solely pursuant to, and in accordance with, the Trust Distribution Procedures."[107]  The Plan notes that the right to object to claims is not waived, yet only permits the Liquidating Trustee to object to claims. Further, the TDP does not appear to provide any avenue for the Insurers to object to claims. These provisions are confusing and inconsistent.

The Plan's proposed finding in Section 9.1(x)(a) is also contradictory. This section asks the Bankruptcy Court to find that "[t]he Allowed amount of any Talc Claim shall be the amount determined under the Trust Distribution Procedures."  However, this language is inconsistent with the Plan provisions that state the Liquidating Trustee's allowance rulings are not subject to review. If the Liquidating Trustee's allowance rulings cannot be reviewed by a Court, then this Court should not enter a finding that appears to approve the Allowance amount. Such a finding is disingenuous and suggests that the Court was involved in approving and reviewing the Allowance amount. In sum, the confusing and ambiguous language is sufficient to find that the Plan was not proposed in good faith.

### H.    The Plan Violates 1129(a)(1) By Seeking to Exclude Foreign Claims

The Trust also improperly excludes "Foreign Claims."  *See* TDP § 6.7 (barring payment of Foreign Claims). This exclusion could lead to additional liability on behalf of the Insurers as a claimant exposed to a Debtor product could bring a claim in the United States and seek recovery of any judgment from the Insurers. Several courts have considered whether foreign claims may be

---

[106] Plan, § 7.2

[107] *Id.*

separately classified from domestic creditors.[108] The flip side of separate classification is, of course, that foreign creditors cannot be lumped into a class with domestic creditors and then treated differently. 11 U.S.C. § 1122. Equality of treatment and non-discrimination against foreign claimants are fundamental precepts of U.S. Bankruptcy law.[109] The Insurers are unaware of any law that authorizes the Debtors to withhold payment from creditors based on their geographic location. To the contrary, since *Dow Corning* and Judge Houser's article, Congress enacted § 1513 of the Bankruptcy Code, which provides that:

> (a) Foreign creditors have the same rights regarding the commencement of, and participation in, a case under this title as domestic creditors.
>
> (b)(1) Subsection (a) does not change or codify present law as to the priority of claims under section 507 or 726, except that the claim of a foreign creditor under those sections shall not be given a lower priority than that of general unsecured claims without priority solely because the holder of such claim is a foreign creditor.

Thus, § 1129(a)(1) precludes confirmation of any Plan that bars payment of foreign claims.

## III.   THE PLAN CANNOT ASSIGN THE INSURANCE POLICIES.

### A.   The Insurance Rights Transfer is Impermissible under the Bankruptcy Code

The Plan proposes to transfer certain "Insurance Rights" to the Trust:

> ***Insurance Rights*** means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the Debtors to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under, or

---

[108] *See, e.g., In re Dow Corning Corp.,* 244 B.R. 634, 663 (Bankr. E.D. Mich. 1999), aff'd, 255 B.R. 445 (E.D. Mich. 2000), aff'd and remanded, 280 F.3d 648 (6th Cir. 2002) (Approving separate classification of foreign claims based on analysis); Barbara J. Houser, *Classification and Treatment of Foreign Claims in U.S. Bankruptcy Proceedings*, 36 Tex. Intl. L.J. 475, 494 (2001) ("foreign product liability claims may be separately classified from domestic claims").

[109] *See Vertiv, Inc. v. Wayne Burt PTE, Ltd.,* 92 F.4th 169, 181 (3d Cir. 2024) *(quoting Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 249 (2d Cir. 1999)) (listing non-discrimination and equality of distribution as "indicia of procedural fairness" consistent with the United States' policy of equality).

attributable to, any and all Insurance Policies now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including: (i) any Insurance Company's failure to provide coverage or otherwise pay under an Insurance Policy; (ii) the refusal of any Insurance Company to compromise and settle any claim or provide defense to any claim; the interpretation or enforcement of the terms of any Insurance Policy with respect to any Claim; (iv) any conduct by any Insurance Company constituting "bad faith" conduct or that could otherwise give rise to extra-contractual damages, or other wrongful conduct under applicable law; or (v) any right to receive proceeds with respect to any Insurance Policy or a coverage action. For the avoidance of doubt, "Insurance Rights" shall include Insurance Proceeds.

This definition presumably includes all benefits under the insurance policies, as well as the

right to pursue extra-contractual claims. Notably, it does not include any of the obligations under

those policies.

> ***Insurance Rights Transfer*** means the transfer, assignment, and vesting of the Insurance Rights described in <u>Section 5.4(iv)</u> of this Plan.[110]

---

[110] **Section 5.4(iv):** Insurance Rights Transfer. In furtherance of the purpose of the Avon Liquidation Trust:

(a)      On the Effective Date, the Liquidating Debtors shall irrevocably transfer, grant, and **assign** to the Avon Liquidation Trust, and the Avon Liquidation Trust shall receive and accept the Debtors' Insurance Rights.

(b)      The Insurance Rights Transfer is made free and clear of all Claims, Liens, encumbrances, or Causes of Action of any nature whatsoever, except available limits of liability for coverage of certain types of Claims under one or more Insurance Policies that may have been reduced by certain prepetition payments made by an Insurance Company to, or on behalf of, one or more of the Debtors.

(c)      The Avon Liquidation Trust shall satisfy, to the extent required under applicable **law**, any premiums, deductibles, or self-insured retentions, and any other amounts arising in any way out of the receipt of any payment from any Insurance Company and in connection with any Allowed General Unsecured Claims and Allowed Talc Claims under any Insurance Policy.

(d)      The Insurance Rights Transfer is made to the maximum extent possible under applicable law.

(Continued...)

This language does not delegate the insureds' obligations under the insurance policies to the Trust. These obligations include the duties to provide notice of claims and to assist and cooperate in the defense of claims.[111] Indeed, there is nothing in the Plan or in the Trust Distribution Procedures that addresses the obligations of the Assureds under the insurance policies. As the Debtors have proposed a Plan of liquidation, there will be no surviving entity to perform the obligations of the Assureds under the insurance policies.

The Plan, therefore, improperly attempts to partially transfer the Insurance Policies. Any assignment or transfer of a contract—whether accomplished under § 363 or § 365—must be made *cum onere*.[112] That is, a contract's rights and obligations must be transferred together.[113] "Bankruptcy law generally does not permit a debtor or an estate to assume the benefits of a contract and reject the unfavorable aspects of the same contract."[114] "If [the debtor] accepts the

---

(e)     The Insurance Rights Transfer is absolute and does not require any further action by the **Debtors**, the Liquidating Debtors, the Avon Liquidation Trust, the Bankruptcy Court, or any other Entity.

(f)     The Insurance Rights Transfer shall be governed by, and construed in accordance **with**, the Bankruptcy Code and the other applicable laws governing the Insurance Policies.

\*     \*     \*

[111] Those obligations are summarized above in Exhibit A hereto.

[112] *DB Structured Prod., Inc. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.)*, 402 B.R. 87, 98 (Bankr. D. Del. 2009) ("the *cum onere* principle will require the rights and obligations under the agreements to be transferred together, if at all"); *see In re Fleming Cos., Inc.*, 499 F.3d 300, 308 (3d Cir. 2007) (applying cum onere principle in the § 365 context); *Folger Adam Sec., Inc. v. DeMatteis/Mac Gregor JV*, 209 F.3d 252, 264 (3d Cir. 2000) (applying *cum onere* principle in the § 363 context").

[113] *In re Am. Home Mortg. Holdings, Inc.*, 402 B.R. at 98.

[114] *Folger Adam Sec., Inc.*, 209 F.3d at 264.

48

contract he accepts it *cum onere*."[115] The Insurance Rights Transfer under the Plan disregards this principle.

As shown above, the Insurance Rights do not include any obligations under the Insurance Policies. The Plan proposed that the Trust shall enjoy the benefits of the Insurance Policies (*i.e.* the right to proceeds or to pursue bad faith claims in connection with the Insurance Policies), without any accompanying obligations (with the one exception of deductibles and SIR payments). Additionally, because the Plan proposes to liquidate the Debtors, there will be no entity that exists that can perform any obligations under the policies, such as a duty to investigate and defend Talc Claims. With no existing party to perform these obligations, the attempted partial assignment further prejudices the Insurers and fails to protect their right to defend against Talc Claims.

In typical Chapter 11 reorganizations involving the assignment of insurance policies, the insurance policies themselves are not assigned.[116] Rather, the benefits under the policies are assigned to a trust, as is done in the Plan, and the reorganized debtor remains responsible for performing its obligations under the policies. A reorganized debtor can perform its contractual duties, thereby preventing any prejudice to its insurers. Here, in contrast, no entity can perform

---

[115] *In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir. 1951) ("If [the debtor] accepts the contract he accepts it cum onere. If [it] receives the benefits [it] must adopt the burdens. [It] cannot accept one and reject the other." (decided under the Bankruptcy Act)); *In re Thornhill Bros. Fitness, LLC*, 85 F.4th 321, 327 ("[T]he Code forbids [] the partial assignment of an executory contract."); *see also Spyglass Media Grp., LLC v. Bruce Cohen Prods. (In re Weinstein Co. Holdings LLC)*, 997 F.3d 497, 501 (3d Cir. 2021) (stating that a buyer of a contract under § 363 "must satisfy post-closing obligations...").

[116] *See, e.g.*, *In re Boy Scouts of America*, Case No. 20-10343-LSS, Third Modified Fifth Amended Plan at Dkt No. 10296 at ECF 27, ¶ 158 (definition of Insurance Assignment noting that the assignment includes the rights, claims, benefits…under or with respect to the Abuse Insurance Policies (***but not the policies themselves***)…") (emphasis added).

49

any of the contractual obligations of the Assureds; the Assureds will be liquidated. The Trust is not the delegee of any of the duties other than the obligation to fund any deductible or SIRs.

In sum, the Debtors cannot cherry-pick benefits from the Insurance Policies. Because the Insurance Rights Transfer only attempts to partially transfer the benefits under the Insurance Policies, it is impermissible and renders the plan unconfirmable under § 1129(a)(1). To the extent that the Insurance Policies may be assigned at all, any rights must be assigned along with the attendant responsibilities.

## B.     The Plan Violates Section 365 of the Bankruptcy Code

The Plan's Insurance Rights Transfer violates Sections 365(f) and 1129(a)(1). The insurance policies are executory contracts because the Certain Insurers and the Assureds both have material, continuing, unperformed obligations. Section 365 allows a debtor to assume and assign an executory contract if the assignee can provide adequate assurance of future performance. There is no other mechanism to assign an executory contract.

The Code does not define the term "executory contract." However, the Court has adopted the *Countryman* definition of executory contracts. When addressing the question of "how much performance must be outstanding for the contract to be treated as executory under § 365, most courts and scholars look to the standard first articulated by Professor Vernon Countryman in his seminal 1973 law review article regarding treatment of contracts under the former Bankruptcy Act—*i.e.*, that an executory contract is one 'under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'"[117]

---

[117] *Enter. Energy Corp. v. United States (In re Columbia Gas Sys., Inc.)*, 50 F.3d 233, 239 (3d Cir. 1995) ("These considerations led us to adopt, as have many courts of appeals, the following

(Continued...)

Although several courts have held that liability insurance policies are non-executory, those decisions do not apply here or are in error. Indeed, the Supreme Court recently described general liability insurance policies similar to those involved as executory contracts in *Truck Insurance Exchange v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024). *Id.* at 282 ("Those *executory contracts* are the ones that give insurers an interest in the proceedings and, in this case, make Truck financially responsible for the bankruptcy claims.") (emphasis added).

Following confirmation, none of the Assureds will perform any of their obligations under the policies, and neither will the Trust. Because the Certain Insurer Policies (like many of the other policies) were delivered in New York, New York law controls.[118] Under New York law, the duty to cooperate is a material obligation.[119] As a result, those policies are executory.

Because the Certain Insurer Policies are executory contracts, the Debtors must assume them, and the Trust must provide adequate assurance of future performance before the Debtor can

---

definition of executory contract for purposes of § 365: '[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'") *citing Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989) (citing cases).

[118] "An insurance contract is made in the state where it is delivered." *Hammersmith v. TIG Ins. Co.*, 480 F3d 220, 233 (3d Cir. 2007) (citing *Harry L. Sheinman & Sons v. Scranton Life Ins. Co.*, 125 F.2d 442, 444 (3d Cir.1941); *see id.* at 234–35 (finding that New York law governed where for nearly every factor, including the delivery of the contract as the place of contracting, New York had the most substantial contacts); *see Cat Internet Services, Inc. v. Providence Washington Ins. Co.*, 333 F.3d 138, 141 (3d Cir. 2003) (finding that a forum state's laws dictated that an insurance contract is controlled by the law of the state in which the policy was delivered); *Gen. Star Nat. Ins. Co. v. Liberty Mut. Ins. Co.*, 960 F2d 377, 379-80 (3d Cir. 1992) (holding that New York law governed the parties' relations where the insured was a NY resident and the insurance contract was "presumably" delivered in NY, even though the location of the parties, trial and settlement negotiations took place in different states).

[119] *See, e.g.*, *Evans v. International Ins. Co.*, 168 A.D. 374, 375 (N.Y. App. Div. 1st Dep't 1990) (failure to cooperate "defeats the right of the insurer to obtain relevant information to enable it to decide upon its obligations under the policy and to protect against false claims" and "constitutes a material breach of the contract of insurance")

assign the policies. Under 11 U.S.C. § 365(f)(2)(B), a debtor in possession 'may assign an executory contract or unexpired lease . . . only if adequate assurance of future performance by the assignee of such contract or lease is provided' …. The primary focus is the assignee's ability to provide the counterparty with the full benefit of its bargain."[120]

The Plan does not provide for the Debtors to assume any of the Certain Insurer Policies, nor does it require the Trust to provide adequate assurance of future performance, violating § 365.

## IV.   THE PLAN IMPERMISSIBLY EXPANDS THE SCOPE OF THE LIQUIDATING TRUSTEE'S AUTHORITY.

### A.   The Liquidating Trustee Cannot "Allow" Talc Claims Under Section 1123(b)(3)(B).

The Liquidating Trustee cannot "allow" or "disallow" claims. Before a claim can be allowed, it must either be filed,[121] or scheduled as undisputed, liquidated and non-contingent.[122] Federal Rule of Bankruptcy Procedure ("Rule") 3002 requires unsecured creditors, like holders of Talc Claims, to file a proof of claim for the claim to be allowed.[123]  Further, a claim "is deemed allowed, unless a party in interest…objects."[124]  The Debtors scheduled all of their talc claims as unliquidated and contingent.[125]  Thus, whether or not a claim was scheduled, to be allowed, the

---

[120] *In re Vice Group Holding, Inc.*, 652 B.R. 423, 429-30 (Bankr. S.D.N.Y. 2023).

[121] 11 U.S.C. §§ 501; 521(1); Fed. R. Bankr. P. 3003(b)(1) and (2); *In re Dennis*, 230 B.R. 244, 247 (Bankr. D. N.J. 1999) ("The Code clearly requires a proof of claim to be filed for a claim to be allowed.").

[122] Fed. R. Bankr. P. 3003(c)(2); *In re Dennis*, 230 B.R. at 247 ("Rule 3003(c)(2) provides a limited exception in…chapter 11 cases to the requirement that a proof of claim must be filed by providing that all scheduled claims which are not designated as disputed, contingent or unliquidated are deemed allowed.")

[123] *Id*.  at 246 ("The Rule [3002], however, indicates that filing a proof of claim is mandatory for an unsecured creditor's claim to be allowed.").

[124] 11 U.S.C. § 502(a).

[125] *See, e.g.*, Addendum to Schedules of Assets and Liabilities and Statement of Financial Affairs, Lead Case No. 24-11836 (CTG), Doc. No. 123, ¶10 at 10-11.

Bankruptcy Code requires each and every Talc Claimant to file a proof of claim because such claims were not scheduled, or were scheduled as unliquidated and contingent.[126]

The Plan does not meet the requirements of § 1129(a)(3), because the Plan impermissibly delegates the Court's function of allowing and disallowing claims to the Liquidating Trustee. Section 157 of Title 28 of the United States Code specifies that only this Court, and no other entity, can allow or disallow claims. "The allowance of [a] claim…is the exclusive province of the bankruptcy court if a proof of claim has been filed in the bankruptcy court."[127]  Moreover, "[t]he duty to examine and pass on proofs of claim is that of the bankruptcy court alone, and cannot be delegated."[128]  Other interested parties also have a say in whether a claim is allowed. Even putting aside insurers' rights to control or associate in the defense of claims, § 502 permits interested parties to object to claims.

Contrary to black letter law, the Plan purports to delegate the power to allow and disallow Talc Claims to the Liquidating Trustee. Specifically, the Plan provides that "the Liquidating Trustee shall have the power and authority to determine the eligibility, amount, and ***allowance*** of Talc Claims…"[129]  The Plan repeatedly references the Liquidating Trustee's authority to "allow"

---

[126] *Spokane Law Enf't Fed. Credit Union v. Barker(In re Barker)*, 839 F.3d 1189, 1194 (9th Cir. 2016) (stating "it shall not be necessary for a creditor to file a proof of claim unless the claim is either not scheduled or is scheduled as disputed, contingent or unliquidated."  (Citing Fed. R. Bankr. P. 3003(c)(2); 11 U.S.C. § 1111(a)).

[127] *In re PRS Ins. Grp., Inc.*, 335 B.R. 77, 81 (Bankr. D. Del. 2005) c*iting Canal Corp v. Finnman (In re Johnson)*, 960 F.2d 396, 404 (4th Cir. 1992); *In re D.M. Barber, Inc.*, 13 B.R. 962, 965 (Bankr. N.D. Tex. 1981) (the bankruptcy court "retains the exclusive jurisdiction to determine the extent to which any such proof of claim should be allowed…"); 4 *Collier on Bankruptcy* ¶ 502.030[1][a] (Alan N. Resnick & Henry J. Sommer eds. 15th ed. Rev. 2005) ("Regardless of the method chosen for liquidation of a claim, the bankruptcy court always retains the jurisdiction and sole right to determine the 'allowability' of the claim under the applicable standards set forth in section 502.").

[128] *In re Mastercraft Record Plating, Inc.*, 32 B.R. 106, 110 (Bankr. S.D.N.Y. 1983).

[129] *See* Plan, Dkt. 1048 at 5.3(v) at ECF p. 36 (emphasis added).

Talc Claims. In § 5.3, the Plan provides that "[a]fter such Claims are Allowed by the Liquidating Trustee…"[130] Under the Plan's definitions, "Allowed" means with respect to…any Claim or Interest…(iii) that is …otherwise resolved after the Effective Date pursuant to the authority of…the Liquidating Trustee, as applicable…"[131] Conversely, disallowed "means, any Claim…that (i) …with respect to Talc Claims, a final determination of the Liquidating Trustee in accordance with the Trust Distribution Procedures…"[132]  The Liquidating Trustee is a fiduciary, not a Bankruptcy Court. Nonetheless, the Plan purports to authorize the Liquidating Trustee to "allow" or "disallow" Talc Claims. This scheme is inconsistent with the provisions of the Bankruptcy Code and the applicable Bankruptcy Rules and substantially diminishes the integrity of the process.[133] Previous use of similar procedures has led to widespread fraud and abuse.[134] The Plan's attempt to grant the Liquidating Trustee power to "allow" claims is improper and requires denial of confirmation of the Plan.

Section 1123(b)(3)(B) provides that a plan may "provide for…the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."[135]  Thus, a debtor may propose a plan that appoints a trustee to enforce or retain its claims or interests. Section 1123(b)(3), however, does not empower

---

[130] See Plan, Dkt. 1048 at 5.3(vii) at ECF p. 39.

[131] *See* Plan, Dkt. 1048, at ECF p. 5.

[132] *See* Plan, Dkt. 1048 at ECF p. 8.

[133] *See, e.g., Century Indem Co. v. Congoleum Corp (In re Congoleum Corp.),* 426 F.3d 675, 693 (3rd Cir. 2005).

[134] *See*, *e.g., In Re Burns and Roe Enters., Inc.*, No. 00-41610 (Bankr. D. N.J. 2006); *Reply of Quigley Co., Inc. and Pfizer, Inc*. Docket No. 1195 at 12 (demonstrating that 1 in 5 of all alleged votes in favor of Plan were from persons who did not hold claims against the debtor) *In re Quigley Co., Inc*. (Bankr. S.D.N.Y. August 3, 2007).

[135] 11 U.S.C.§ 1123(b)(5).

a debtor to grant unfettered authority to a plan trustee. Under § 1123(b)(3)(B), a plan trustee may only retain or enforce claims or interests that belong to the bankruptcy estate.[136]  Stated differently, a plan trustee may not retain or enforce claims that are *against* the bankruptcy estate.

Section 1123(b)(3) does not authorize the Liquidating Trustee to "allow" Talc Claims because the Talc Claims do not belong to Debtors' bankruptcy estate. Under the Plan, "the Liquidating Trustee shall have the power and authority to determine the eligibility, amount, and ***allowance*** of Talc Claims…"[137]  Critically, the Plan defines Talc Claims to mean "any Claim ***against*** one or more of the Debtors, known or unknown…directly or indirectly arising out of or relating to the presence of or exposure to talc or talc-containing products in connection with…one or more of the Debtors…"[138]  Here, Talc Claims are claims held by alleged creditors *against* the Debtors' bankruptcy estate. Talc Claims do not belong to the bankruptcy estate. Hence, because the Liquidating Trustee is appointed under § 1123(b)(3)(B), the Liquidating Trustee cannot enforce or retain the Talc Claims.

Even more troubling, the Liquidating Trustee's allowance decisions are binding on the Insurers. The Plan states that "[t]he Liquidating Trustee's determination of eligibility, amount, and allowance of each Talc Claim shall be final and binding, and shall not be subject to any challenge or review of any kind, by any court or other person or entity…"[139]  Hence, not only does the Plan purport to grant the Liquidating Trustee power to allow Talc Claims—an exclusive judicial function—such determination is not subject to any review. Unlike a decision from a trial court, the

---

[136] *In re Diocese of Camden, New Jersey*, 653 B.R. 309, 336 (Bankr. D.N.J. 2023), citing *In re Dynamic Brokers*, Inc., 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) (finding that section 1123(b)(3) applies only to actions belonging to the estate).

[137] *See* Plan at § 5.3(v) at ECF p. 36 (emphasis added).

[138] *Id*. at ECF p. 16 (emphasis added).

[139] *Id.* at § 5.3(v) at ECF p. 36.

Insurers cannot challenge the Liquidating Trustee's allowance decisions. This provision prejudices the Insurers by leaving them with no recourse to challenge any non-core Talc Claim findings by the Liquidating Trustee. The Plan's expansion of the Liquidating Trustee's role is overreach and impermissible.

### B.     The Bankruptcy Court Cannot Delegate Powers to the Liquidating Trustee that the Bankruptcy Court Does Not Have.

The Bankruptcy Court cannot delegate non-existent powers to the Liquidating Trustee. As noted above, the Plan purports to grant the Liquidating Trustee authority to "allow" the Talc Claims. Moreover, the Plan provides that the "Liquidating Trustee's determination of eligibility, amount, and allowance of each Talc Claim shall be *final and binding*, and shall *not be subject to any challenge or review* of any kind, by *any court* or other person or entity…"[140]  This Plan language grants the Liquidating Trustee with significantly more power than the Court possesses.

Congress has enacted several statutes defining a Bankruptcy Court's jurisdiction.[141] Under 28 U.S.C. § 157(b)(2)(B), "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution" is not a core proceeding.[142]  Section 157(b)(2)(O) states "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship" are core claims "*except* personal injury tort or wrongful death claims[.]"[143]  And Section 157(b)(4) provides that "Non-core proceedings under section 157(b)(2)(B) of title 28, United States Code, shall not be subject to the mandatory abstention

---

[140] *See* Plan at § 5.3(v) at ECF p. 36 (emphasis added).

[141] 28 U.S.C. §§ 157(b)(2)(B), 157(b)(2)(O), 157(b)(4), and 157(b)(5).

[142] 28 U.S.C. § 157(b)(2)(B).

[143] 28 U.S.C. § 157(b)(2)(O) (emphasis added).

provisions of section 1334(c)(2)".[144]  28 U.S.C. § 157(b)(5) precludes a bankruptcy court from trying personal injury tort and wrongful death claims,[145] but a district court is not required to abstain from hearing personal injury tort claims, even if such claims are based on state law.

Read together, these statutes bar the Bankruptcy Court from issuing final rulings on personal injury tort or wrongful death claims such as the Talc Claims here. Hence, the Plan's disregard of these mandates is impermissible. The Plan specifies that the Liquidating Trustee shall make "final and binding" determinations regarding the Talc Claims—determinations that a Bankruptcy Court cannot itself issue.

Moreover, the Liquidating Trustee's determinations are not subject to *any* review. Absent express Congressional statutory direction, no federal court can issue decisions entirely immune from review, yet the Plan requires the Liquidating Trustee to make such decisions. No such statute is applicable to the Plan. Hence, the Plan's attempts to elevate the Liquidating Trustee above the Bankruptcy Court are improper.

The Plan's direction that the Liquidating Trustee "allow" Talc Claims is similarly improper. Under 28 U.S.C. § 157(b)(2)(B), *liquidation* of a personal injury or wrongful death claim for distribution purposes is not a core proceeding. Allowance and liquidation are related, but distinct concepts. Under Section 502(b) of the Bankruptcy Code, "claims-allowance has two parts; it 'determines both the liability of a debtor and the amount of the claim.'"[146]  In contrast,

---

[144] 28 U.S.C. § 157(b)(4).  The mandatory abstention provisions of section 1334(c)(2) prevent the district court from hearing certain proceedings that can be heard in a state court, if certain conditions are met.

[145] "The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending."  28 U.S.C. § 157(b)(5).

[146] *In re Dow Corning Corp.*, 215 B.R. 346, 354-55 (1997) citing 4 Collier on Bankruptcy ¶ 502.01.

liquidation involves the process of ascertaining the value of a claim.[147] "Allowance subsumes liquidation, since the latter involves fixing the amount of a claim but does not involve the determination of its validity."[148] Here, the Bankruptcy Court cannot issue a final order on the liquidation of the Talc Claims for distribution. However, the Plan purports to grant the Liquidating Trustee an even greater power: the Liquidating Trustee can allow (i.e. determine the validity *and* value) of the Talc Claim to make distributions under the TDP. Moreover, the Liquidating Trustee's determinations are not just a final order but are binding and not subject to review.[149]

In sum, Congress has defined the Court's jurisdiction to rule on personal injury and wrongful death claims like the Talc Claims. The Court cannot, through plan confirmation, delegate powers it does not have. Thus, the Debtors' attempt to expand the Liquidating Trustee's powers is impermissible and precludes confirmation of the Plan.

## V.     THE PLAN IMPROPERLY ESTABLISHES AN ASBESTOS TRUST.

The Plan improperly creates an asbestos trust addressing future claims in violation of Section 1129(a)(1). A bankruptcy court can only confirm a plan that complies with the Bankruptcy Code.[150] The Debtors' Plan violates Section 524(g). Under § 524(g), a debtor may establish a trust

---

[147] *Id*. at 357 ("In sum, every circuit and nearly every other court required to decide the issue has held that a claim is liquidated if its value can be readily ascertained whether or not the debtor's underlying legal liability on that claim is in dispute.")

[148] *Id*. at 359.

[149] This is especially inappropriate because the Trust is not attempting to evaluate or defend individual claims under applicable state law, but is attempting to "settle" claims under a Committee drafted protocol. The claims are essentially being channeled and passed through to the Trust and barred from accessing the tort system where they could actually be liquidated.

[150] 11 U.S.C. § 1129(a)(1).

to address *future* liability from asbestos claims.[151]  To do so, a debtor must meet certain requirements. Critically, a debtor must continue to operate as a going concern. The Debtors acknowledge that the Plan is a liquidating Plan.[152]  Hence, § 524(g) doesn't apply. While the Debtors don't cite § 524(g) in their Plan, the Plan attempts to shed liability for future claims. Specifically, it creates the Trust and channels Talc Claims to this Trust, despite the alleged lack of a discharge, for claims that arise after confirmation through some eventual dissolution of the Trust. This attempt is improper and violates § 1129(a)(1).

The Plan provides that "liability for all Talc Claims shall be permanently assumed by the Avon Liquidation Trust…."[153]  Further, the Plan states that "[e]xcept to the extent that a holder of an Allowed Talc Claim agrees to different treatment, *in full and final satisfaction, settlement, release of*, and exchange for an Allowed Talc Claim, each holder shall receive, from the Avon Liquidation Trust, such holder's share of the RC Recovery Fund…."[154]  The Plan's definition of Talc Claim impermissibly expands the scope of claims addressed by the Trust.

The Plan's Talc Claim definition includes *future* claims. Under the Plan, a Talc Claim means "any Claim against one or more of the Debtors, known or *unknown*…directly or indirectly arising out of or relating to the presence of or exposure to talc or talc-containing products in connection with…one or more of the Debtors…"  The Plan, however, does not limit "unknown" Talc Claims to pre-petition claims. Rather, the Plan expands Talc Claims to mean any claim "whether *or not* diagnosable or manifested before confirmation of the Plan or the close of the Chapter 11 Cases."  Thus, Talc Claims could arise for alleged injuries that occur *after* the Debtors'

---

[151] 11 U.S.C. § 524(g).

[152] *See* Plan at 5.4(ii)

[153] *See* Plan at 4.4(ii).

[154] *Id.*

cases conclude (*i.e.* future claims). Indeed, the claimants' committee already has taken this position.

Other language in the Talc Claim definition also signals the Debtors' intent to resolve future claims. For instance, Talc Claim includes claims for "medical monitoring". Courts "have begun to recognize claims like medical monitoring, which can allow plaintiffs some relief ***even absent present*** manifestations of physical injury." For "the toxic tort context, courts have allowed plaintiffs to recover for emotional distress[,]…the increased risk of future harm,…and the reasonable costs of medical monitoring or surveillance." Section 524(g) is the only provision of the Bankruptcy Code authorizing the channeling of future claims to a trust. The Debtors, however, make no effort to comply with § 524(g) or its requirements and no representative was appointed in this case to represent the interests of claimants whose demands may arise in the future.

In sum, the Plan's sweeping definition of Talc Claim includes future claims. The Plan's attempt to address future liability without complying with § 524(g)'s strict requirements is improper and bars confirmation under § 1129(a)(1)

## VI.   THE PLAN IMPROPERLY DETERMINES WHEN SUBSTANTIAL CONSUMMATION OCCURS.

The Plan prematurely determines substantial consummation. Section 12.6 of the Plan provides that "[o]n the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1102 and 1127(b) of the Bankruptcy Code."  This provision improperly attempts to establish substantial consummation *before* the required actions occur.

Substantial consummation requires "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property

dealt with by the plan; and (C) commencement of distribution under the plan."[155]  This is a factual

determination that must be made in hindsight, after the required events have actually occurred.[156]

The statute requires actual transfer, assumption, and commencement—not merely the promise that

these events will happen.

The Plan contemplates transfers of property to the Trust and the Trust's assumption of

certain assets, but these events have not yet occurred. Once these events occur, substantial

consummation may be established—this cannot be done in the provisions of the Plan before the

events take place. Section 12.6 improperly conflates plan confirmation with plan performance and

should be rejected as inconsistent with 11 U.S.C. § 1101(2).

## VII.    THE PLAN DID NOT OBTAIN THE NECESSARY VOTES

### A.    All Debtors But API Failed to Obtain the Necessary Vote

The Plan, although a joint plan for all of Avon Debtors, is a separate plan for each Debtor

as a matter of law. As such, in determining whether the voting requirements of § 1129(a)(10) have

been satisfied, Debtors must show that those requirements are satisfied separately as to each

debtor. Because only claimants against Debtor API cast ballots, Debtors cannot make that showing

for any of the Debtors other than API. The Plan therefore cannot be confirmed on the basis of the

existing vote.

In *In re Tribune Co*., Judge Carey held that for a joint plan proposed by more than one

jointly-administered debtor to be confirmed, absent substantive consolidation or consent, it had to

---

[155] 11 U.S.C. § 1101(2).

[156] *See, e.g., In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989) (finding that the plan was "in fact, has been substantially *completed*.") (original emphasis); *In re H & L Devs., Inc.*, 178 B.R. 77, 80 (Bankr. E.D. Pa. 1994) ("Whether a plan has been substantially consummated is a question of fact to be determined upon the circumstances of each case and the evidence provided by the parties.")

be accepted by at least one impaired class on a debtor-by-debtor basis, rather than on a per-plan basis. [157]

The debtors in *Tribune* were Tribune Company and over one hundred of its subsidiaries. There were two competing plans, neither of which "received the affirmative vote of an impaired class for each debtor entity included in the respective joint plans."[158] For example, one of the plans lacked an impaired accepting class with respect to 39 of the 111 debtors.[159] The proponent of the other plan faced the same problem, but argued that its plan "was accepted by an impaired class at every Debtor for which votes were cast," meaning that where votes were actually cast with respect to a particular debtor, they were cast in favor of the plan.[160] That proponent argued that "there is a substantial difference between affirmative rejection of a plan and simple creditor inaction. . . . Apathy of creditors . . . holding de minimus [sic] claims is not cause to derail the DCL Plan."[161]

The court found that neither plan satisfied the requirements of § 1129(a)(10). The court placed great emphasis on the fact that the proposed plan expressly stated that the debtors' estates were "***not*** being substantively consolidated," which meant that the joint plan "actually consists of a separate plan for each Debtor."[162] Accordingly, "[a]scribing the plural to the meaning of 'plan'

---

[157] *In re Tribune Co.*, 464 B.R. 126, 183 (Bankr. D. Del. 2011), amended, in part, on reconsid., 464 B.R. 208 (Bankr. D. Del. 2011), aff'd, in part, vacated, in part, 2014 WL 2797042 (D. Del. June 18, 2014), aff'd, in part, rev'd, in part and remanded, 799 F.3d 272 (3d Cir. 2015), aff'd on remand, 587 B.R. 606 (D. Del. 2018).

[158] *Id*. at 180.

[159] *Id.*

[160] *Id*., quoting one of the parties' briefs.

[161] *Id.*, again quoting one of the parties' briefs (ellipses by the court).

[162] *Id.* (emphasis in original).

in § 1129(a)(10) is entirely logical and consistent with such a scheme."[163] In sum, the court ruled as follows:

> I find nothing ambiguous in the language of § 1129(a)(10), which, absent substantive consolidation or consent, must be satisfied by each debtor in a joint plan. Neither plan here satisfies § 1129(a)(10).[164]

Judge Carey is not the only Delaware bankruptcy judge to apply a per-debtor interpretation of § 1129(a)(10). In *In re JER/Jameson*, which involved several affiliated debtors, Judge Walrath dismissed the Chapter 11 case of one of those debtors that had only a single creditor that said it would oppose any reorganization plan, and thus no plan for that debtor could be confirmed. Citing *Tribune*, Judge Walrath concluded that, absent substantive consolidation, that debtor's case served no reorganizational purpose because "there must be a consenting class for each individual debtor in a joint plan for it to be confirmed."[165] And in *Brookstone Holdings*, Judge Shannon similarly required that each of several affiliated debtors in a joint plan had to have an impaired accepting class, but he confirmed the plan because the debtors were able to prove that each of them had an impaired accepting class.[166]

---

[163] *Id.*

[164] *Id.* In a later case, Judge Carey applied the holding of *Tribune* and rejected an argument that a plan did not meet the requirements for confirmation, where the joint plan for approximately 300 debtors provided for substantive consolidation and had been accepted by one impaired class. *In re Woodbridge Group of Cos. LLC*, 592 B.R. 761, 778 (Bankr. D. Del. 2018). Because the *Woodbridge Group* joint plan provided for substantive consolidation, the court held, it did not need to be accepted on a per-debtor basis.

[165] *In re JER/Jameson Mezz Borrower II LLC*, 461 B.R. 293, 302 (Bankr. D. Del. 2011). *See also id.* at 302-03 (because the debtor "could get no accepting class . . . in the absence of substantive consolidation, [the debtor] does not have any chance of confirming a plan").

[166] *In re Brookstone Holdings Corp.*, 2011 WL 13502583, at *6, *13 (Bankr. D. Del. Feb. 24, 2011).

To be sure, there are cases outside of the Third Circuit rejecting the per-debtor approach, holding instead that a joint plan by several debtors can be confirmed on a per-plan basis, even if it is not demonstrated that there is an impaired accepting class for each debtor.[167] Other courts follow the decisions of this District. Recently, for example, a Florida bankruptcy court followed the per-debtor approach outlined by Delaware bankruptcy judges. In *In re Consolidated Land Holdings*, multiple, jointly-administered debtors sought to confirm a joint plan that did not propose substantive consolidation. The debtors had classified claims and interests into five classes of impaired claims. Only one class—Class 3, which consisted solely of allowed general unsecured claims of Radisson Hotels—accepted the plan. The court found that Radisson's claims were improperly gerrymandered into a separate class to ensure that one impaired class accepted the plan.[168] The court also found that even if Radisson's vote counted, the plan could not be confirmed because Radisson was not a creditor of one of the debtors. Citing both *Tribune* and *JER/Jameson*, the court said, "I agree with the 'per debtor' approach" when considering a joint plan filed in a

---

[167] *See In re NESV Ice, LLC*, 661 B.R. 427, 445-46 (Bankr. D. Mass. 2024) (applying per-plan approach, albeit "with some reservation," and acknowledging that "applying the 'per plan' approach may allow for greater attempts at chicanery by plan proponents"); *85 Flatbush RHO Mezz LLC v. TH Holdco LLC (In re 85 Flatbush RHO Mezz LLC)*, 2022 WL 11820407, *11 (S.D.N.Y. Oct. 20, 2022) (affirming bankruptcy court's plan confirmation order based on the per-plan approach where case law in that district was different than "out-of-circuit" case law from the Delaware bankruptcy court); *JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Properties Inc. (In re Transwest Resort Properties, Inc.)*, 881 F.3d 724 (9th Cir. 2018).

[168] *In re Consolidated Land Holdings, LLC*, 2021 WL 3701799, at *4-*5 (Bankr. M.D. Fla. Aug. 20, 2021). The plan had two classes of general unsecured claims Radisson's and everyone else's, including the deficiency claim of a secured creditor, Wells Fargo. "Because Wells Fargo's still-unknown deficiency claim could exceed Radisson's outstanding claims, had the Debtors combined all unsecured claims into one class, it could not get the 'yes' vote of one needed non-insider class without Wells Fargo's support, and they could not confirm its plan. By separately classifying Radisson's claims, arguably, they have one accepting class.").

jointly-administered case.[169] Applying that approach to the case before it, and noting that the debtors were not substantively consolidated, the court held that "absent substantive consolidation, the subsections of § 1129(a) must be satisfied by each Debtor. Because Radisson is not a creditor of 200 STL, the Debtors' Joint Plan has not been accepted by an impaired class for each Debtor as required by § 1129(a)(10). The Debtor's Joint Plan is not confirmable."[170] In deciding what authority to follow, the Court should bear in mind that the Plan here seeks to bind future claims against Debtors when not a single impaired creditor voted in favor of their respective plans. Such a result would surely be impermissible under § 524(g) and this Court's decisions on the permissive scope of a bankruptcy discharge and injunctions.

Here, as in *Tribune*, the Plan does not substantively consolidate any of the Debtors. Section 5.1 of the Plan states:

> The Plan is being proposed as a joint plan of liquidation of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.[171]

Because the Plan does not substantively consolidate the Debtors, each Debtor must, as *Tribune* held, separately satisfy the requirements of § 1129 of the Bankruptcy Code.[172] According to the Plan, Class 3 includes unsecured claims against each of the Debtors. *See* Plan at § 3.3. The Balloting Agent, Epiq, filed a declaration on June 27, 2025, reporting that the "Debtors only

---

[169] *Id.* at *6 & n.68.

[170] *Id.* at *6 (emphasis in original).

[171] *See also* Plan at § 3.2 (groupings under the Plan "shall not affect any Debtor's status as a separate legal Entity [or] result in substantive consolidation of any Estates").

[172] *In re Tribune Co.*, 464 B.R. at 183.

received ballots for Class 3 against Debtor API; consequently, no Ballots for Class 3 were received for any other Debtors other than API…"  Dkt. No. 1221 at 5. The fact that the only votes that were cast were with respect to Debtor API means that the Plan cannot be confirmed as to any of the other Debtors.

## B.     A Plan Cannot be Confirmed on the "Votes" By Holders of Unfiled Claims.

Although there is no dispute that no Debtor but API received the vote of an impaired class, even that vote was improper. Confirmation should be denied because the Plan has not received the necessary votes for approval by properly allowed claims. Certain Insurers acknowledge that the Court previously ordered that temporarily allowed talc claims could vote on the Plan in the Solicitation Order, but reiterate their argument here that only liquidated, noncontingent claims or claims as to which a proof of claim has been filed may be permitted to vote.

A bankruptcy court can only confirm a Chapter 11 plan if the holders of allowed claims vote in its favor.[173] Only the holder of an allowed claim or interest may vote.[174] As noted earlier, a claim may only be allowed when a proof of claim is filed. Accordingly, until a party is deemed to have, or actually has, an 'allowed' claim, it has no right to accept or reject a plan.[175] Hence,

---

[173] 11 USC § 1129(a)(8).  That section states, in pertinent part: "(8) With respect to each class of claims or interests--(A) such class has accepted the plan; or (B) such class is not impaired under the plan." *Id*.

[174] 11 USC § 1126(a).  That section states, in pertinent part, "[t]he holder of a claim or interest allowed under section 502 of this title [11 USCS § 502] may accept or reject a plan…." *Id*.

[175] *See In re M. Long Arabians*, 103 B.R. 211, 215 (9th Cir. BAP. 1989) (*citing In re Orosco,* 77 B.R. 246, 249 (Bankr. N.D. Cal. 1987), *aff'd*, 93 B.R. 203 (9th Cir. BAP. 1988); *Matter of Gardinier, Inc.*, 55 B.R. 601, 604 (Bankr. M.D. Fla. 1985)).

because no Talc Claimant filed a proof of claim, no Talc Claimant can have allowed claims and their votes may not be counted.[176]

While the Court ruled that claims may be temporarily allowed for voting purposes, confirming a plan on this basis would be improper. The Debtors' schedules reflect no tort claims that are undisputed, liquidated and non-contingent. There is no reliable estimate of the number of tort claimants or the values of their claims and no means for the Court to determine whether or not the Plan truly serves the best interests of creditors. Therefore, the Plan does not merit confirmation.

## VIII.  RESERVATION OF RIGHTS

As of the filing of this Objection, discovery is ongoing. Accordingly, the Insurers reserve the right to object to the Plan on additional grounds, including any grounds offered by the Insurers' expert witnesses, or on any grounds asserted by other objecting parties.

## IX.  CONCLUSION

For the foregoing reasons, the Insurers respectfully request that the Court enter an order denying confirmation of the Plan.

DATED:  July 1, 2025                  Respectfully submitted,

                         */s/ Marc Casarino*
                         Marc Casarino (DE 3613)
                         KENNEDYS CMK LLP
                         222 Delaware Avenue
                         Suite 710
                         Wilmington, DE 19801
                         marc.casarino@kennedyslaw.com

                         George R. Calhoun (pro hac vice)
                         IFRAH PLLC

---

[176] *See, e.g., In re Orosco*, 77 B.R. 246, 249 (Bankr. N.D. Cal. 1987) *aff'd*, 93 B.R. 203 (9th Cir. BAP 1988); *In re M. Long Arabians*, 103 B.R. 211, 215 (B.A.P. 9th Cir. 1989).

1717 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Phone: (202) 525-4147
george@ifrahlaw.com

*Attorneys for Everest Reinsurance
Company (formerly known as
Prudential Reinsurance Company)
and TIG Insurance Company
(successor by mergers to
International Surplus Lines
Insurance Company and Gibraltar
Casualty Company)*

By: */s/ Sommer L. Ross*
Sommer L. Ross, Esq. (DE Bar No. 4598)
**DUANE MORRIS LLP**
1201 N. Market Street, Suite 501
Wilmington, DE 19801
Telephone: (302) 657-4951
E-mail: slross@duanemorris.com

Russell W. Roten, Esq. (Admitted pro hac vice)
Jeff D. Kahane, Esq. (Admitted *pro hac vice*)
Nathan Reinhardt, Esq. (Admitted *pro hac vice*)
Timothy Evanston, Esq. (Admitted *pro hac vice*)
Ashley Storey, Esq. (Admitted *pro hac vice*)
**SKARZYNSKI MARICK & BLACK LLP**
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
Telephone: (213) 721-0650
Facsimile: (213) 721-0640
Email:  rroten@skarzynski.com
kahane@skarzynski.com
nreinhardt@skarzynski.com
tevanston@skarzynski.com

*Counsel for Certain Insurers*

  /s/ Timothy Martin
Timothy Martin

68

WHITE AND WILLIAMS LLP
Courthouse Square
600 N. King Street, Suite 800
Wilmington, Delaware 19801
Phone: (302) 654-0424
E-mail:  martint@whiteandwilliams.com

Mark D. Plevin (admitted pro hac vice)
PLEVIN & TURNER LLP
580 California Street, 12th Floor
San Francisco, California 94104
Phone: (202) 580-6640
E-mail:  mplevin@plevinturner.com

Miranda H. Turner  (admitted pro hac vice)
Tacie H. Yoon (admitted pro hac vice)
PLEVIN & TURNER LLP
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
Email:  mturner@plevinturner.com,  tyoon@plevinturner.com

*Attorneys for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America, and as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company; Federal Insurance Company; TIG Insurance Company, formerly known as International Insurance Company, but only to the extent policies were assumed by Westchester Fire Insurance Company; ACE American Insurance Company*

/s/ Timothy Martin _____
Timothy Martin
WHITE AND WILLIAMS LLP
Courthouse Square
600 N. King Street, Suite 800
Wilmington, Delaware 19801
Phone: (302) 654-0424
E-mail:  martint@whiteandwilliams.com

Mark D. Plevin (admitted pro hac vice)
PLEVIN & TURNER LLP
580 California Street, 12th Floor
San Francisco, California 94104
Phone: (202) 580-6640
E-mail:  mplevin@plevinturner.com

Miranda H. Turner  (admitted pro hac vice)
Tacie H. Yoon (admitted pro hac vice)
PLEVIN & TURNER LLP
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
Email:  mturner@plevinturner.com,  tyoon@plevinturner.com


*Attorneys for Allianz Underwriters Insurance Company, The American Insurance Company, Associated Indemnity Corporation, and Fireman's Fund Insurance Company*