**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AIO US, INC, *et al.*, | Case No. 24-11836 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Related Docket No. 1319** |

<u>**MEMORANDUM OPINION**</u>

# TABLE OF CONTENTS

Factual and Procedural Background .............................................................4

   1. The Avon business ....................................................................4

   2. The company's talc liability ....................................................6

   3. The bankruptcy case ...............................................................8

   4. The plan..................................................................................11

   5. The confirmation hearing .....................................................20

Jurisdiction ..............................................................................................28

Analysis ....................................................................................................29

   I. The plan was proposed in good faith. .................................31

      A. The plan generally seeks to achieve ends that are within the contemplation of the bankruptcy laws..............................31

      B. While the plan's treatment of claims for foreign exposures to the debtors' talc products is a factor that weighs against a finding of good faith, it is insufficient to tip the balance under the "totality of the circumstances." .................................................33

   II. Modest changes to the plan are required in order for the plan to respect the rights of the insurers. ........................................36

      A. The insurance contracts are not executory...................45

      B. The trust distribution procedures reflect a voluntary settlement between the debtor/trust and the claimants. ...............50

      C. Certain of the insurers' remaining objections lack merit; others require modifications to the proposed order...................57

         1. Although the insurance policies are not executory, it is nevertheless the case that the rights cannot be transferred without the associated terms and conditions. .........................58

         2. Claims resolved by the trust may be described as "allowed" claims; that allowance, however, reflects a voluntary settlement, not an adjudication of liability.................................60

3.  The plan and confirmation order should be silent about the
    preclusive effect of this Court's actions. ....................................................64

4.  The liquidating trustee need not be "neutral." .......................................65

5.  The "sharing" provisions are permissible..................................................67

6.  The Court will not waive the rules providing for a stay of the
    effectiveness of the confirmation order if any party represents
    that it intends to seek a stay pending appeal. ........................................70

III. The insurers' remaining objections to confirmation are overruled....................71

A.  The objections based on the vote are without merit. ....................................73

B.  The plan need not comport with § 524(g). ....................................................76

C.  Debtor is not required to liquidate all claims before confirmation..............80

IV. The plan's payment of bond indenture fees is permissible. .............................83

V.  The gatekeeping provision cannot be approved over the UST objection. .........89

Conclusion .................................................................................................................95

Avon Products, Inc. and various of its affiliates filed these bankruptcy cases in 2024.  The debtors were once the owners of the iconic Avon cosmetics brand.  They spun off their U.S. assets, however, in a 2016 transaction.  During these bankruptcy cases, they sold their foreign operations to Natura, their Brazilian parent company.  The debtors and Natura also resolved, after extensive litigation with the Committee, various estate claims that the debtors held against Natura.  Accordingly, the debtor entities now hold only the proceeds of those sales, insurance assets, and other causes of action.  The question now before this Court is whether the plan of reorganization that the debtors have proposed can be confirmed.

These bankruptcy cases were precipitated by personal injury claims asserted against the debtors by plaintiffs who allege that their diseases were caused by exposure to the debtors' talc-containing cosmetic products.  The debtors proposed a plan in February of this year and this Court approved a disclosure statement in May.  The U.S. Trustee and various insurers objected to confirmation of the plan.  This Court conducted a confirmation hearing in July.

As described in further detail below, the Court concludes that certain provisions of the plan and confirmation order must be revised in order to permit the plan to be confirmed.  Subject to those revisions, however, the plan is confirmable.  *First,* the Court concludes that the plan has been proposed in good faith.  The evidence suggests that the debtors undertook a process designed to treat constituencies fairly and to maximize value for the benefit of creditors, as the Bankruptcy Code contemplates.  There are imperfections in the plan.  For example, the provision that

bars recovery from claimants whose exposure to the debtors' products did not occur in the United States or the United Kingdom looks to this Court like an improper effort by certain plaintiffs' lawyers to protect their turf. Even so, however, the totality of the evidence supports a finding that the plan has been proposed in good faith.

*Second*, the Court largely overrules the objections asserted by insurers that relate directly to the treatment of their insurance policies, though certain of those objections require modifications to the terms of the plan. Broadly speaking, as far as the insurers are concerned, the trust distribution procedures established in the plan should be viewed as a voluntary settlement, between the talc claimants and the debtor/trust, of talc claims. A financially distressed company can, outside of bankruptcy (and without court approval) enter into a settlement under materially similar economic terms with plaintiffs who are asserting claims against it – assigning both the claims and its insurance assets to a trust – and wind down its business. That trust can then sue the company's insurers, arguing that there is insurance coverage for the settlements the trust reached with the claimants. The insurers could respond to such a lawsuit by arguing that the trust has not complied with the various conditions to insurance coverage, and therefore the coverage is vitiated. The principal point this Court intends to make is that the respective rights of the trust (which is to be created under this plan) and the company's insurers should be essentially the same as they would be had this occurred out of bankruptcy. (There is an exception for the insurers' rights to challenge the assignment of the policies to the trust, which are preempted by § 1123(a)(5)(B) of the Bankruptcy Code). To be sure, this may set up a

2

high stakes and complex dispute to be resolved in insurance coverage litigation. But that is what it is. So long as small adjustments to the plan and confirmation order are made to comport with the principle that the bankruptcy neither expands nor contracts the rights of the parties, the insurer objections to the trust distribution procedures do not provide a reason why the plan cannot be confirmed.

*Third*, the insurers raise a handful of objections that are not directly related to their insurance policies. While the insurers' standing to assert these objections (particularly in view of the fact that they do not claim to be creditors here) is uncertain, the Court ultimately concludes that these objections fail on the merits. One of the 20 debtors in this case has only a single creditor that has asserted a claim, and that creditor did not vote on the plan. While there is a division of authority on the question, many courts hold, as the insurers here argue, that in such circumstances the class has not accepted the plan. Here, however, the solicitation order clearly provides that such a class will be deemed to have accepted the plan. Whether or not the inclusion of such language is appropriate, here it was entered on notice to all parties in interest and without objection. That order will therefore control. The Court also rejects the insurers' argument that the plan must comply with § 524(g) of the Bankruptcy Code and their contention that the Bankruptcy Code prohibits assigning the task of resolving unliquidated claims to a post-confirmation liquidating trust.

*Fourth*, the U.S. Trustee argues that the payment of indenture trustee fees under the plan is an improper end run around § 503(b) of the Bankruptcy Code, which

authorizes the payment of such fees only on a showing that the indenture trustee made a "substantial contribution" to the case.  The Court concludes that on the facts present here, the payment of the fees is fundamentally a question of whether the plan discriminates among similarly situated creditors.  Under the Bankruptcy Code, however, unfair discrimination is an objection that can be raised only by a class of creditors that rejects the plan's treatment of their claims.  Because here the payment of these fees was appropriately disclosed, and all of the creditors who might be viewed as "victims" of the discrimination voted to support the plan, this form of disparate treatment is not a basis to deny confirmation of the plan.

*Finally*, the plan contains a "gatekeeper" provision that bars the assertion of any claim that could be reasonably understood to violate the plan's exculpation provision.  And any claim that falls within that sweep may go forward only if this Court finds that the claim is "colorable" on the merits.  The Bankruptcy Code provides no authority for such an order.  The gatekeeping provision must be removed.

### Factual and Procedural Background

### 1.    The Avon business

Avon, founded in 1886, is a leading global beauty, fashion, and home related products company.[1]  The corporate entities that filed these bankruptcy cases, however, have not operated or sold products in the United States since 2016, when

---

[1] D.I. 12 ¶ 23 (first-day declaration).  The Court relies on the first-day declaration only as to background matters.  In connection with the elements of plan confirmation, the Court relies only on documents and testimony that were admitted into evidence during the confirmation hearing.

they spun off their U.S.-based assets.[2]  The debtors now before this Court are Avon's

U.S. holding companies., which as of the time of the filing owned non-debtor foreign

Avon subsidiaries and the majority of Avon's intellectual property assets.[3]

All of the debtors' revenue was derived from foreign operations.[4]  The debtors

are wholly owned by Natura, a Brazilian corporation.[5]  After acquiring the debtors in

2019, Natura provided substantial funding to them.[6]  As of the petition date, the

debtors owed Natura $1.271 billion, a substantial portion of which was secured by

the debtors' assets.[7]  The chart below, created by the debtors, provides a high-level

summary of the company's ownership structure:[8]

---

[2] *Id.* ¶ 29.

[3] *Id.*

[4] *Id.* ¶ 38.

[5] *Id.* ¶ 39.

[6] *Id.* ¶ 41.

[7] D.I. 12 ¶ 48.

[8] *Id.* ¶ 33.  Note that this chart depicts the entities that filed at the time these cases were initiated.  Sixteen additional entities later filed separate bankruptcy petitions.  These cases are now jointly administered.



### 2.    The company's talc liability

Beginning in 2010, various plaintiffs began to assert personal injury claims against the debtors on account of alleged exposure to Avon's talc-containing products.[9]  Claimants alleged that Avon's talc-containing cosmetic products were contaminated with asbestos and caused mesothelioma or other diseases.[10]  By 2020, debtors faced a rapid influx of talc-related lawsuits.[11]  This increase in filings against Avon coincided with the bankruptcy filing of LTL, a Johnson & Johnson subsidiary,

---

[9] July 21, 2025 Hr'g Tr. at 39.

[10] D.I. 12 ¶ 78.

[11] July 21, 2025 Hr'g Tr. at 40.

6

and the imposition of a stay against the assertion of talc-related claims against Johnson & Johnson.[12]

The debtors have incurred roughly $225 million in defense and settlement costs since 2010.[13] As of the petition date, the debtors had obtained dismissal of 197 talc claims and settled 350 talc claims. The median value of these settlements was $99,500.[14] Between 2020 and 2024 alone, the debtors obtained dismissal of 119 talc claims and settled 310 claims.[15] They paid roughly $123.5 million in settlement costs, settling 35 talc claims for less than $10,000; 268 talc claims between $10,000 and $3 million; and 7 talc claims for amounts greater than $3 million.[16]

The debtors took only two talc cases to trial, suffering adverse jury verdicts in both.[17] The *Chapman* trial resulted in a jury verdict of $46 million and is currently on appeal.[18] The *Ramirez* trial resulted in a jury verdict of $24.5 million.[19] The debtors assert that they would have appealed that verdict as well, but the case is currently stayed as a result of this chapter 11 filing.[20]

---

[12] *Id.* at 110.

[13] D.I. 12 ¶ 80.

[14] D.I. 1402 ¶ 18.

[15] Debtors' Ex. 85.

[16] *Id.*

[17] July 21, 2025 Hr'g Tr. at 176; D.I. 1402 ¶ 19; D.I. 12 at 32.

[18] July 21, 2025 Hr'g Tr. at 176; D.I. 1402 ¶ 19; D.I. 12 at 33.

[19] *Id.*

[20] *Id.*

As of the petition date, 386 talc-related cases were pending against Avon.[21] Also as of the petition date, debtors had outstanding liquidated talc liabilities of approximately $78.1 million – $7.6 million for cases that they had settled but had not yet paid the amounts promised in the settlements and $70.5 million on account of the two judgments entered against them.[22]

### 3.    The bankruptcy case

Debtor API, a U.S. based holding company, and certain of its U.S. subsidiaries filed these chapter 11 cases in August 2024.[23]  In October 2024, 16 additional U.S. subsidiaries filed chapter 11 cases in this Court.[24]  The debtors' cases are being jointly administered.[25]  Natura, which is the debtors' parent company and their prepetition secured lender, agreed to provide the debtors a $43 million DIP loan to finance these bankruptcy cases.[26]

The debtors had also negotiated, before the bankruptcy filing, a proposed settlement with Natura, under which Natura would provide cash and other consideration to the bankruptcy estate in exchange for a release of estate causes of action.[27]  Specifically, Natura would pay the debtors $30 million in cash, exclude certain assets including insurance receivables and preference claims from its

---

[21] D.I. 12 ¶ 79.

[22] D.I. 1402 ¶ 19.

[23] D.I. 1.  Avon Products, Inc. is referred to as "API."

[24] D.I. 297.

[25] D.I. 389 at 7.

[26] D.I. 10; D.I. 64; D.I. 56 (interim DIP order); D.I. 318 (final DIP order).

[27] D.I. 65.

proposed asset purchase, assume all liabilities related to API's pension plan, waive roughly $530 million in secured debt, and grant a release of the debtors and their estates from certain claims that would otherwise reduce creditor recoveries.[28]  The debtors asserted that this proposed settlement preserved the going concern value of the business, provided numerous benefits to the estates, and resulted in meaningful recoveries for unsecured creditors.[29]  In addition, Natura agreed to serve as a stalking horse bidder to acquire substantially all of the debtors' assets.[30]

The Committee vigorously opposed this settlement and sale.[31]  While the debtors sought a sale hearing in late October, the Court gave the Committee an additional month to take discovery, setting the hearing on the sale and proposed settlement for late November.  The parties engaged in extensive litigation over the course of the following months, which included substantial discovery and the Committee filing a motion to dismiss the case.[32]

While the parties were engaged in active discovery, the debtors also ran a 13-week marketing process for the sale of substantially all of the debtors' assets.  They received no additional qualifying bids and cancelled the auction.[33]  The Committee, the debtors, and Natura ultimately settled on the eve of trial and proposed a global

---

[28] D.I. 65 at 3-4.

[29] *Id.* at 4-5.

[30] D.I. 64.

[31] D.I. 163, 398, 476.  The Official Committee of Unsecured Creditors is referred to as the "Committee."

[32] *See* D.I. 370, 497, 500, 501.

[33] D.I. 415.

settlement that resolved both the estate claims against Natura as well as the objections to the sale.

At the December 5, 2024 hearing, the parties explained the terms of the global settlement, which included that (1) Natura would provide the debtors $34 million of unencumbered cash, (2) Natura would exclude the following assets from the sale: the debtors' cash as of the closing date, liquidation insurance receivables (approximately $4.8 million), rabbi trust assets (approximately $25.5 million), preference claims and commercial tort claims, (3) Natura would assume certain pension assets and liabilities, (4) Natura would assume the attorneys' fees incurred in connection with API's prosecution of the appeal from the *Chapman* verdict and Natura may assume prosecution of the appeal, (5) Natura would waive all unsecured claims, intercompany claims, and all secured claims (except to the extent necessary to satisfy Natura's credit bid), (6) Natura would fund, in full and in cash, all outstanding DIP commitments prior to the sale closing date, and (7) all of the debtors' rights under talc insurance policies would be transferred into a trust, created by the plan, for the benefit of creditors.[34]  Natura and the debtors also agreed to release each other from any and all claims, current, unknown, or future.[35]

Following a hearing during which the terms of orders approving the sale and settlement were discussed (which is discussed further in Part V of this Memorandum

---

[34] D.I. 577-1 at 20-22 of 41; D.I. 581 (order approving the settlement).

[35] D.I. 577-1 at 22-25 of 41.

Opinion), the Court entered orders approving both the settlement and the sale of substantially all of the debtors' assets to Natura.[36]

### 4.    The plan

After approval of the sale and settlement, the parties undertook negotiations toward a plan.  On February 28, 2025 the debtors filed an initial chapter 11 plan of liquidation and a proposed disclosure statement.[37]

The debtors' primary assets are preference and commercial tort causes of action, rights to coverage under insurance policies, and an anticipated $31 million in cash as of the effective date.[38]  The plan proposes that, on the effective date, all of the debtors' assets will vest in a liquidation trust created by the plan.[39]  Melanie L. Cyganowski will be appointed as liquidating trustee to administer, resolve, liquidate, and pay all claims against the debtors.[40]  The trust is a mechanism for resolving only those claims presented during the life of the trust, not future arising claims.[41]  The

---

[36] D.I. 581, 582.

[37] D.I. 812, 813.  The plan was amended several times prior to the disclosure statement hearing, and again prior to the confirmation hearing.  This Court will cite to the second amended plan, D.I. 1319, when referring to the plan that is before this Court for confirmation. For present purposes, however, the material terms, including the distribution structure, classification and treatment of creditors, voting procedures, and other provisions material to plan confirmation have not changed materially since the earlier version of the plan filed at D.I. 965.

[38] D.I. 1028, § 1.1.  The disclosure statement was amended several times prior to the disclosure statement hearing.  Except when addressing an objection to a specific prior version of the disclosure statement, this Court will cite to relevant provisions in the approved disclosure statement, D.I. 1028, which have remained materially unchanged since the version filed at D.I. 966.

[39] D.I. 1319, § 5.4.

[40] Id., § 5.3.

[41] D.I. 1319-1, § 3.2.

trust will be dissolved at the earlier of five years after its creation or when all trust assets have been depleted.[42]

*Classification and treatment of creditors under the plan*

The plan establishes eight creditor classes: priority claims (class 1); secured claims (class 2); general unsecured claims (class 3); talc claims (class 4); subordinated claims (class 5); intercompany claims (class 6); intercompany interests (class 7); and parent interests (class 8).[43]

Classes 1, 2, and 7 are unimpaired and deemed to accept – the debtors anticipate that class 1 and 2 claimants' rights under the plan will be unaltered and that their claims will be paid in full; class 7 intercompany interests will receive no distribution under the plan and will be reinstated solely to maintain the debtors' corporate structure and to facilitate the debtors' dissolution.[44]

Classes 5 and 8 are impaired and deemed to reject – class 5 claims are subordinated claims and they will be deemed expunged, released, and extinguished as of the effective date; class 8 interests are parent (API) interests that will be cancelled and new parent interest will be issued to the liquidation trust.[45]  Class 6 intercompany claims will all be either reinstated or cancelled and released at the option of the debtors or the liquidating debtors.[46]  Regardless, no distributions will be

---

[42] D.I. 1319, § 5.4.

[43] *Id.*, § 3.3.

[44] *Id.*, §§ 4.1, 4.2, 4.7.

[45] *Id.*, §§ 4.5, 4.8.

[46] *Id.*, § 4.6.

made out on account of intercompany claims.[47]   Intercompany claim holders are not entitled to vote on the plan, and their claims can either be treated as unimpaired, and deemed to accept, or impaired, and deemed to reject.[48]

Class 3 and 4 creditors are the only impaired classes eligible to vote to accept or reject the plan.[49]  Class 3 includes all general unsecured claims against the debtors such as the unsecured 2043 note claims, trade claims, and former employee-related claims.[50]  The debtors have upwards of $49 million in outstanding liability on account of class 3 claims.[51]  The bond trustee's fees and expenses relating to the 2043 notes are excluded from the class 3 claim pool and instead are proposed to be paid pursuant to an agreement between the debtors and the bond trustee as a condition precedent to confirmation of the plan.[52]

The plan provides that class 3 creditors can either (1) recover their *pro rata* share of waterfall distributions from a general unsecured claims recovery fund (which will be funded with up to $14 million in cash) or (2) they can elect to receive treatment identical to class 4 talc claimants in accordance with trust distribution procedures, and recover their *pro rata* share of cash proceeds from insurance rights and retained causes of action.[53]  The net result of this mechanism is that claimants who make the

---

[47] *Id.*

[48] D.I. 1319, § 4.6

[49] *Id.,* § 3.6.

[50] D.I. 1028, § 1.2.

[51] *Id.*

[52] D.I. 1319, §§ 12.16, 9.1.

[53] *Id.*, § 4.3; D.I. 1028, §§ 1, 1.5; D.I. 1319-1, § 3.2.

class 3 election will recover the same percentage of the liquidated value of their claims as class 4 talc claimants do.  While this election might (or might not) result in greater recoveries, the payout amount and timing are uncertain.[54]

The holders of talc claims against any or all of the debtors are assigned to class 4.[55]  The plan provides that talc claims that were unliquidated as of the petition date will be resolved and liquidated in accordance with trust distribution procedures.[56]  Talc claims that were liquidated pre-petition, whether by settlement or pursuant to a jury verdict, will be paid as soon as practicable from the trust.[57]

All other talc claims will be paid out on a first-in, first-out basis.[58]  The trust will only pay talc claims if the talc exposure, from use of debtors' talc-cosmetic products, occurred in the United States or the United Kingdom.[59]  Claimants' recoveries are dependent on the proceeds from insurance coverage and those from other estate causes of action.  The debtors emphasized that nothing in the trust distribution procedures determines whether the insurers are obligated to pay under their policies on account of the talc claims.[60]

---

[54] *Id.*  Greater recoveries from the class 3 election depend on the liquidated claim value assigned to talc claims (the denominator) and insurance recovery and the proceeds of recoveries on estate causes of action (the numerator).

[55] D.I. 1319, § 4.4.

[56] *Id.*

[57] D.I. 1319-1, § 4.2.

[58] *Id.*, § 3.1.

[59] *Id.*, § 6.7.

[60] *Id.*, § 2.3.

Mesothelioma talc claimants can elect to have their claims reviewed through either the expedited review or an individual review process.[61]  If a mesothelioma talc claimant selects the expedited review process and provides satisfactory evidence of a mesothelioma diagnosis and regular exposure to the debtors' cosmetic talc products for at least three years, then the claimant will be offered the scheduled value ($10,000) of the claim.[62]  A claimant must submit evidence of the name of the products to which the claimant was exposed, how often the claimant used the product,  the time frame in which the claimant was exposed, the duration of use, and information regarding where and when the debtors' talc product(s) were purchased.[63]  The trust distribution procedures also establish strict medical diagnosis criteria – the trust "must have reasonable confidence that the medical evidence provided in support of the talc claim is credible and consistent with recognized medical standards."[64]

If the mesothelioma talc claimant selects the individual review process, the claimant will be required to satisfy the exposure and medical diagnosis criteria described above and must also submit additional evidence to aid the liquidating trustee's specific liquidated value determination.[65]  This includes information about whether the claimant used other non-debtor talc products and if the claimant had exposure to asbestos or asbestos products other than what was alleged to be present

---

[61] *Id.*

[62] *Id.*, §§ 4.3(b), 4.4(b).

[63] D.I. 1319-1, § 4.3(b).

[64] *Id.*, § 4.4.

[65] *Id.*, § 4.3(c)(1).

in the debtors' cosmetic talc products.[66]   The liquidating trustee will consider the

historical liquidated values of other similarly situated mesothelioma talc claims

against the debtors in the tort system and the historical value of such claims paid out

by the debtors.[67]   A mesothelioma talc claimant's allowed claim under the individual

review process will be capped at $3 million.[68]   Subject only to the application of this

cap, however, the principal requirement of the trust distribution procedures is to

generate allowed claim amounts that mirror the debtors' prepetition experience in

resolving talc claims.

All other disease talc claimants will automatically proceed through the

individual review process.[69]   If the liquidating trustee determines that the claimant

has provided satisfactory evidence of a disease diagnosis and has also established

that he or she has had no exposure to asbestos or non-debtor talc products, then the

claimant may receive an allowed claim of up to $6,000.[70]

Claimants are not required to accept the liquidated value assigned to their

claims through these processes.   The trust distribution procedures provide that

claimants may arbitrate any disputes arising from the liquidating trustee's

determination of claim allowance or the value of their talc claims.[71]   The plan does

---

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] D.I. 1028, § 1.6; D.I. 1319-1, § 4.3.

[70] D.I. 1028, § 1.6; D.I. 1319-1, § 4.3(c)(2).

[71] D.I. 1028, § 1.6; D.I. 1319-1, § 4.5.

not contemplate, however, any access to a judicial process to determine the allowed amount of a talc claim.  A claimant's sole recourse is to arbitration, and the task of the arbitrator will be to determine whether the trust applied the trust distribution procedures correctly.

*Distribution structure*

The plan provides that on the effective date, the liquidating trust will first pay in full all professional fees (including those fees and expenses of the bond trustee for the 2043 notes), administrative expense claims, secured claims, and priority claims. Remaining cash on-hand would be allocated to the operating expense reserve for the benefit of the liquidating trustee, and then to the general unsecured claims recovery fund.[72]  Once all other outstanding claims and the liquidating trustee's operating expenses have been paid, post-effective date cash (insurance proceeds and any recoveries from other causes of action) will be allocated for the benefit of class 4 talc claimants and class 3 special election claimants.[73]

*Voting and solicitation procedures*

Classes 3 and 4 are the only impaired classes whose members are eligible to vote to accept or reject the plan.[74]  The proposed voting and solicitation procedures order temporarily allowed all class 3 and 4 claims for purposes of voting on the plan.[75] Each class 4 talc claimant was accorded one vote on the plan against debtor API

---

[72] D.I. 1319, § 5.10.

[73] *Id.*, § 5.11.

[74] *Id.*, § 3.6.

[75] D.I. 1028, § 2.2(d).

only.[76]  And for voting purposes only, all mesothelioma talc claims were valued at $10,000 (reflecting the scheduled expedited review value of such claims in the trust distribution procedures) while all other talc disease claims were valued at $20.[77]

Debtors also noted that they were aware of only one potential claim that may be against a debtor other than API – the EPA (represented by the Department of Justice, acting on behalf of the United States), which has a claim against debtor MIH.[78]  This, coupled with the fact that none of the other debtors, other than API, hold any assets, led the debtors to propose that the MIH claimant receive the same treatment as creditors of API under the plan.[79]  The debtors explained as much in a footnote to the disclosure statement.[80]

The plan provides that any class that, as of the commencement of the confirmation hearing, does not have at least one holder of an allowed claim in an amount greater than zero for voting purposes shall be considered "vacant" and deemed eliminated from the plan for voting purposes.[81]

*Other relevant provisions*

The plan contains standard debtor-releases, an exculpation provision, an injunction, and a "gatekeeping" provision.[82]  The gatekeeping provision provides that

---

[76] *Id.*, § 2.5.

[77] *Id.*, § 2.2(d)(iii).

[78] D.I. 1028, n.13.  Debtor MI Holdings, Inc. is referred to as "MIH."

[79] *Id.*

[80] *Id.*

[81] D.I. 1319, § 3.4.

[82] *Id.*, §§ 10.4(i), 10.6, 10.7, 10.8.

parties may not pursue any claims that may relate to, or are reasonably likely to relate to, claims released or exculpated in the plan, without first requesting a determination from the bankruptcy court that such claim was not subject to a plan injunction and is a "colorable" claim on the merits.[83]

*Disclosure statement and proposed voting and solicitation procedures hearing*

Various insurers objected to the disclosure statement and proposed voting and solicitation procedures.[84]  The debtors resolved most of those objections and filed an amended plan, disclosure statement, and proposed solicitation procedures order reflecting the terms of those resolutions.[85]  London Market Insurers, however, maintained objections to the temporary allowance of talc claims and to the confirmation timeline.[86]  The debtors argued that London Market Insurers lacked standing to object to the proposed voting procedures for talc claimants.[87]

The Court held a hearing on the debtors' motion for approval of the disclosure statement and solicitation and voting procedures on May 19, 2025.  The Court approved the disclosure statement and solicitation and voting procedures subject to certain changes to the ballots to which the debtors had agreed.[88]  The Court also issued an opinion that held that the London Market Insurers were parties in interest

---

[83] D.I. 1319, § 10.8.

[84] D.I. 1020, 1021, 1022.  The insurers objected to various provisions in a prior iteration of the disclosure statement, D.I. 965.

[85] D.I. 1027, 1028, 1029, 1030.

[86] D.I. 1021.

[87] D.I. 1031.

[88] D.I. 1047.

who were entitled to be heard with respect to both objections. The Court, however, overruled the objections on the merits, finding the procedures and confirmation timeline to be appropriate.[89]

### 5. The confirmation hearing

After the May 19, 2025 hearing, certain insurers filed various motions to adjourn the confirmation hearing. They sought extensions for discovery and filed a motion to dismiss the bankruptcy case.[90] The insurers notified debtors of their intent to conduct a 30(b)(6) deposition and also proposed to introduce expert testimony at confirmation to establish that exposure to talc does not cause mesothelioma. The debtors moved *in limine* to exclude any expert testimony on this topic.[91] They argued that it was not relevant to confirmation because such testimony goes to the merits of the talc claims, and the plan does not prejudice the insurers' authority to contest, for coverage purposes, the merits or value of the talc claims.[92] The debtors also moved to quash all 30(b)(6) topics pertaining to the merits of the underlying talc claims, including historical data trends and prepetition talc verdicts and settlement histories (although the debtors had produced, in discovery, documents that contained such information).[93] The Court, during a status conference, denied the debtors' motion to quash certain topics from the 30(b)(6) deposition but granted the *in limine* motion

---

[89] D.I. 1125.

[90] D.I. 1137, 1155, 1250, 1268, 1269, 1301, 1302.

[91] D.I. 1246.

[92] *Id.* at 8-9.

[93] *Id.* at 5-7.

regarding the proposed expert testimony after the debtors and the Committee represented that the intent of the plan was to leave in place all of the insurers' rights with respect to the merits of the underlying talc claims.

The U.S. Trustee and the insurers objected to confirmation of the plan.[94]  The U.S. Trustee objected to the plan injunction and gatekeeping provision and argued that the plan provision for payment of the bond trustee's fees and expenses circumvents the requirements of § 503(b) and results in disparate treatment of creditors, rendering the plan unconfirmable.[95]  Insurers objected on various grounds, arguing that the plan was not proposed in good faith, the plan did not obtain the necessary votes,  the plan improperly seeks to alter insurers' rights by "allowing" talc claims and binding insurers to the trust's claim valuations, and asserting that their insurance policies are executory contracts such that the plan cannot assign rights under the insurance policies without also transferring the debtors' obligations.[96]  The debtors amended the plan in response to those objections.  The second modified plan was filed on July 17, 2025.[97]

The Court held the confirmation hearing on July 21 and 23, 2025.  Philip Gund, the debtors' chief restructuring officer and treasurer, testified on behalf of the debtors

---

[94] D.I. 1232, 1233, 1235, 1238.  The parties objected to a prior iteration of the plan, D.I. 1050.

[95] D.I. 1232 at 1-2.

[96] D.I. 1233, 1235, 1238.

[97] D.I. 1319.

and was subject to cross examination.  All other testimony came in by declaration.[98]
All opposing parties had the opportunity to present their arguments.  The debtors
responded to the filed objections and those raised during the hearing.

Philip Gund testified to the debtors' intent with respect to the plan and trust
distribution procedures, the negotiations underlying the plan, how the trust
distribution procedures are intended to mirror the tort system for talc claims, and the
debtors' history in the tort system regarding talc-related claims.[99]  Gund testified that
the debtors' decision to file for bankruptcy was prompted by an increase in talc filings
against the estate, $1.3 billion in funded debt with little cash on-hand, growing
defense costs, and concerns that recent adverse jury verdicts would affect the debtors'
historical ability to reach smaller settlements.[100]  He testified that the trust
distribution procedures and the plan were intended to maximize the value of the
estate while creating a "fair and equitable process for the resolution of unsecured
creditor claims [and] talc claims."[101]

Gund testified that the debtors maintained a spreadsheet of all talc claims
against the debtors, 386 of which were outstanding as of the petition date.[102]  Gund

---

[98] The Court also admitted, during the confirmation hearing, certain exhibits as well as
designated deposition testimony.  To the extent the Court relies on designated deposition
testimony to which a party objected, the Court overrules the objection.

[99] July 21, 2025 Hr'g Tr. at 38.

[100] *Id.* at 40-42, 64.

[101] *Id.* at 71.

[102] *Id.* at 40, 53-54.

had asked the debtors to create a summary of 429 claims between 2020-2024 that had been resolved, excluding verdicts.[103]  That summary showed the following:[104]

| Category | Number of resolutions | Percent of resolutions by count | Percent of settlements by count | Total resolution value |
|---|---|---|---|---|
| Settlement amount greater than $3 million | 7 | 1.6% | 2.3% | $48,450,000 |
| Settlement amount between $10,000 and $3 million | 268 | 62.5% | 86.5% | $74,944,000 |
| Settlement amount less than $10,000 | 35 | 8.2% | 11.3% | $79,000 |
| Dismissed | 119 | 27.7% | N/A | $0 |
| **Total** | **429** | **100%** | | **$123,473,000** |

Gund testified that the trust distribution procedures are intended to mimic the tort system in process and resolution.[105]  The trust distribution procedures establish medical criteria consistent with those used in the tort system for the liquidating trustee to consider when evaluating claims and also provide historical settlement values with which the liquidating trustee is charged with aligning.[106]

Mesothelioma talc claimants can have their claims reviewed under the expedited review or individual review process.  Debtors' counsel suggested that, in light of the company's tort history, most mesothelioma claimants will likely elect

---

[103] *Id.* at 59.

[104] *Id.* at 59-60; Debtors' Ex. 85.

[105] July 21, 2025 Hr'g Tr. at 62, 84-85;

[106] *Id.* at 114; D.I. 1319-1, § 4.3(c)(1).

individual review because the scheduled value for expedited review claims is so low.[107]

And while the statements of counsel are not evidence, the evidence that is in the

record of the proposed result of the expedited review process and the company's

settlement history (in light of ordinary common sense) seems to support that

assertion.

The expedited review process assigns mesothelioma talc claimants with valid

claims a $10,000 value – which is the lower bound of the category in which the debtors

place the majority of settlements (268) they had reached.[108]    Mesothelioma talc

claimants who elect the individualized review process will be able to recover up to,

but no greater than, $3 million.  This value reflects the higher bound of the category

in which the debtors place the majority of settlements they had reached.[109]    The

$3 million cap was negotiated with the Committee and reflected the debtors' view

that such a cap would result in significant savings in the claims resolution process.[110]

All other talc-disease claims will be individually reviewed by the liquidating

trustee and are subject to a $6,000 cap.[111]  Debtors' counsel explained that the drastic

difference between the scheduled value assigned to other talc-disease claims (such as

ovarian cancer claims) and mesothelioma claims reflects the difference in the

---

[107] July 21, 2025 Hr'g Tr. at 180-181.

[108] *See* Debtors' Ex. 85; Gund Dep. at 241-242.

[109] *See* Debtors' Ex. 85; July 21, 2025 Hr'g Tr. at 67-69.  This "bracketing" of claims as falling within a range of $10,000 to $3 million of course accepts the categories that the debtors chose to assign to these claims, which is (necessarily) somewhat arbitrary.

[110] July 21, 2025 Hr'g Tr. at 67-69.

[111] D.I. 1319-1, § 4.3(c)(2); July 21, 2025 Hr'g Tr. at 176-177.

strength of the evidence of causation.[112]  Gund testified that the Committee had proposed to include in the trust distribution procedures the average value of mesothelioma claims, but the debtors rejected this proposition because they were concerned that "the average value would either become a target or a minimum and would, ultimately, inflate claims."[113]

Gund testified that the debtors do not concede that their products contain asbestos.[114]  In fact, the debtors maintained throughout, and adhere to the position, that their products were safe.[115]  But despite the fact that outside of bankruptcy the debtors could respond to talc claims by arguing, for example, that exposure to the debtors' talc products does not cause mesothelioma, under the expedited review process mesothelioma claimants need only establish proof of diagnosis and exposure to an Avon talc product for three years to receive a settlement offer.[116]  While in the individual review process, the liquidating trustee may consider evidence regarding whether the products at issue contained asbestos, for purposes of the expedited review process the debtors were effectively compromising their defense that exposure to talc does not cause mesothelioma.[117]  The debtors contend that in light of the increase in claims they faced in recent years, the trust distribution procedures

---

[112] July 21, 2025 Hr'g Tr. at 176.

[113] Id. at 132, 138-139.

[114] Id. at 112-113.

[115] Id. at 113.

[116] Id. at 114-115.

[117] Id. at 171-173.

provide a streamlined and more efficient process for claims resolution. Coupled with the $3 million cap, the debtors contend that these procedures greatly reduce the total cost of managing their talc liability.[118]

Gund testified that the debtors intended both for the plan to protect the estate's right to recover on available insurance assets, and (relatedly) to protect the insurers' rights. He testified that the debtors were unwilling to agree to a plan or trust distribution procedures that inflated values for talc claims.[119] He explained that the debtors insisted on provisions expressly stating that the trust distribution procedures do not affect the insurers' rights and also added in audit provisions to protect against fraudulent or improper claims.[120] And though not in evidence, debtors' counsel also explained that the debtors would not agree to a plan provision that would grant the liquidating trustee broad authority to amend the trust distribution procedures' scheduled values and criteria without court approval.[121]

Stephenie Kjontvedt's declaration regarding the tabulation of votes was also admitted into evidence.[122] Sixty-one general unsecured class 3 claimants (90.71% of the voting creditors in the class) holding $8,143,287.51 in claims (96.93% in amount) voted to accept the plan.[123] Seven class 3 claimants (10.29% of the voting creditors in

---

[118] July 21, 2025 Hr'g Tr. at 84.

[119] *Id.* at 74, 82-83.

[120] *Id.* at 83.

[121] *Id.* at 182-183.

[122] D.I. 1221.

[123] *Id.* at 4.

the class) holding $258,000.00 (3.07% in amount) in claims voted to reject the plan.[124]

Debtors' counsel also submitted a proffer of testimony with respect to the voting

status of the fourteen non-bondholder creditors in class 3 – all fourteen non-

bondholder creditors, totaling $4,054,287.15 in claims, voted to accept the plan, none

voted to reject it.[125]  Just over 90 percent of class 3 claimants elected to forgo their *pro*

*rata* share of distributions from the general unsecured claims recovery fund in favor

of receiving treatment identical to class 4 creditors and sharing in the pool of

insurance and cause of action recovery proceeds.[126]  All of the class 4 (talc) claimants

(100%) who submitted ballots voted to accept the plan.[127]  No class 4 claimant voted

to reject the plan.[128]

 The debtors only received ballots for class 3 against debtor API and no other

debtor.[129]  Debtors had entered into a stipulation with the EPA, a creditor of debtor

MIH, whereby the EPA agreed to have its claim against MIH be treated as a non-

electing class 3 claim against debtor API.[130]  The EPA did not, however, vote on the

---

[124] *Id.*

[125] July 21, 2025 Hr'g Tr. at 120-121; D.I. 1316, n.6.

[126] D.I. 1221-3.

[127] D.I. 1221 at 5.

[128] *Id.*

[129] *Id.*

[130] D.I. 1296.

plan.[131]  Class 4 votes were only solicited for debtor API in accordance with the plan and the solicitation procedures order.[132]

During closing arguments, the debtors described certain changes to the plan that they agreed to make in response to the objections asserted during the hearing. The debtors agreed to remove certain conflicting provisions or phrases that might be understood to affect the insurers' rights.[133]  They also agreed to remove the debtors and liquidating debtors entirely from the protection of the section 10.4 plan injunction, and agreed to revise the plan injunction to ensure that insurers' rights are not impaired by the plan injunction.[134]  At the close of argument, the Court directed the debtors to file a redline on the docket showing those plan changes, which filing has been docketed at D.I. 1362.[135]  The insurers were invited to file a further redline showing those changes that they believed needed to be made for the plan to be confirmable (subject to the reservation of their rights to contend that no plan would be confirmable).  Two such redlines were filed at D.I. 1386 and 1388.

## Jurisdiction

When a proponent of a plan of reorganization seeks confirmation of that plan, the contested matter arises under § 1129 of the Bankruptcy Code and thus falls

---

[131] July 21, 2025 Hr'g Tr. at 213; July 23, 2025 Hr'g Tr. at 16.

[132] D.I. 1221 at 5.

[133] July 23, 2025 Hr'g Tr. at 7.

[134] *Id.* at 22-23.

[135] The U.S. trustee objected to certain modifications to the plan injunction in § 10.4 of the plan.  After conferring with the U.S. trustee, the debtors filed additional plan revisions at D.I. 1385 which resolve the U.S. trustee's objection to the § 10.4 plan injunction.

within the district court's subject-matter jurisdiction over matters "arising under" the Bankruptcy Code provided in 28 U.S.C. § 1334(b). That jurisdiction has been referred to this Court under 28 U.S.C. § 157(a) and the district court's February 29, 2012 standing order of reference. Plan confirmation is a core matter under 28 U.S.C. § 157(b)(2)(L).

## Analysis

The debtors' confirmation brief walks through the elements that a plan proponent is required to establish to confirm a plan of reorganization, including satisfaction of the various elements of § 1129(a) of the Bankruptcy Code, and identifies the record evidence that, they contend, demonstrates the satisfaction of each of those elements.[136] Much of what the debtors say there is not contested.

This Memorandum Opinion will not contain specific findings and conclusions addressing each element necessary to show that the plan is confirmable. As is customary, the Court is prepared to enter a confirmation order that makes the necessary and appropriate findings, which will need to be revised by the parties to reflect the conclusions set forth herein. This Memorandum Opinion is addressed only to the objections to confirmation that were raised by one or more party in interest.[137]

---

[136] *See* D.I. 1320.

[137] Certain of the objections asserted by the parties have been mooted by changes to the plan and/or confirmation order that the debtors agreed to make in light of the evidence presented at the confirmation hearing. *See* July 23, 2025 Hr'g Tr. at 7, 22-23. This Memorandum will not address those issues.

Four parties in interest asserted objections to plan confirmation – three groups of insurers and the U.S. Trustee.[138]  These objections fall into five categories that the Court will address in the following order:

- *First*, the insurers argue that the plan was not proposed in good faith;

- *second*, insurers challenge certain findings and particular plan provisions on the ground that they would give the trust an improper "leg up" in subsequent insurance coverage litigation;

- *third*, the insurers assert a number of other confirmation objections that do not, on their face, relate to the treatment of their rights under their insurance policies;

- *fourth*, the U.S. Trustee argues that the plan's proposed reimbursement of the fees of the bond indenture trustee is impermissible; and

- *finally*, the U.S. Trustee contends that the "gatekeeper" provision in the proposed plan injunction is improper.[139]

---

[138] The U.S. Trustee objection is docketed at D.I. 1232.  A broad group of insurers filed a joint objection to confirmation, docketed at D.I. 1233.  During the confirmation hearing, these objections were argued by counsel for two of the groups of insurers that filed these objections. The Court will generally describe those arguments as those of the "Certain Insurers."  An objection filed by Hartford-related insurers (referred to, collectively, as "Hartford") was docketed at D.I. 1235.  A group of Travelers'-related insurers joined in portions of the other insurer objections.  D.I. 1238.

[139] The U.S. Trustee's objection also originally objected to confirmation on the ground that the plan injunction was overbroad.  D.I. 1232 at 9-10.  The parties negotiated a consensual resolution to that objection.  *See* July 21, 2025 Hr'g Tr. at 20, 250.

## I.     The plan was proposed in good faith.

### A.     The plan generally seeks to achieve ends that are within the contemplation of the bankruptcy laws.

Section 1129(a)(3) of the Bankruptcy Code provides that a plan of reorganization must be "proposed in good faith and not by any means forbidden by law."[140]  Courts have read this language to mean that both the means used and the ends sought in proposing a plan need to accord with the purposes of bankruptcy law.[141]  In making this assessment, courts are to consider the entire record and reach a judgment based on the "totality of the circumstances."[142]

Statements made by counsel, of course, are not evidence.  But counsel for the debtors explained that the debtors took time to study what had occurred in other mass tort bankruptcy cases.  "We understand the issues that have been raised by courts, by insurers, by other creditors, other objecting parties.  And we worked very hard to minimize those issues here … [by seeking] to do things right."[143]

The evidence at the confirmation hearing is broadly consistent with that representation.  There is no question that the bankruptcy was filed in good faith.  As described above, the bankruptcy was precipitated by the press of talc claims against

---

[140] 11 U.S.C. § 1129(a)(3).

[141] *See In re Combustion Engineering*, 391 F.3d 190, 247 (3d Cir. 2004) ("for purposes of determining good faith under section 1129(a)(3) the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.") (cleaned up); *In re American Capital Equip.,* 688 F.3d 145, 157 (3d Cir. 2012) (same); *In re Boy Scouts of America*, 642 B.R. 504, 645 (Bankr. D. Del. 2022) (same).

[142] *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (Bankr. D. Del. 2012).

[143] July 21, 2025 Hr'g Tr. at 145.

the debtors, including two large adverse judgments.[144]  During the bankruptcy case, the debtors reached an arm's length settlement (after extensive litigation) with the Committee that provided for the settlement of various estate causes of action against Natura arising out of pre-petition transactions and a process for the marketing and sale of the companies' assets (principally the shares of non-debtor foreign subsidiaries), which culminated in a sale of those assets to Natura.[145]

The evidence also demonstrates that the plan was proposed in good faith. Gund testified that the plan's trust distribution procedures were broadly intended to create a construct under which the trust would settle talc claims with individual talc claimants on terms that roughly mirrored the company's settlement history outside of bankruptcy.[146]  He explained that as a fiduciary, the debtors believed they were obligated to seek to preserve whatever insurance was available for the benefit of the talc claimants (who made up a substantial fraction of the companies' creditor body).[147]  At the same time, however, he testified that the debtors sought to do this in a way that treated the companies' insurers fairly and preserved coverage defenses that the insurers would otherwise have.[148]

---

[144]  *Id.* at 42 (Gund testimony that debtors filed for bankruptcy because they "had approximately $3 million in cash … approximately $1.3 billion in funded debt … increasing amounts of talc claims, recent verdicts, upcoming interest payments to the bondholders as a result of that, and [they weren't] able to operate.").

[145]  D.I. 581, 582.

[146]  July 21, 2025 Hr'g Tr. at 62, 68-69, 84-85.

[147]  *Id.* at 82-84.

[148]  July 21, 2025 Hr'g Tr. at 74, 82-84.

**B.    While the plan's treatment of claims for foreign exposures to the debtors' talc products is a factor that weighs against a finding of good faith, it is insufficient to tip the balance under the "totality of the circumstances."**

The insurers contend that under the plan's trust distribution procedures, foreign claims are not eligible for payment.[149]  The insurers cast this objection as one under § 1129(a)(1), presumably because they contend that the provision is inconsistent with § 502(b), which provides that claims allowance should turn on whether the creditor holds a valid "right to payment" against the debtor under applicable non-bankruptcy law.[150]  For reasons this Court will describe in Part II.B, the settlement mechanism set up through the trust distribution procedures does not and need not (in light of the unanimous consent of the talc claimants) precisely reflect parties' legal rights outside of bankruptcy.  The Court is therefore not persuaded that the inclusion of this provision, without any objection from an affected talc claimant, raises a question about improperly altering the rules of claims allowance.

It does, however, bear on the question of good faith.  As an initial matter, the debtors are correct in pointing out that § 6.7 of the trust distribution procedures is focused on location where the claimant alleges to have been exposed to the debtor's product, not on the claimant's nationality.[151]    That provision states that

---

[149] D.I. 1233 at 45-46.

[150] *See* 11 U.S.C. § 101(5).

[151] A highly regarded former bankruptcy judge published a law review article suggesting that it may be appropriate to classify foreign creditors separately.  *See* Barbara J. Houser, *Classification and Treatment of Foreign Claims in U.S. Bankruptcy Proceedings*, 36 Tex. Int'l L. J. 475, 494 (2001).  While that issue is not before this Court, the Court appreciates that the factors identified in Judge Houser's article may provide a basis for separate classification.

33

"[n]otwithstanding anything to the contrary herein, the Trust shall only pay Talc Claims if there is an allegation of Debtor Talc Exposure in the United States or the United Kingdom."[152]   Claimants exposed in the United States or in the United Kingdom are thus eligible to receive payment from the trust while claimants who allege that they were exposed to the debtors' products elsewhere are not.  The debtors assert that this provision is simply based on the history of the kinds of claims that were asserted and settled before the bankruptcy filing.

But if the only concern were with the potential allowance of otherwise invalid foreign claims, it would be sufficient for the trust distribution procedures to focus on whether the claim was valid, without regard to where the alleged exposure occurred. And while it may well be true that claimants asserting exposure to the debtors' products from outside the United States or the United Kingdom have not sued the company before, the past is not always a perfect predictor of the future.  So there surely is no basis to say that a claimant exposed in some other country might not be able to present a claim to the trust demonstrating that the claimant has a valid "right to payment" from the debtor under non-bankruptcy law, which is generally what is required to recover as a creditor in bankruptcy.

---

But even so, if a plan provided materially inferior treatment to that class of foreign creditors, it could be confirmed only if the disadvantaged class voted in favor of confirmation.  *See* 11 U.S.C. § 1129(b); *In re Tribune Co.*, 972 F.3d 228, 232 (3d Cir. 2020).  It also bears note that Judge Houser's 2001 law review article pre-dates the 2005 adoption of Chapter 15 of the Bankruptcy Code.   Section 1513(b) of the Bankruptcy Code now "specifies that foreign creditors … must receive at least the same treatment as general unsecured creditors without priority."  8 *Collier on Bankruptcy* ¶ 1513.02 (16th ed. 2025).

[152] D.I. 1319-1 § 6.7.

In addition to being unnecessary to serve any legitimate bankruptcy purpose, improper reasons why such a provision might be included in a trust distribution procedure come readily to mind. If, for example, the typical clients of those plaintiffs' lawyers representing committee members are individuals who have been exposed to the debtors' products in the United States or the United Kingdom, those lawyers might well draft a provision like this one to ensure that their "turf" not be invaded by others. Particularly in view of the fact that trust distribution procedures tend to make it easier and less expensive to assert claims against a trust than it was for plaintiffs to file suit against the debtors in the tort system (a feature of bankruptcy trusts discussed in Part II, below), this is certainly an approach that a committee member's attorney concerned with protecting one's own market share might take.

To be clear, the record contains no evidence that demonstrates that this is the reason for the provision, and the Court makes no such finding. But the motive and opportunity for a committee to seek to include such a provision, and the failure of the parties to suggest a legitimate reason for the provision that is at all persuasive, might well allow one to connect the dots.

The Third Circuit has, in other mass tort bankruptcy cases, emphasized the important role of the bankruptcy court in protecting the "integrity of the bankruptcy court proceeding as a whole."[153]  No part of the judicial role is more important than that. Even so, the record before this Court contains a substantial body of evidence demonstrating the debtors' good faith in proposing the plan. The debtors explained

---

[153] *In re Congoleum Corp.*, 426 F.3d 675, 685 (3d Cir. 2005).

that they set out to "do things right" – and that statement that is backed up by a great deal of record evidence.  It is also significant that not a single talc claimant with exposure to the debtors' products outside the United States or the United Kingdom has objected to the plan on this basis.

For those reasons, the Court will find that the debtors have established that this plan was proposed in good faith and not by any means forbidden by law.  The requirements of § 1129(a)(3) are therefore satisfied.  The Court emphasizes, however, that the inclusion of a provision like this is not a good look.  In the absence of prior authority addressed to the question, the Court does not believe that its inclusion overcomes the substantial body of other evidence demonstrating the debtors' good faith.  But now that this marker has been placed, however, the Court would not expect in future cases to confirm a plan containing a provision like this one in the absence of a more persuasive justification for its inclusion.

## II. Modest changes to the plan are required in order for the plan to respect the rights of the insurers.

The insurers also assert a number of objections to confirmation that relate directly or indirectly to the plan's treatment of their insurance policies.  As a conceptual matter, it is now settled that bankruptcy law intends for the bankruptcy filing of the insured to be as "neutral" as possible to the rights and obligations of the insurer.  The Third Circuit's recent *Boy Scouts* opinion makes this point clearly.[154] Section 541 of the Bankruptcy Code brings into the bankruptcy estate all of the

---

[154] *In re Boy Scouts of America*, 137 F.4th 126, 164 (3d Cir. 2025).

property, including insurance policies, that belonged to the debtor immediately before the filing.[155]  Those property rights, however, are defined by non-bankruptcy law.[156] And unless there is some bankruptcy-related reason that requires otherwise, the Supreme Court explained in *Butner,* "there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."[157]

This neutrality principle serves an important point of bankruptcy policy. "Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy."[158]  The forum shopping point is an especially important one here.

Chapter 11 is intended to permit an otherwise viable business facing financial distress to reorganize.[159]  It may also properly be used, such as in cases like this one, to maximize value by permitting a going concern sale and facilitating an appropriate resolution of estate causes of action.   But the powerful tools of bankruptcy are famously subject to misuse.[160]  If the estate's interest in property were greater in bankruptcy than outside of bankruptcy, a debtor might file for bankruptcy for reasons

---

[155] 11 U.S.C. § 541(a).

[156] *Butner v. United States*, 440 U.S. 48, 55 (1979).

[157] *Id.*

[158] *Id.* (citation and internal quotation omitted).

[159] *In re LTL Mgmt., LLC*, 64 F.4th 84, 101 (3d Cir. 2023).

[160] *In re SGL Carbon Corp.*, 200 F.3d 154, 161 (3d Cir. 1999).

that have nothing to do with chapter 11's purpose of facilitating the reorganization of a distressed business.   Rather, cases might be filed by debtors that seek a tactical advantage over another party.

That would be inconsistent with bankruptcy policy, which provides that a "debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either."[161]   As the Third Circuit's discussion in *Boy Scouts* reveals, the principle of *Butner* seeks to guard against the risk that parties might "forum shop" into bankruptcy for tactical purposes.

A series of Third Circuit decisions, including *Combustion Engineering* and *Boy Scouts*, have sought to give effect to the *Butner* principle in the context of a mass tort bankruptcy filing by a debtor that holds insurance coverage under a standard liability policy.[162]   The challenge, as the circumstances of this case demonstrate, is that basic principles of insurance and bankruptcy law clash in a way that makes the goal of "neutrality" – while it sounds laudable and is easy enough to articulate – a very difficult one to achieve in practice.

The nub of the problem is that the basic insurance bargain presumes that the insured's liability will be determined in the tort system.   When an insured receives a

---

[161] *Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 381 (2019) (internal quotation and citation omitted) (noting that the seminal decision in *Board of Trade of Chicago v. Johnson*, 264 U.S. 1, 15 (1924) "establish[es] this principle").

[162] *Combustion Engineering*, 391 F.3d at 218 (noting how the objective was to "not impair [the insurers'] rights or increase their burdens under the subject insurance policies"); *Boy Scouts*, 137 F.4th at 165 (relying on this discussion in *Combustion Engineering* for the proposition that "a plan cannot be confirmed when it incorporates provisions that impermissibly impair [a contractual] counterparts' rights").

claim, the insured may tender that claim to the insurer. If the insurer accepts that the claim is covered by the policy (or is prepared to defend under a "reservation of rights"), the insurer steps in and defends the claim. And the insured is subject to a contractual obligation to cooperate in defending the claim. Collusion between the claimant and the insured will typically void the coverage.

The practice in mass-tort bankruptcy cases is difficult to square with this insurance model. To begin, a debtor with mass tort liability, like any debtor in a bankruptcy case, requires the creditors' support for its plan of reorganization to emerge from bankruptcy. And what looks to a bankruptcy lawyer like good faith negotiations between a debtor and its creditors over a plan of reorganization, including the treatment of claims held by mass tort claimants, may well look to an insurance lawyer like collusion between the insured and the claimants.

That practice is complicated further by the way in which post-confirmation bankruptcy trusts operate. As a statutory matter, a claimant who asserts a claim for wrongful death or personal injury has a right to a jury trial on allowance of that claim in bankruptcy.[163] But as a practical matter, claimants in mass tort bankruptcy cases very rarely exercise this jury-trial right. Rather, the task of liquidating the (often) thousands of unliquidated personal injury claims is left to a post-confirmation trust.

---

[163] *See* 28 U.S.C. § 157(b)(5) ("The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending."); *id*. § 1411(a) ("Except as provided in subsection (b) of this section, this chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim.").

While many details differ across cases, the usual practice is for the trust to make a settlement offer to a claimant based on information that the claimant provides. A claimant may decline the offer and seek a more individualized assessment from the trust. In many cases, a claimant may not resort to a jury trial until various steps in the process (often including mediation) are exhausted. These procedures are typically set forth in "trust distribution procedures." In many cases (though not in this case), these procedures will include matrices that set out presumptive claim values based on the type of disease and its severity. These trust distribution procedures are commonly approved by the bankruptcy court as part of the plan of reorganization.

As sensible as all of this may be from the perspective of creating a mechanism for liquidating thousands of tort claims so that tort victims may recover their *pro rata* share of the estate assets, this mechanism of liquidating claims is very different from the process contemplated by the debtor's insurance policies. At the end of the day, the trust – which will succeed to the debtor's rights under its insurance policies – will likely seek insurance coverage for claims that have been "allowed" under these trust distribution procedures. To be sure, the insurers will be free to argue that the trust's failure to tender claims and cooperate with the insurers in their defense operates to vitiate the insurance coverage. But in the event of litigation between the trust and the insurers, the trust will likely trumpet (to a state court judge who may be unfamiliar with the bankruptcy process) that these procedures have all been approved by a bankruptcy court who found the plan, among other things, to be "fair and equitable." Against that backdrop, there is a sense in which declaring the plan

to be "neutral" with respect to insurance issues is about as effective as a court order declaring a bell to have been unrung.

Except that perhaps there is still a way to square this circle. The basic transaction involved in the creation of a post-confirmation liquidating trust is simply the creation of a trust under state law and a transaction under which the debtor's assets are transferred to the trust. As part of the transaction, the trust becomes liable for making pro rata distributions to creditors on account of claims that had run against the debtor. The trust distribution procedures are simply an agreement as among the claimants and the debtor/trust regarding the process by which claims will be liquidated and paid.

While this commonly occurs in a bankruptcy case, there is no reason why it *cannot* occur outside of bankruptcy. Indeed, a state law assignment for the benefit of creditors similarly involves impressing on the debtor's assets a trust, over which the assignee serves as trustee. State corporate law may provide other similar mechanisms by which a corporate entity can wind down its affairs in such a manner. To the extent there is a way to make the bankruptcy "neutral" with respect to insurance, the closest way this Court believes it can do so is to make clear that, as between the trust and the insurers, subject to one exception discussed below in Part II.C.1, the parties' rights vis-à-vis one another should be no different than they would be had such a transaction taken place under state law outside of bankruptcy. That is (again, subject to the one exception), this Court's order confirming the plan should not put a thumb on the scale one way or the other. The parties' rights are

essentially the same as they would be had such a transaction occurred outside of bankruptcy.

Indeed, courts applying state law have confronted insurance coverage disputes that have involved insureds reaching "voluntary settlements" with an underlying claimant without having tendered the claim to the insurer or cooperating in the defense of the claim.  This Court does not purport to opine on any such dispute. Unless and until the trust in fact seek insurance coverage for one or more claims, any such pronouncement would be premature and inappropriate.  But it bears note that courts considering such matters have reached varying conclusions in varying circumstances.  In some cases, courts have found that the failure to follow the procedures contemplated by the insurance policies renders insurance coverage unavailable.[164]  In others, courts have found that the actions of the insured did not prejudice the insurer, and therefore that coverage remained available.[165]  Perhaps, if the trust could show that its procedures for resolving claims was the same as the process to which the insurers had consented before the bankruptcy, a coverage court

---

[164] *See, e.g., Matter of State Farm Mut. Auto. Ins. Co. (Perez)*, 94 A.D.3d 1314, 1315 (N.Y. App. Div. 3d Dep't 2012) ("Where an insurance policy expressly requires the insurer's prior consent to any settlement by the insured with a tortfeasor, failure of the insured to obtain such prior consent from the insurer constitutes a breach of a condition of the insurance contract and disqualifies the insured from availing himself of the pertinent benefits of the policy.") (internal citations and quotations omitted).  *See also Appleman on Insurance Law & Practice* § 137.10[A][1] ("Policies commonly provide that the insured may not make any payment or assume any obligation in settling or compromising a claim, except at the insured's own cost, without the insurer's consent. If the insured effects a settlement with the injured person without the previous consent of the insurer as required by the policy, the insurer is thereby released, unless otherwise excused, as, for example, when the insurer withdraws or refuses to defend.")

[165] *Ideal Mut. Ins. Co. v. Myers*, 789 F.2d 1196 (5th Cir. 1986) (holding that an insurer is not discharged from liability when settlement is reasonable and does not prejudice insurer).

would similarly find that the process adopted here did not prejudice the insurers. This Court, however, is making no finding one way or the other on this issue. To the extent there is a takeaway for the benefit of a court that may subsequently be hearing an insurance coverage dispute between the trust and the insurers in this case, it is that (again, subject to the exception about assignment, discussed below in Part II.C.1) the question before that court should be viewed exactly the way it would be if the parties had engaged in a transaction that achieved the same economic result outside of bankruptcy.

To be clear, the Court appreciates that even if insurers have every ability to assert insurance coverage defenses in precisely the way they would have in the event that a similar transaction had occurred outside of bankruptcy, they may still feel aggrieved by the process. *First*, the creation of a trust with relatively simple and inexpensive mechanisms for asserting and liquidating claims may encourage claimants who would not have chosen to sue (due to the cost, burden, and delay associated with the tort system) to assert claims against the trust.[166] In this sense, it is certainly possible that (by virtue of claims coming out of the woodwork) the insurers may end up paying more than they otherwise would have.[167] The insurers contend that this is inconsistent with the principle of neutrality reflected in *Butner* and the

---

[166] American Bankruptcy Institute, A Practitioner's Guide to Liquidation and Litigation Trusts, Chapter 6.B. – Benefits of a Liquidation Trust (2016).

[167] *See Boy Scouts*, 642 B.R. at 556 (relying on the testimony of Charles Bates to explain why tens of thousands "Proofs of Claim were filed in the case as opposed to the prepetition average of fifty per year").

cases described above.[168]  *Second*, having the trust resolve hundreds or thousands of claims, and then present all of these claims for coverage, creates something of an "all or nothing" problem for an insurer.  In the typical case in which there is a dispute about whether a particular claim falls within an insurance policy's coverage, an insurer can typically make a decision about whether to provide coverage or litigate a coverage dispute with its insured in which the stakes are limited to the claim that is presented.  Having the insured (which is now the trust) aggregate these claims and present them *en masse* may well affect the negotiating leverage between the parties in a way that the insurer had not contemplated in issuing the policies, and that the insurer may contend places it at a disadvantage.

The answer to both of these objections, however, is the same one set out above. The debtors could have created a similar trust outside of bankruptcy that could have, in the same way, encouraged the assertion of claims that would not have been filed in the tort system, and aggregated many claims that would all be presented at once. Had the debtors done so and the insurers argued that the policies did not cover these "voluntary settlements," a court with jurisdiction over the insurance coverage case would resolve that dispute by applying state law and the terms of the insurance policies.  So too, here.  While the Court will address the parties' specific insurance-related objections in the balance of this Part II, the overarching objective is to achieve the form of "neutrality" described above.

---

[168] *See* Leanard P. Goldberger, *Last Man Standing: Insurers' Participation in Plan Confirmation Process*, Am. Bankr. Inst. J. at 30-31 (Nov. 2008).

### A.    The insurance contracts are not executory.

Hartford contends that its insurance policies are executory contracts.[169]  If that is true, they could only be assumed and assigned to the trust if the debtors were able to provide "adequate assurance" that the trust would be able to meet the debtors' obligations under the policies.[170]  Courts have uniformly rejected the contention that an insurance policy covering a period in the past, for which all premiums have been paid, is an executory contract within the meaning of § 365.  Judge Kearse's decision in an appeal arising out of the *Ames Department Stores* bankruptcy case is an example.  "Courts considering insurance policies in which the policy periods have expired and the initial premiums have been paid routinely find that they are not executory contracts despite continuing obligations on the part of the insured."[171]  Literally every other case this Court has been able to identify has reached the same result.[172]  In view of the consistency of this authority, this Court will follow the unbroken line of precedent and reach the same conclusion.

---

[169] D.I. 1235 at 13-21.

[170] *See* 11 U.S.C. § 365(f)(2)(B).

[171] *In re Ames Department Stores*, No. 93-4014, 1995 WL 311764, at *3 (S.D.N.Y. May 18, 1995).

[172] *See, e.g., In re Federal-Mogul Global, Inc.*, 385 B.R. 560, 576 (Bankr. D. Del. 2008) ("because the premiums are paid, the policy coverage periods have expired, and the remaining obligations of the insureds are ministerial, the Asbestos Insurance Policies are non-executory contracts and therefore, do not fall under § 365 of the Bankruptcy Code."); *In re Grace Indus.*, 341 B.R. 399 (Bankr. E.D.N.Y. 2006) ("Where, as in this case, an insured debtor has paid the initial premium in full, and the policy period has expired, the insurance policy is not an executory contract, despite continuing obligations on the part of the insured."); *In re Vanderveer Estates Holding, LLC*, 328 B.R. 18 (Bankr. E.D.N.Y. 2005) (same); *In re Sudbury Inc.*, 153 B.R. 776 (Bankr. N.D. Ohio 1993) (same).  *See also* Douglas N. Candeub, *When a Non-Executory Insurance Policy Is Assumed: A Case Study*, Am. Bankr. Inst. J. at 40 (March 2015) ("Bankruptcy courts consistently hold that an insurance policy for

In fairness to Hartford, however, a colorable case can be made that this line of authority is less than fully satisfactory. But even if one were to play out this line of argument to its logical conclusion, it would make no difference to the outcome here. To back up to first principles, the term "executory contract" is not defined in the Bankruptcy Code. The Third Circuit, however, has followed the generally prevailing view and adopted the Countryman definition of the term.[173] Under that definition, an executory contract is one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."[174]

On this understanding, contractual rights will fall into one of three categories. *First*, if the debtor has fully performed but the counterparty has not, the estate simply has an asset – the right to obtain the counterparty's performance. *Second*, if the counterparty has performed and the debtor has not, the counterparty simply holds a prepetition claim for the value of the debtor's performance. The *third* category, contracts that are materially unperformed on both sides, are within the scope of the

---

which the policy period expired prior to the insured's bankruptcy – and for which the initial premium was paid--is *not* an "executory contract" under § 365 of the Bankruptcy Code.") (emphasis in original); 3 *Collier on Bankruptcy* ¶ 365.02 (16th ed. 2025) ("An insurance policy under which the insured's bankruptcy would not relieve the insurer of its obligation, despite unpaid premiums, is not an executory contract, because the debtor's nonperformance of its premium obligations is not a breach that would excuse the insurer of its obligation to perform.").

[173] *Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989) (quoting Vern Countryman, *Executory Contracts in Bankruptcy, Part 1*, 57 Minn. L. Rev. 439, 460 (1973)).

[174] *Id.*

Countryman definition of an executory contract.[175]  And what is meant by "materially unperformed," in the bankruptcy context, is that one party's failure to perform will excuse the other party's performance.[176]

If one takes a careful look at the cases involving liability insurance policies covering past periods for which all premiums have been paid, courts find these policies to be non-executory for one of two reasons.  *First*, some cases, such as the bankruptcy court's decision in *Federal-Mogul*, find the contracts to be non-executory because the insured's remaining obligations, such as the duty to cooperate with the insurer in connection with the defense of claims, are purely "ministerial," or "immaterial" in the Countryman sense.  Hartford seeks to distinguish that line of cases, arguing that its policy is governed by New York law, and that under New York law the insured's failure to cooperate will void the coverage (that is, it will excuse the insurer's obligation to perform under the contract).

The question of whether the trust will comply with its obligations under the contract – and whether, if it does not, that failure operates to void the coverage – is the *merits* question in an insurance coverage matter that is not yet ripe and is not for this Court to decide.  As described above, cases involving "voluntary settlements" by insureds depend on the particular facts and circumstances of each case and may well vary based on the governing state law.  So at least in this Court's view, declaring the policies to be non-executory on the ground that the insured's obligations are all purely

---

[175] 3 *Collier on Bankruptcy* ¶ 365.02[2][a].

[176] *Id.* ¶ 365.02[2][b].

"ministerial" sweeps too broadly. That may or may not turn out to be right, based on the particular facts and circumstances that have not yet transpired. It does not seem, however, to be a wholly satisfactory basis on which to conclude that policies are non-executory.

The second rationale that some of the cases provide for finding the obligations to be non-executory is that the insurer does not have an unconditional *right* to obtain the insured's performance of its contractual obligations. Instead, the insured has a choice whether it wants to obtain insurance coverage, or not. If the insured does not want insurance coverage, it has no obligation to tender claims, cooperate in the defense, or anything else. Understood this way, the insured's obligations can be understood not as executory obligations, but simply as conditions to coverage. And as the Third Circuit explained in *Weinstein*, there "is a distinction between failure of a condition and a breach of a duty. If the remaining obligations in the contract are mere conditions, not duties, then the contract cannot be executory for purposes of § 365."[177] The Court in *Sudbury* found a liability insurance policy to be non-executory on this basis. While the insured's failure to meet the conditions of coverage might well operate to vitiate coverage, that was true only with respect to particular claims. The insured's "failure to cooperate as to any one claim would not meet the Countryman definition since it would not excuse the Insurer's performance in respect of other claims."[178]

---

[177] *In re Weinstein Company Holdings*, 997 F.3d 497, 509 (3d Cir. 2021) (cleaned up).

[178] *See Sudbury*, 153 B.R. at 779.

In *Sudbury*, the question whether the contracts were executory mattered only because the insurer sought administrative claim status for retroactive premiums that might become due under the policies.[179]  That question is not presented here.  Rather, Hartford is presumably contending that if the policy is executory, the failure to provide adequate assurance means that the contract must be rejected and therefore (perhaps) that Hartford no longer needs to perform its contractual obligations.

That outcome cannot be correct.  Regardless of the pigeonhole in which one wants to put this problem, the central principle here derives from *Butner*.  The bankruptcy filing should neither expand nor contract either party's rights.  The insured still has all of the contractual obligations provided for under the contract.  And if the insured can live up to those obligations (or if its failure to do so is excused under applicable non-bankruptcy law), then the insurer is likewise required to meet its obligations.  Perhaps one can reach that conclusion (as *Sudbury* does) by describing the insured's obligations as "conditions to coverage" rather than "executory obligations."  It is also conceivable that one could reach the same result by treating the contract as an executory one but finding that the insurer's ability to assert

---

[179] In many cases, the question whether a contract is executory is important to the question whether pre-petition defaults must be cured to obtain the counterparty's performance.  *See Weinstein* 997 F.3d at 501 ("In practice, an executory contract can be 'assumed' and then 'assigned' to a buyer under § 365 of the Bankruptcy Code provided all existing defaults are cured.  A non-executory contract, on the other hand, can be sold under § 363 to a buyer, who must satisfy post-closing obligations but need not worry about pre-closing breaches or defaults, which typically remain unsecured claims against the debtor's estate.  Thus, whether a contract is classified as executory or non-executory has significant implications for its treatment in a bankruptcy sale.").  That concern is absent here.

coverage defenses in the future provides it with appropriate adequate assurance of the trust's future performance.  As noted above, in light of the uniformity of the caselaw finding the policies to be non-executory, this Court will follow that course.  It bears note, however, that even if one were to view the contract as executory, the ultimate outcome here would be the same – the trust would get the policies subject to the same terms and conditions under which the debtors had them.  In no event, however, should either party obtain a windfall by virtue of the happenstance of the bankruptcy filing.

### B.    The trust distribution procedures reflect a voluntary settlement between the debtors/trust and the claimants.

The objecting insurers also raise a host of challenges to the trust distribution procedures themselves, arguing (among other things) that the procedures improperly eliminate the requirement that a claimant show causation.  Under the trust distribution procedures, a claimant with mesothelioma who can show that the claimant had been exposed to the debtors' cosmetic products will be entitled to receive a settlement offer from the trust.  The requirement that would otherwise apply in the tort system, that the plaintiff show that exposure to the defendant's product caused the plaintiff's injury, is essentially being compromised as part of the global resolution reflected in the trust distribution procedures.

To engage this objection (and others that relate to the operation of the trust distribution procedures), one needs to step back and unpack what trust distribution procedures are, and how they fit into the processes contemplated by the Bankruptcy Code.  To start with the statutory provisions, the Code contemplates two separate

things: (1) the mechanism for liquidating an unliquidated claim (which the Code describes, in § 502, as claims "allowance"), and (2) the recovery that creditors in each particular class will receive on account of their allowed claim (which is described, in § 1123(a)(3), as the "treatment" provided to claims in a particular class).

The trust distribution procedures in this case, as is common in mass tort bankruptcy cases, address both the mechanism for "allowing" the unliquidated claims (the settlement process contemplated by the trust distribution procedures) and the "treatment" that allowed talc claims will receive (each claimant will receive a ratable share of insurance recoveries and the recoveries on other causes of action assigned to the trust). In this Court's view, the process of fixing the amount of the otherwise unliquidated claims is best understood as "allowance," while the distribution of the proceeds of any insurance recoveries (including the sharing with other creditors that make the election) is "treatment."[180]

The debtors take a different view of this, describing all of the work done by the trust distribution procedures as a form of "treatment."[181] Debtors cite to the bankruptcy court opinion in *Boy Scouts* as support for that proposition. It is true that a passage in that opinion could perhaps be read, in isolation, to support that view.[182] A more careful review of the *Boy Scouts* opinion, however, reveals that the *Boy Scouts*

---

[180] *See Bankruptcy and Insurance Law Manual, Chapter 9: Defining "Claim": Bankruptcy Code vs. Insurance Policy* (4th ed. 2020).

[181] July 21, 2025 Hr'g Tr. at 155.

[182] *Boy Scouts*, 642 B.R. at 623. ("Trust distribution procedures, such as the TDP here, establish the method by which claims channeled to a trust will be resolved. While these procedures invariably differ somewhat in each case, the procedures encompass the means by which claims will be submitted, processed, liquidated and paid…. This is treatment.").

court was sensitive to the Bankruptcy Code's distinction between "allowance" and "treatment."

The distinction is an important one.  If a class of creditors accepts a plan's proposed "treatment" of that class, the class's acceptance can bind an individual creditor in that class who opposes that treatment.  But every individual claimant is entitled to the protections provided by the statutory process of determining the allowed amount of that creditor's claim.[183]  Because claims allowance is not a matter on which the vote of a majority can bind a minority, the Court does not believe it correct to describe the mechanism of resolving unliquidated claims as part of a plan's "treatment" of a class of creditors.

The court in *Boy Scouts* reached that same conclusion.  "The allowance of a claim is distinct from treatment of a claim and the class vote does not bind a dissenting creditor with respect to whether its claim is allowed."[184]  The Court accordingly does not believe it correct to say that everything contained in a trust distribution procedure can fairly be described as a form of "treatment," and the Court does not read the opinion in *Boy Scouts* to so hold.  In *Boy Scouts*, individual claimants

---

[183] *See e.g., In re Filex, Inc.,* 116 B.R. 37, 40 (Bankr. S.D.N.Y. 1990) (noting a plan was "patently unconfirmable under Chapter 11 of the Bankruptcy Code because it provide[d] that all objections or disputes as to claims w[ould] be resolved by an arbitrator in accordance with the rules of the American Arbitration Association rather than by th[e] court in accordance with 11 U.S.C. § 502."); *In re Butcher,* 459 B.R. 115, 130 (Bankr. D. Colo. 2011) (finding chapter 13 plan unconfirmable where it sought to "cut off" the Bankruptcy Code's claims allowance process and noting that the court was "unaware of arguments in the chapter 11 context that plan confirmation should cut off the orderly claim allowance process set out in the Bankruptcy Code and the Rules").

[184] *Boy Scouts,* 642 B.R. at 672.

had ultimate recourse to the tort system to liquidate their claims, as § 502 of the Bankruptcy Code and §§ 157(b)(5) and 1411(a) of title 28 require.  To be sure, the trust distribution procedures in *Boy Scouts* required claimants to jump through various hoops (such as engaging in mediation efforts) before doing so, but that is no different from a court's inherent authority, in a civil case, to direct parties to mediation.  So long as those conditions do not unduly burden the exercise of a claimant's statutory right to the judicial process, that is a matter within a court's discretion and may appropriately be included as part of a trust distribution procedure.  Whether that exercise is called "treatment" or something else is of little moment.  In this Court's view, it probably is not, since the Court views the issue of "allowance" to be logically antecedent to "treatment."  Nothing in this case, however, requires the Court to resolve that question.  The only point that matters for current purposes is that because not *everything* in the trust distribution procedures is properly described as "treatment," the class's acceptance of the trust distribution procedures does not insulate the procedures from all judicial scrutiny.

That gives rise to another question that the *Boy Scouts* opinion engaged: "what standard" a court should apply in assessing a trust distribution procedure.[185]  The *Boy Scouts* court's answer to that question may be more implicit than express.  This Court reads the case to be saying, in effect, that so long as individual creditors' rights to access the claims allowance process are appropriately preserved, and the class of creditors affected by the procedures votes to accept the proposed "treatment," the

---

[185] *Id.* at 623.

Court otherwise need not say more about the trust distribution procedures beyond making those findings the Bankruptcy Code itself requires. Otherwise put, to the extent that the trust distribution procedures provide that creditors with certain types of injuries will receive settlement offers from the trust in particular amounts, in the absence of some suggestion that the plan has been proposed in bad faith, the particular amounts need not be approved by the court as "fair," "equitable," "reasonable," or otherwise.

Here, various insurers raise a host of objections to the trust distribution procedures, arguing that the settlement offers that the trust will make to claimants under those procedures are too high, and that the procedures improperly dispense with the requirement that a claimant establish causation in order to obtain an allowed claim.[186] The insurers are correct that the trust distribution procedures provide that a claimant suffering with mesothelioma will receive a settlement offer from the trust so long as the claimant demonstrates exposure to the debtors' product.[187] The claimant is not required, as a plaintiff would be in the tort system, to show that the exposure to the product is causally related to the claimant's disease.

But the insurers' challenge to this process misapprehends what the Court is doing in "approving" the trust distribution procedures. In this Court's view, this distribution procedure is no more than an agreement that binds the claimants and the trust with respect to the mechanism for determining each claimant's respective

---

[186] D.I. 1233 at 20-21.

[187] D.I. 1319-1, §§ 4.3(b), 4.4(b).

share of the trust's assets. That is all. Nothing in this process ought to affect, let alone to determine, the insurers' obligations under their policies. This is the reason the Court granted the debtors' motion *in limine* and excluded the insurer's expert who sought to testify that exposure to talc does not cause mesothelioma. While it is true that under the trust distribution procedures, the trust will make settlement offers to talc claimants diagnosed with mesothelioma without requiring proof of a causal relationship, nothing in this Court's approval of the trust distribution procedures is intended to suggest that such a claimant holds a valid "right to payment" that would be compensable outside of bankruptcy. As described above, the parties would be able to reach an identical agreement outside of bankruptcy without court approval. And as between the trust and the insurers, the fact that the Court is approving the trust distribution procedures is not intended in any way to alter the parties' rights. The insurers' rights to dispute coverage are fully preserved. To the extent an argument is made to a court hearing an insurance coverage dispute that this Court's confirmation order reflects an adjudication by this Court about the "fairness" or "reasonableness" of the procedures, this Memorandum Opinion is intended to provide a clear and blunt answer: it doesn't.

In sum, then, this Court views the principles that govern approval of trust distribution procedures to be as follows:

(1)     Claims "allowance" is an individual right. Every claimant is entitled to access to the tort system with respect to the allowance of their own claim. Here, the plan gives every claimant the right to an arbitration in

which the arbitrator would apply the trust distribution procedures, not access to the tort system.  Had any claimant objected to the plan on this basis, the Court would not be able to deprive that claimant of access to the tort system.  Accordingly, a single objection from a claimant who alleged exposure to the debtors' products outside the United States or the United Kingdom would be sufficient to derail this plan.  No such objection, however, was received.   Because the claimants have unanimously supported the plan and no claimant has raised any objection, this procedure is acceptable.

(2)     All of the process under which unliquidated claims may be liquidated through a consensual process is just that – a voluntary and consensual process between the claimants and the trust.  The Court does not believe it has any meaningful role in "approving" or in superintending that process.  So long as the process does not unduly burden a claimant's right to access to the tort system (which the claimants here have waived, *see* point (1), above), the various steps that the parties will take under the trust distribution procedures are no different from any other out-of-court settlement mechanism.

(3)     Section 1122 of the Bankruptcy Code imposes certain limits on how claims may be classified.   Personal injury claims are all general unsecured claims.  In some cases, however, trust distribution procedures create separate classes of different types of personal injury claimants

56

and provide different treatment to those classes. This case, however, does not require the Court to address any question of "classification" as all talc claims are classified together.

(4)  Within a class, all claims must receive equal "treatment," which is what the holder of a claim within a class receives on account of the claimant's allowed claim. Here, there is no dispute that this requirement is met.

(5)  As described above, nothing in this process may expand or contract the rights of the insurers. Accordingly, any proposed "finding" that would tilt the playing field in a subsequent coverage dispute one way or the other should be deleted.

**C.    Certain of the insurers' remaining objections lack merit; others require modifications to the proposed plan and confirmation order.**

While the analysis above resolves most of the objections to the trust distribution procedures, the insurers advance a number of other objections related to the treatment of their insurance policies, some of which do require modifications to the terms of the plan and/or the confirmation order. To that end, the Court notes that it does not believe it is entitled to pick up its own pen to mark up the plan so that it reads the way the Court might prefer. Section 1121 of the Bankruptcy Code identifies who may file a plan, and the bankruptcy judge is not among the listed parties. Rather, the role of the Court is set out in § 1129(a), which provides that the court "shall" confirm a plan if the statutory requirements are met. Accordingly, this Court views its role as being limited to answering the question whether the plan the

57

debtors have proposed is confirmable.  The Court may require changes to the plan only where those changes are *necessary* to render the plan confirmable.

>   1.   **Although the insurance policies are not executory, it is nevertheless the case that the debtors' rights cannot be transferred without the associated terms and conditions.**

The Court addressed the insurers' arguments that their policies are executory contracts subject to § 365 in Part II.A, above.  The policies are not executory.  That said, even without the ability to rely on § 365(f), the insurers may not enforce the anti-assignment provisions of their insurance agreements.  This is the exception referenced above in the introductory paragraphs to this Part II.  Section 1123(a)(5)(B) of the Bankruptcy Code provides that a plan shall "provide adequate means for the plan's implementation, such as … transfer of all or any part of the property of the estate to one or more entities."  In *Federal-Mogul*, the Third Circuit held that this provision preempts state law to the extent that state law would otherwise prevent a debtor-in-possession from transferring an insurance policy to a post-bankruptcy trust.[188]

This is an exception to the principle described above under which the filing of the bankruptcy case neither expands nor contracts the rights of the parties to an insurance contract.  Outside of bankruptcy, an insurer might (or might not) be able to enforce a contractual anti-assignment clause when an insured seeks to transfer an insurance policy to a third party such as a trust.  (In certain circumstances, state law might not permit the enforcement of this kind of provision, such as where the transfer

---

[188] *In re Federal-Mogul Global Inc.*, 684 F.3d 355, 366 (3d Cir. 2012).

did not change the risk borne by the insurer.)[189]  Under *Federal-Mogul*, however, that defense is unavailable when the transfer occurs under a plan of reorganization in a chapter 11 bankruptcy case.

The insurers do not take issue with that statement of the law.  Their principal argument, however, is that any assignment of the insurance "rights" must bring with it the "obligations" under the insurance policies.  As described above in the discussion whether the insurance policies are executory contracts, that is not quite right.  When an executory contract is assumed and assigned, the assignee must of course take the rights subject to the obligations.  But Part II.A explains that the insurance policies here, fully paid and expired, are not executory.  Strictly speaking, the insured debtors have no remaining "obligations" under the contracts.  If the trust chooses not to seek insurance coverage under one or more of the policies, the trust (as successor to the debtor) will have no obligation at all under that policy.  Rather, the policies contain certain terms and conditions.  Nothing in the transfer alters those terms and conditions.  To the extent those terms and conditions were enforceable under non-bankruptcy law the day before the bankruptcy, they remain enforceable by the insurers against the trust.  To the extent any of the plan language may be read to suggest that the insurance "rights" may be transferred without the corresponding terms and conditions, the plan and confirmation order must be revised to reflect the fact that the "rights" remain subject to those terms and conditions.

---

[189] *See, e.g., Travelers Cas. & Sur. Co. v. U.S. Filter Corp.*, 895 N.E.2d 1172, 1178 (Ind. 2008); *SR Int'l Bus. Ins. Co. v. World Trade Center Props., LLC*, 375 F. Supp. 2d 238, 248-249 (S.D.N.Y. 2005).

### 2. Claims resolved by the trust may be described as "allowed" claims; that allowance, however, reflects a voluntary settlement, not an adjudication of liability.

The insurers object to the language in the plan that describes claims resolved by the trust in accordance with the trust distribution procedures as "allowed" claims. The insurers would instead use the terminology "resolved."

This dispute has quite a bit of history. A typical liability policy provides that the insurer becomes liable for the amount that the insured is "legally obligated to pay," or words to similar effect. Courts have struggled with how this language intersects with the bankruptcy process. In *UNR Industries*, the Seventh Circuit suggested that the confirmation of a plan of reorganization amounted to a "judgment or settlement" of the debtor's total estimated (present and future) asbestos liability, and concluded that its insurers were liable, by virtue of the order confirming the plan, for that amount.[190] In this Court's view, that statement reflects a misapprehension of federal bankruptcy law, confounding the confirmation process with the claims allowance process.

At the other extreme, certain insurers read the decision of a California appellate court in *Fuller-Austin* to hold that insurers were obligated to indemnify the post-bankruptcy trust only the cents-on-the-dollar payment that the trust actually paid to claimants, not the full amount of the allowed claims owed by the debtor to the claimants.[191] It is less than clear to this Court that the certain insurers' description

---

[190] *In re UNR Indus. v. Continental Cas. Co.*, 942 F.2d 1101 (7th Cir. 1991).

[191] D.I. 1233 at 29 & n. 55 (citing *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 38 Cal. Rptr.3d 716, 732 (Cal. Ct. App. 2006).

of the *Fuller-Austin* holding is correct. That, however, is of little moment for current purposes. This Court's concern is with ensuring that the plan and confirmation order properly describe what is happening by virtue of *this Court*'s orders. The effect of those decisions on some subsequent insurance coverage case is for a later court to decide.

As a matter of federal bankruptcy law, nothing in the Court's confirmation order is adjudicating or resolving *any* individual talc claim, let alone the debtors' aggregate present and future talc liability. To be sure, the Bankruptcy Code envisions that it is the role of the bankruptcy court to "allow" or "disallow" creditors' claims. In this case however (as in many mass tort cases), the plan does something different from what is strictly contemplated by the Bankruptcy Code. Rather than have the bankruptcy court (or a district court following a jury trial) adjudicate claims disputes, the liquidating trust expects to settle the vast majority of those claims with the claimants. To the extent those efforts are unsuccessful, the trust distribution procedures provide that the claimant and the trust will have the claim liquidated through an arbitration. At bottom, however, the plan contemplates that the claims will be settled rather than litigated.

As far as the vocabulary goes, the Court does not think that there is anything wrong with describing the result of this settlement process as the "allowance" of a claim. So the Court will overrule the insurers' objection that would require the term "allowed" to be replaced with "resolved." But it is true that this "allowance" process differs from the kind of allowance contemplated by § 502 of the Bankruptcy Code in

that no court is making any adjudication of liability.  Rather, the claims are being "allowed" in the settled amounts because the claimants and the trust all agreed to this settlement mechanism.  In approving it, this Court is saying no more than that these "allowed" amounts shall be binding on the trust and the claimants with respect to each claimant's relative share of the trust's assets.  The consequence of that "allowance" on the insurers' obligations under their policies is not a matter that is properly before this Court, and the Court will not speculate as to how a court that may later be tasked with resolving such a dispute might do so.

Separately, however, the Court believes it appropriate (in response to the insurers' argument about how their liability should be limited to paying the cents on the dollar that the trust actually distributes to creditors) to address any potential confusion over *whose* liability is being resolved through the trust distribution procedures.  As a formal matter, when a bankruptcy court resolves a claims allowance dispute under § 502 of the Bankruptcy Code, the question that is being adjudicated (at least in the first instance) is the liability of the prepetition debtor.[192]

The Bankruptcy Code contemplates that, in a chapter 11 case, the plan will provide for the payment of allowed claims.[193]  As a practical matter, even outside of the context of mass tort cases, most chapter 11 debtors now confirm plans before all

---

[192] *See* 11 U.S.C. § 101(10) (defining a "creditor" as an entity "that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor"); *id.* § 101(5) (defining "claim" as a "right to payment"); *id.* § 502(b) (explaining that when there is an objection to a "claim," the court shall "determine the amount of such claim … as of the date of the petition, and shall allow such claim in such amount").

[193] 11 U.S.C. § 1123(a)(3) ("a plan shall … specify the treatment of any class of claims or interests that is impaired under the plan").

the asserted claims are fully reconciled.  Accordingly, the work of resolving claims allowance disputes and making distributions to creditors on account of their claims commonly falls to a post-confirmation trust.  (Certain insurers' objection to the creation of such a trust in this case is addressed below in Part III.B.)  The point, for current purposes, is that the liability that is determined in a claims allowance dispute is the liability of the debtor, not the trust.  And to the extent the "treatment" a class of creditors will receive under a plan is a *pro rata* distribution out of a certain pool of assets, the plan imposes on the trust the legal obligation to make those distributions to creditors.

The same is true under the trust distribution procedures in this case.  The liability that is being settled is the liability of the prepetition debtors.  And the trust's obligation to pay is limited to paying creditors their *pro rata* share of the proceeds of any insurance recoveries.  In this sense, it might be implicit in *Federal-Mogul* that the "transfer" of the insurance policies to the trust is not literally a "transfer" of the "policies" such that the trust replaces the debtors as the insured.  Rather, to capture the intent of *Federal-Mogul* of ensuring that the trust has the same rights that the debtors had to recover on the debtors' policies for the benefit of creditors, it may be more accurate to say that the trust succeeds to the debtors' rights to enforce the policies – which policies still insure the debtors' liability.  For this reason, while this Court does not purport to resolve any question of insurance coverage, the Court does believe it appropriate to clarify that it does not see how *this Court's* order would mean that the insurers' obligations would be limited to the cents on the dollar payment the

trust is obligated to pay claimants. The principle that the bankruptcy filing should not operate as a windfall must apply equally in both directions.

### 3. The plan and confirmation order should be silent about the preclusive effect of this Court's actions.

The debtors and the insurers have each suggested their own language for § 5.4 of the plan regarding the preclusive effect of the confirmation order in a subsequent insurance coverage dispute. As this Court sees it, however, the more appropriate course is for the plan and confirmation order to be silent about the preclusive effect of the Court's order. In this Memorandum Opinion, the Court is undertaking to describe as clearly and carefully as it can the matters that it is deciding, and those that remain undecided. It ought to be clear enough, for example, that by granting the debtor's motion *in limine* and declining to consider evidence purporting to show that exposure to talc products is not causally related to incidence of mesothelioma, that this Court has not "actually decided" any issue of causation, let alone that any such finding would be necessary to this Court's judgment in confirming the plan.

It is generally settled law, however, that the preclusive effect of a court's judgment is properly decided by the subsequent court, not the rendering court. "A court usually does not get to dictate the preclusion consequences of its own judgment."[194] "Disputes about the effect of a decision in one case on the prosecution of another are for the judge presiding in the second case. In the law of preclusion the

---

[194] *Smith v. Bayer Corp.*, 564 U.S. 299, 307 (2011) (quoting Wright, Miller & Cooper, 18 *Fed. Prac. & Proc.* § 4405 (2d ed. 2002)) (internal quotations omitted).

second court normally determines the effects of the first judge's order."[195]  This Court believes that the best practice is to follow that admonition.  Accordingly, the plan and confirmation order ought to be silent about the preclusive effect of this Court's confirmation order.  This Court would certainly entertain a subsequent motion or other appropriate proceeding to enforce the plan, confirmation order, or the injunctions entered thereunder.[196]  But unless and until a dispute arises about the effect of this Court's ruling that is properly brought before this Court to decide, the effect of this Court's judgment in some subsequent proceeding will be left to the court hearing that proceeding.

### 4.    The liquidating trustee need not be "neutral."

Certain objecting insurers take issue with the appointment of Melanie Cyganowski, a former bankruptcy judge, as the liquidating trustee, claiming that as a result of her previous engagements on behalf of talc claimants, she will not be impartial.[197]  This argument reflects a misapprehension of the role of the liquidating trustee.  The trustee of a post-confirmation trust, like the trustee of any trust, owes a fiduciary duty to the beneficiaries of the trust, which includes taking appropriate steps to maximize the corpus of the trust.[198]  A trustee has a duty to "administer the

---

[195] *Pettibone Corp. v. Easley,* 935 F.2d 120, 123-124 (7th Cir. 1991).

[196]  *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders. What is more, when the Bankruptcy Court issued the 1986 Orders it explicitly retained jurisdiction to enforce its injunctions.") (internal citation omitted).

[197] July 21, 2025 Hr'g Tr. at 291.

[198] *See Restatement of the Law – Trusts (Third)* § 77 ("The trustee has a duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust.").

trust in a manner that is impartial with respect to the various beneficiaries of the trust."[199]  But that duty of "impartiality" does not extend to entities, like the insurers, against which the trust may hold causes of action.  To the contrary, the job of the trustee is to recover as much as the trustee can for the trust's beneficiaries.

In fairness to the insurers, the task of resolving claims disputes is, before confirmation (and in most cases, even after confirmation) the role of the bankruptcy judge.  The plan here operates differently.  With the consent of every claimant, the task of seeking to settle claims disputes has been assigned to the liquidating trustee, subject to the right to arbitrate if settlement efforts are unsuccessful.  Regardless, to the extent insurers contend that their insurance policies do not obligate them to pay the claims as resolved by the liquidating trustee, their rights to make that argument in any court of competent jurisdiction are fully preserved.

The key point for current purposes, however, is that while the liquidating trustee is duty bound to be fair and impartial in the trust's dealings with the beneficiaries, these duties do not extend to entities against which the trust holds causes of action, like the insurers.[200]  Perhaps the claimants are hoping, through the appointment of a former bankruptcy judge as the trustee, that a state court handling

---

[199] *Id.* § 77.

[200] The Court is aware that the bankruptcy court reached a somewhat different conclusion in *In re Diocese of Camden, New Jersey*, 653 B.R. 309, 356-357 (Bankr. D. N.J. 2023).  While the Court agrees with the statement in *Diocese of Camden* that a bankruptcy court should not confirm a plan that "is so biased as to strip the Insurers of rights necessary to ensure the Plan is equitable," *id.* at 356, it respectfully disagrees with the suggestion that the trustee of a post-confirmation trust has a duty of impartiality that runs to entities other than the beneficiaries of the trust.

a coverage dispute might believe that the trust's litigation positions should be given some deference on the ground that the trust is some sort of adjunct of this Court. If so, that effort ought to prove unsuccessful. With respect to efforts to obtain insurance coverage, the trust is situated no differently from any other litigant. The trustee's duty is to do her best to maximize claimant recoveries, much like the directors of a corporate entity owe duties to maximize shareholder value. The trust should be treated like any other litigant and is entitled to no special deference. For that reason, the insurers' objection to the appointment of Cyganowski as liquidating trustee (whose qualifications are not otherwise disputed) is overruled.

### 5. The "sharing" provisions are permissible.

As described above, the plan contains a mechanism whereby non-talc unsecured creditors (in class 3) may make an election that would entitle them to receive the same percentage recovery on their allowed claims as the recovery that is ultimately obtained for the (class 4) talc claimants. The mechanic of this election requires that certain proceeds recovered by the liquidating trust on account of the insurance policies and retained causes of action be allocated to the "Special Electing GUC Recovery Fund," from which these claimants will receive their distribution.[201]

During closing argument, the insurers objected to this diversion of the proceeds of their insurance policies.[202] The debtors offer two responses to this concern. *First*, they suggest that under *Moore v. Bay*, the liquidating trust is free to distribute any

---

[201] D.I. 1319 § 4.3; D.I. 1028, §§ 1, 1.5; D.I. 1319-1, § 3.2.

[202] July 21, 2025 Hr'g Tr. at 280.

assets that the estate recovers to all creditors.[203]  This Court did the best it could to grapple with the *Moore v. Bay* opinion in its recent decision in *ONH*.[204]  Whatever one thinks of *Moore v. Bay*, it is limited to the proceeds of avoidance actions.  That much is clear from the fact that the decision is now codified in § 550(a) of the Bankruptcy Code.  The rights under the debtors' insurance policies, however, come into the bankruptcy estate under § 541.[205]  So *Moore v. Bay* has no application here.

Moreover, third-party insurance policies are different from policies that cover damage to the debtor's own assets, in that outside of bankruptcy there are circumstances (typically, after a claimant obtains a judgment against the insured) in which claimants have direct rights to recover against an insurer whose policy responds to *that claimant's* claim.[206]  In *Travelers*, the Supreme Court described this type of action as a "true 'direct action' suit," – one in which the claimant is exercising rights under state law, as a form of a traditional creditors' remedy, similar to the right to levy any asset to satisfy a judgment.  Here, a claimant who holds a judgment is entitled to satisfy that judgment by seeking to recover on the insurance assets directly from the insurer.  This non-bankruptcy law interest in the debtor's insurance assets may well be sufficient to give that claimant an interest in specific and traceable proceeds that is loosely analogous to a secured creditor's interest in its collateral

---

[203] July 23, 2025 Hr'g Tr. at 17.  *See Moore v. Bay*, 284 U.S. 4 (1931).

[204] *In re ONH AFC CS Investors, LLC*, No. 24-50058, 2025 WL 13535850 (Bankr. D. Del. May 8, 2025).

[205] Susan N. K. Gummow, *Bankruptcy and Insurance Law Manual*, at 87 (3d ed. 2016).

[206] *Id.* at 89.

(though the Court need not decide the issue here).[207]  The Court is therefore not persuaded that the proceeds of liability insurance policies are wholly unencumbered estate assets that should be distributed ratably to general creditors in accordance with their statutory priority.[208]

The debtors' *second* argument is more persuasive.  They argue that this sharing mechanic was clearly set forth in the disclosure statement and was agreed to by 100 percent of the talc claimants.  Even accepting that the proceeds of insurance are an asset in which the talc claimants have an interest, there is nothing in the Bankruptcy Code that prohibits them from consenting to the sharing with other unsecured creditors in the manner provided for in the plan.[209]  And the limits on "gifting" established by the absolute priority rule and the Third Circuit's decision in *Armstrong* have no application in the absence of an objecting class of creditors, which is absent here.[210]  The Court accordingly rejects the argument that the sharing of insurance proceeds with the electing general unsecured creditors renders the plan unconfirmable.

---

[207] *Travelers*, 557 U.S. at 143 n.2.  *See also In re Caribbean Petrol. Corp.*, 580 Fed. App'x 82, 86 (3d Cir. 2014) (addressing, but rejecting in light of plan language at issue, argument that direct action statute "removes [insurance] proceeds from the bankruptcy estate, places them into a separate fund, and renders them unavailable for distribution to other general unsecured creditors under the Plan until the interests of Tort Claim holders have been satisfied").

[208] Taken to its logical conclusion, the implications of this position would be that those tort claimants whose claims are covered by insurance would be entitled to those proceeds, to the exclusion of claimants whose claims are not covered.  As is common in mass tort bankruptcy cases, however, the plan here provides (without objection from any party in interest) for the ratable sharing of all insurance proceeds among the talc claimants.  D.I. 1319-1, §§ 2.3, 3.2.

[209] *See generally In re ICL Holding Co., Inc.*, 802 F.3d 547, 555-556 (3d Cir. 2015).

[210] *See Armstrong World Indus.*, 432 F.3d 507, 513 (3d Cir. 2005).

      **6.**    **The Court will not waive the rules providing for a stay of the effectiveness of the confirmation order if any party represents that it intends to seek a stay pending appeal.**

Bankruptcy Rules 3020(e) and 6004(h) provide that orders confirming a plan and providing for the sale of assets are automatically stayed for 14 days unless the court orders otherwise. The debtors have asked this Court to waive that stay.

Those rules operate primarily as a courtesy to the district court. In the event that a party seeks a stay pending appeal of this Court's confirmation order, these rules are intended to provide the district court (assuming a motion for a stay pending appeal is filed promptly) some time to consider the merits of the motion for a stay pending appeal before a plan is consummated. For that reason, this Court would only be prepared waive that period if no party in interest intended to seek a stay pending appeal.

Accordingly, if any party represents to the Court that it intends to seek a stay pending appeal, this Court will not shorten the 14-day period contemplated by the rules for the district to decide whether to grant a stay pending appeal (or, if necessary, an administrative stay while it considers the request for a stay pending appeal). In the absence of a party making such a representation, however, the Court would be prepared to waive the operation of these rules as the debtors have requested.

The Court notes that the confirmation order also contains language addressing whether and when an appeal from the Court's order would be equitably moot. The doctrine of equitable mootness, however, is purely an appellate doctrine. This Court does not believe it appropriate for the bankruptcy court to address that issue one way or the other.

70

* * *

The Court hopes and believes that the discussion in Part II.C of this Memorandum Opinion will provide the parties with meaningful guidance on the various language issues reflected in the redlines of the plan, trust distribution procedures, and confirmation order.[211]  The parties are directed to meet and confer, with the benefit of this guidance, to see if they might be able to work through language that comports with this Court's rulings.  To the extent that a dispute remains that requires this Court's resolution, the parties should reach out to chambers, and the Court will promptly schedule a status conference (by Zoom) to resolve any such dispute.

## III.    The insurers' remaining objections to confirmation are overruled.

The insurers also raise a handful of confirmation objections that are not about insurance issues.  If these objections were meritorious, the question whether the Court should deny confirmation based on these objections would be complex.  On the one hand, *Truck Insurance* held that insurers are parties in interest with standing to object to confirmation.[212]  And *Lexmark* dismisses "prudential standing" which had otherwise been the "standing" bar to a plaintiff suing to enforce the rights of third parties.[213]  *Lexmark* holds that what had been described as prudential standing

---

[211] D.I. 1362, 1386, 1388.

[212] *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024).  This Court previously held that the rationale of *Truck Insurance* meant that the insurers had standing to object to confirmation but left open the question whether there were limits to the range of issues that might properly be raised.  *See* D.I. 1125 at 18-21.

[213] *Lexmark Intern. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014).

should properly be understood as a merits point – a statutory cause of action does not extend to permitting a plaintiff to sue on account of an injury to a third party.

So how does the *Truck Insurance* principle apply, in light of *Lexmark*, when an objector is raising a confirmation issue that is not about *that* party's rights?  On the one hand, a case can be made that the statutory protection does not extend to that party (meaning, in effect, that the objector is not a "party-in-interest" for that purpose).  The Third Circuit's opinion in *PWS* (which predated both *Truck Insurance* and *Lexmark*) could be read to support that view, though that opinion is careful to note that it is addressing only the "narrower" "person aggrieved" standard that governs bankruptcy appeals, not the statutory term "party in interest."[214]  On the other, one could also conclude that because the proponent of a plan bears the burden of demonstrating the elements required for confirmation, a party with standing to object to confirmation (which the insurers have) can simply insist that the proponent meet its burden.  As interesting as that question may be, the Court need not resolve it here, as the various objections the insurers seek to assert all fail on the merits.

---

[214] *In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d Cir. 2000) ("The chance that the other creditors would have acted differently is simply too speculative to be a basis for third party standing here.").  *See also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643 (3d Cir. 1988) ("Third-party standing is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan."); *In re James Wilson Assoc.*, 965 F.2d 160, 169 (7th Cir. 1992) (Section 1109(b) was not "intended to waive other limitations on standing, such as that the claimant be within the class of intended beneficiaries of the statute that he is relying on for his claim, although a literal reading of section 1109(b) would support such an interpretation.  We think all the section means is that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains.").

## A.    The objections based on the vote are without merit.

The plan before the Court is filed on behalf of 20 separate corporate entities, each of which filed its own bankruptcy case in this Court, which cases are being jointly administered.[215]    *Tribune* holds that such a plan needs to meet the requirements for confirmation for each of the individual debtors.[216]    This Court agrees.  Section 1121 provides that the "debtor may file a plan … at any time in a voluntary case," and goes on to explain the circumstances in which another party in interest may file a plan.[217]  After all, during the exclusive period, only *the debtor*, not a corporate parent or affiliate, may file a plan for that corporate entity.  So it must follow as a matter of logic from the command of § 1121 that the 20 debtors in this bankruptcy case filed 20 plans.  As a matter of convenience, those plans are contained in a single document that may be described colloquially as "the plan."  As a statutory matter, however, they can only be understood as 20 plans, each of which must meet the requirements for confirmation.[218]

---

[215] D.I. 389 at 7.

[216] *In re Tribune Co.*, 464 B.R. 126, 183 (Bankr. D. Del. 2011) (subsequent history, which does not bear on the discussion at issue, omitted).  *See also In re JER/Jameson Mezz Borrower II LLC,* 461 B.R. 293, 302 (Bankr. D. Del. 2011).

[217] 11 U.S.C. § 1121.

[218] The Ninth Circuit reached the opposite conclusion in *In re Transwest Resort Props.*, 881 F.3d 724, 729-730 (9th Cir. 2018).  Its reasoning is that the language of § 1129(a)(10) requires that an impaired accepting class have accepted "the plan," and thus concludes that "plain language" of the statute requires acceptance on a "per plan" not "per debtor" basis.  The problem with that analysis is that it simply assumes the conclusion that the single document is one plan rather than multiple plans.  The opinion never seeks to square that reading with the words of § 1121.

Here, the voting declaration (which was admitted into evidence) states that the only votes cast were with respect to API.[219]  On this basis, certain insurers argue that the plans for the other 19 debtors fail to meet the requirements of § 1129(a)(10).[220] The debtors correctly respond, however, that 18 of those 19 debtors have no impaired classes of creditors.[221]  Because § 1129(a)(10) applies only "[i]f a class of claims is impaired under the plan," the subsection is inapplicable to the 18 debtors that do not have any impaired class.[222]

That leaves only one debtor, MIH, which has a voting class – one that contains a single creditor, the United States, which elected not to vote on the plan.[223]  Debtors rely on the Tenth Circuit's decision in *In re Ruti-Sweetwater* that holds that a creditor's failure to vote "constituted an acceptance of the Plan."[224]  As *Collier* explains, that case "has been followed by some courts and rejected by others.  The latter cases appear to reason that the failure or inability of a creditor to vote on a plan is not the equivalent of acceptance of the plan."[225]  The bankruptcy court in *Vita*, for example, joined what it described as a "clear majority of courts" in holding that

---

[219] Debtors' Ex. 25 at 5.

[220] D.I. 1233 at 61-67.

[221] D.I. 1320 (relying on § 3.4 of the plan, which eliminates classes for which no creditor asserts a claim).

[222] 11 U.S.C. § 1129(a)(10).

[223] D.I. 1296; July 23, 2025 Hr'g Tr. at 16.

[224] 836 F.2d 1263, 1266 (10th Cir. 1988).

[225] 7 *Collier on Bankruptcy* ¶ 1126.04 (16th ed. 2025) (footnotes omitted).

"an impaired class that fails to vote to reject a Chapter 11 plan is not deemed to have accepted the plan."[226]

The courts in both *Adelphia* and *Tribune*, however, concluded that where the rule that a non-voting class is deemed to have accepted is "explicit and well-advertised" to creditors, the court may enforce that rule.[227]  While this Court might state the point slightly differently, the Court generally agrees with the basic analysis of those decisions.  In this Court's view, the critical point is not that the principle was announced by the debtor and "well advertised" to the creditors.  Rather, the point is that the rule was approved by the court itself after notice to the creditors.  After all, if the *Vita* decision is correct and a class without votes is not an accepting class, then it is hard to see what authority the debtor would have simply to announce a different rule – even if it says so explicitly and clearly.  The Court is more persuaded, however, by the fact that here this rule was not announced unilaterally by the debtor but was instead included in the solicitation procedures that were approved by the Court, without objection, on notice to all parties in interest.

Paragraph 44 of the Solicitation Order that this Court entered in May provides that "[a]ny Class that contains Claims entitled to vote but for which no valid votes are returned shall be deemed to have accepted the Proposed Plan."[228]  This provision

---

[226] *In re Vita Corp.*, 358 B.R. 749 (C.D. Ill. 2007).

[227] *See Tribune*, 464 B.R. at 183-84; *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 260 (Bankr. S.D.N.Y. 2007).

[228] D.I. 1047 ¶ 44.

was clearly disclosed in the debtors' solicitation motion.[229]  And while various of the

insurers asserted objections to the debtors' proposed solicitation procedures, none of

those objections raised any question about this provision.[230]  That amounts to consent.

As this Court explained elsewhere,

> The reason debtors file motions for courts to approve their solicitation
> procedures is so that, before the estate incurs the expense of distributing
> the disclosure statement and plan ballot to creditors, all parties in
> interest have a chance to weigh in on the propriety of the proposed
> procedures, and the Court can resolve any dispute about them.  Once a
> court has considered the motion and decided that the procedures are
> appropriate, that decision should not generally be subject to a
> subsequent challenge.[231]

That is the case here, and provides sufficient reason to overrule, on the merits,

the insurers' objection to the voting.

### B.    The plan need not comport with § 524(g).

The insurers argue that the plan improperly creates an asbestos trust

addressing future claims without complying with § 524(g).[232]  For this reason, the

insurers contend, the plan fails to comport with the Bankruptcy Code and thus cannot

be confirmed on account of § 1129(a)(1).[233]

Congress enacted § 524(g) of the Bankruptcy Code to address the due process

concerns associated with discharging a claim held by someone who may have been

exposed to an asbestos-containing product but had not yet suffered from any disease

---

[229] D.I. 814 at 44.

[230] D.I. 1020, 1021, 1022.

[231] *See generally In re Smallhold*, 665 B.R. 704, 715 (Bankr. D. Del. 2024).

[232] D.I. 1233 at 58-60.

[233] *See* 11 U.S.C. § 1129(a)(1) (plan must comply "with the applicable provisions of this title.").

as of the time of the debtor's bankruptcy. That section provides that future-arising claims may be "channeled" to a trust, but only upon the satisfaction of strict requirements designed to ensure that the plan treat the future-arising claimants fairly, despite their practical inability to participate in the bankruptcy case.[234] This provision was necessitated by the fact that if those who will become sick in the future do not hold "claims" that are subject to being discharged in the bankruptcy case, those claimants would be able to assert those claims against the reorganized debtor. In that event, the reorganization of a distressed company with asbestos liability would be effectively impossible. That result was viewed as worse for all involved.

That concern is absent here. These debtors are liquidating rather than reorganizing. As a result, they are not eligible to be discharged under § 1141(d) of the Bankruptcy Code, let alone to receive the "supplemental discharge" contemplated by § 524(g). While the insurers and the Office of the U.S. Trustee raised concerns that the plan's injunction, as drafted, effectively operated as a discharge in disguise, the Court understands that the parties have consensually resolved those objections.[235]

The insurers' remaining point is that this plan effectively *will* deal with future-arising claims because the trust distribution procedures provide a broad definition of talc claims. As a result, the insurers contend that a claimant who is diagnosed with mesothelioma after the petition date but while the trust is still in existence is likely

---

[234] *See generally Combustion Engineering*, 391 F.3d at 234 & n. 45.

[235] *See* D.I. 1232 at 9-10; D.I. 1233 at 6-9; July 21, 2025 Hr'g Tr. at 20-23, 250.

to receive a settlement offer from the trust.[236]  The insurers argue that this is only permissible in a § 524(g) case.  But that is incorrect.

Because this case does *not* involve a § 524(g) trust, the trust created by this plan ought to deal with "claims" in essentially the same way that a chapter 7 trustee would.  As unfair as it may seem to a future-arising claimant, a chapter 7 trustee would distribute the debtor's assets to those creditors who presented "claims" while the trustee still had assets to distribute.  Those who presented claims after the bankruptcy estate was fully administered would be unable to recover out of the estate's assets.

But what about a claimant that appeared after the bar date, but while the chapter 7 trustee still had assets to distribute, because the claimant did not develop a disease until after the bar date had passed?  There is little doubt that the recent diagnosis of an asbestos-related disease would satisfy the "excusable neglect" standard.[237]  So the failure to file a proof of claim by the bar date would not preclude that creditor from recovering.

And what about the insurers' argument that such a creditor does not hold a "claim" under § 101(5) of the Bankruptcy Code that would entitle that claimant to recover out of the bankruptcy estate?  The answer to that objection is provided by the

---

[236] D.I. 1233 at 58-60.

[237] *See Pioneer Inv. Servs. Co. v. Brunswick Assocs., L.P.*, 507 U.S. 380, 395 (1993) (describing "intervening circumstances beyond the party's control" as satisfying the excusable neglect standard).  The Court recognizes that because § 726(a)(3) provides for the payment of a "proof of claim which is tardily filed" in chapter 7 cases, although at a lower priority than timely filed claims, the "excusable neglect" standard may operate differently in the chapter 7 context.

Third Circuit's decision in *Grossman's*, which suggests that such a creditor does indeed hold a "claim" in bankruptcy.

The question in *Grossman's* arose in the context of determining whether a creditor's claim had been discharged. But the statutory term "claim" has the same meaning in the context of the discharge as it does in deciding who may receive a distribution. In *In re Grossman's*, the *en banc* Third Circuit held that the scope of the term "claim" in § 101(5) of the Bankruptcy Code is fact specific. "In determining whether an asbestos claim has been discharged, the court may wish to consider, inter alia, the circumstances of the initial exposure to asbestos, whether and/or when the claimants were aware of their vulnerability to asbestos, whether the notice of the claims bar date came to their attention, whether the claimants were known or unknown creditors, whether the claimants had a colorable claim at the time of the bar date, and other circumstances specific to the parties."[238]

Similar to those courts that have adopted the "prepetition relationship" test, the point is that if the claimant would have had absolutely no reason to know to file a proof of claim in the debtor's bankruptcy case – such as the passenger who would in the future fly on an airplane that contained a defective engine manufactured by the debtor – then concerns about due process counsel strongly against reading § 101(5) of the Bankruptcy Code to provide that such a claim has been discharged.[239]

---

[238] *In re Grossman's*, 607 F.3d 114, 127 (3d Cir. 2010) (*en banc*).

[239] *See generally Epstein v. Official Committee of Unsecured Creditors of Estate of Piper Aircraft Corp.*, 58 F.3d 1573, 1578 (11th Cir. 1995) ("There is no preconfirmation exposure to a specific identifiable defective product or any other preconfirmation relationship between

Avon's cosmetic products, however, are quite unlike the aircraft engine. Those who used the products would likely have had the kind of "prepetition relationship" with Avon that would lead their "claims" to fall within § 101(5) in those jurisdictions that have adopted the prepetition relationship test. And their claims would likewise appear to satisfy the Third Circuit's definition of "claims" adopted in *Grossman's*. To be sure, a rule under which a creditor's claim is discharged in a bankruptcy case that occurs before the claimant is diagnosed with a disease may be viewed as a harsh one. But because Avon's customers knew that they had used Avon's products, the application of the *Grossman's* test would suggest that even those claimants might well hold "claims" under § 101(5) that would be entitled to payment in (and, if the debtor were entitled to a discharge, be discharged by) the Avon bankruptcy case. Nothing in the insurers' objection provides reason to believe that the definition of "claim" adopted under the plan would provide for the recognition of a "claim" that would fall outside the Bankruptcy Code's definition under applicable law.

### C. The debtors are not required to liquidate all claims before confirmation.

Certain insurers also asserted, during closing argument (though the point does not appear to have been advanced in their confirmation objections) that the plan improperly establishes a post-confirmation trust to address claims and distribute the proceeds of insurance to creditors. They argue that § 1123(b)(3) contemplates the

---

Piper and the broadly defined class of Future Claimants. As there is no preconfirmation connection established between Piper and the Future Claimants, the Future Claimants do not hold a § 101(5) claim arising out of Piper's prepetition design, manufacture, sale, and distribution of allegedly defective aircraft.").

possibility that a post-bankruptcy entity (such as a post-confirmation trust) might be charged with the task of the "settlement or adjustment of any claim or interest belonging to the estate."[240]  But there is no statutory authority, they argue, for a post-confirmation trust to play a role in resolving claims *against* the estate.

Perhaps a case can be made that the Bankruptcy Code, as originally enacted in 1978, contemplated that the claims allowance process would be complete before plan confirmation.  Even if that is correct, the 1994 enactment of § 524(g) certainly provided for claims to be "channeled," after confirmation, to a post-confirmation trust, that would undertake to ensure that present and future-arising claims would receive substantially similar treatment.

More fundamentally, however, as the chapter 11 process has grown increasingly expensive, it has become commonplace for post-petition entities, such as a post-confirmation liquidating trust, to take on responsibilities that the Bankruptcy Code assigned to the "trustee," but that cannot as a practical matter be completed before confirmation.  It is now unexceptional for a bankruptcy court to confirm a chapter 11 plan that leaves the liquidation of estate assets (not just the causes of action contemplated by § 1123(b)(3)(B)), and the resolution of claims against the estate, to a post-confirmation trust.[241]  To be sure, there are circumstances in which,

---

[240] *See* July 21, 2025 Hr'g Tr. at 350-351 (citing 11 U.S.C. § 1123(b)(3)(B)).

[241] Counsel for the certain insurers was, perhaps to his credit (and perhaps not), wholly undaunted by the fact that the implication of his argument would fundamentally disrupt modern chapter 11 practice:

> [THE COURT]: [T]here is, now, a lot of water over the dam, and the notion that we confirm a plan when the major transactions have been completed, and

when a post-confirmation trust is addressing matters that the Code envisioned being performed by the trustee (including a debtor-in-possession) before a plan was confirmed, some confusion may arise over whether the operative legal rules are those provided by the Bankruptcy Code or by the confirmed plan.

Whatever imperfections may exist in the modern practice, this Court does not believe that these innovations are precluded by the Bankruptcy Code. Section 1123(b)(6) provides, of course, that a plan may "include any appropriate provision not inconsistent with the application of this title."[242] The Supreme Court in *Purdue Pharma* explained the limits of the kind of provision that this may include. Such a provision must "concern *the debtor*—its rights and responsibilities, and its relationship with its creditors."[243] Accordingly, it cannot include a "radically different power to discharge the debts of a nondebtor without the consent of affected nondebtor claimants."[244] But giving a post-confirmation trust the authority to resolve claims against the estate and distribute the proceeds of estate causes of action is nothing

---

the mop-up work, including the mop-up work with respect to unliquidated claims is handled on a trust on a post-petition basis is now … what happens in 98 percent of the cases.

So, is your argument that that's all wrong, and I need to decree that that shall never happen again?

[COUNSEL]: Yes.

*Id.* at 352.

[242] 11 U.S.C. § 1123(b)(6).

[243] *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 218 (2024) (emphasis in original).

[244] *Id.* (internal citation omitted).

like the third-party release invalidated in *Purdue Pharma*. This type of provision fits squarely within the catch-all of § 1123(b)(6).[245] This objection is therefore overruled.

## IV.    The plan's payment of bond trustee fees is permissible.

Section 12.16 of the plan provides for the payment of reasonable fees and expenses for the indenture trustee for the Unsecured 2043 Notes, up to a cap "as previously agreed to in writing between the Debtors and the Bond Trustee."[246] In a brief submitted by the bond trustee and in testimony that the debtors elicited at the confirmation hearing, the parties disclosed that this agreed cap was $850,000.[247]

The U.S. Trustee objects to the payment of this amount, arguing that providing for the payment of these fees in the plan is, in effect, an end run around the demanding standard for a substantial contribution claim under § 503(b) of the Bankruptcy Code.[248]

The Court disagrees with that argument on the merits. The Court notes, however, that to the extent the bond trustee or the debtors are contending that the U.S. Trustee lacks standing to raise this objection because it lacks an economic stake in the matter, the Court rejects that argument. Congress devised a system under which the U.S. Trustee would play an independent role in ensuring compliance with the Bankruptcy Code. To that end, § 307 of the Bankruptcy Code grants the U.S.

---

[245] *But see Diocese of Camden, New Jersey*, 653 B.R. at 336 ("section 1123(b)(3) applies only to actions 'belonging' to the estate, and not to actions 'against' the estate").

[246] D.I. 1048 § 12.16.

[247] D.I. 1316 at 3; July 21, 2025 Hr'g Tr. at 86.

[248] D.I. 1232 at 10-14.

Trustee standing to be heard on any issue in a bankruptcy case.[249]  As explained below, the Court concludes that on the merits, the U.S. Trustee's argument is unsuccessful.  But that the issues are being raised by a party that lacks an economic stake in the resolution should be understood as a feature, not a bug.

As this Court sees the issue, the applicable analysis may well be different outside the plan context than it is when the payment is contemplated under a plan. The issue arises from the fact that in a typical bond indenture, there is not a direct contractual relationship between the borrower and the underlying noteholder. Rather, the borrower's relationship is with the indenture trustee, which typically handles the enforcement of rights under the indenture, and in turn has contractual obligations to the noteholders.  Accordingly, the indenture trustee's right to recover legal fees (which is typically provided for under the indenture) is a general unsecured claim, no different in character from the rights of the underlying noteholders (in an unsecured bond issuance).  At times, the bond trustee may well pay a constructive role in forging consensus among the noteholders and facilitating the reorganization. The issue that arises is the legal standard to apply when the trustee seeks to receive compensation out of the estate for the fees it has incurred.

The answer to that question is easy when the debtor opposes paying those fees. The standard is "substantial contribution," as set out in § 503(b) of the Bankruptcy Code.  Section 503(b) expressly contemplates that reasonable fees may be paid when

---

[249] 11 U.S.C. § 307 ("The United States trustee may raise and may appear and be heard on any issue in any case or proceeding under this title but may not file a plan pursuant to section 1121(c) of this title.").

the indenture trustee makes a "substantial contribution" to the case. That standard, however, is a demanding one. It does not permit granting the trustee an allowed administrative claim (even if the fees are reasonable) to pay costs that the trustee would in any event bear to protect the interests of the bondholders.[250]

Where the debtor agrees that the bankruptcy estate should pay the fees, either under a plan or by separate motion, the analysis becomes slightly more complex, as the thoughtful decisions in *Adelphia* and *Mallinckrodt* demonstrate.[251] In both of those cases, the courts allowed for the payment of reasonable fees. As this Court understands those opinions, the courts essentially treated the request as (and this is this Court's own take on these opinions – the decisions do not say this in so many words) a consensual resolution of a § 503(b) request, to which the U.S. Trustee was objecting. In both cases, the courts took a careful look at the question of the contributions made by the indenture trustee and the reasonableness of the fees. The courts credited the debtor's judgment that the fees warranted administrative claim status. Neither court, however, treated the debtor's judgment as the beginning and end of the analysis. Both carefully examined the merits of the request and reached the independent judgment that the indenture trustee's contribution was indeed a substantial one.

That analysis is certainly a sensible one in the contexts in which those cases arose, which is different from the context of the current dispute. In *Adelphia*, the

---

[250] *See Lebron v. Mechem Financial Inc.,* 27 F.3d 937, 943-944 (3d Cir. 1994).

[251] *See In re Adelphia Commc'ns Corp.,* 441 B.R. 6, 12-19 (Bankr. S.D.N.Y. 2010); *In re Mallinckrodt*, 639 B.R. 837, 906-907 (Bankr. D. Del. 2022).

issue arose on a motion filed after confirmation.[252]  In *Mallinckrodt*, the payment was to be made under a plan, but certain classes of creditors had voted to (or were deemed to) reject the plan.[253]  In this regard, the issue in *Adelphia* and *Mallinckrodt* is similar to the one raised before this Court in *Yellow*, when the debtors sought to settle prepetition claims that certain creditors had asserted, while other parties in interest had pending objections to allowance of those claims.[254]  Without definitively resolving the standard that the court would apply to review the proposed settlements, this Court concluded that, at the very least, it was required to pay due respect to the objecting party's statutory right to object to the claims as a party in interest.  There, that meant that the proposed settlements would be measured by a standard that was more rigorous than the most deferential form of business judgment standard that might otherwise apply to a motion under Rule 9019.[255]  In reviewing the *Adelphia* and *Mallinckrodt* decisions, where the U.S. Trustee (as a party-in-interest) had objected to the payment of the fees, those courts appear to be engaging in a similar analysis.

It is certainly possible that the fees in this case could be approved by application of that same standard, as the record here does demonstrate that the bond trustee played an important role in facilitating a consensual resolution of potential disputes between commercial creditors and the talc claimants.[256]  The Court

---

[252] *Adelphia*, 441 B.R. at 8-9.

[253] *Mallinckrodt*, 639 B.R. at 896.

[254] *In re Yellow Corp.*, 670 B.R. 397 (Bankr. D. Del. 2025).

[255] *Id.* at 411.

[256] While the statements of counsel are not evidence, counsel for the bond trustee set out during closing argument the nature of the contributions.  *See* July 23, 2025 Hr'g Tr. at 53-55.

concludes, however, that in view of the language and structure of the Bankruptcy Code, the circumstances of this case make it somewhat easier than the cases presented in *Mallinckrodt* or *Adelphia*.

The reason for that is that the Bankruptcy Code's prohibition on discriminatory treatment of similarly situated creditors, as the Third Circuit explained in *Tribune*, is a statutory protection for a class of creditors that rejects the plan's treatment of their claims.[257]  The right to "equal treatment" across different classes is not one that may be enforced at the behest of an individual creditor or party-in-interest, so long as the *class* of affected creditors votes to accept the plan's treatment of their claims by the requisite majorities.

Here, the economic substance of the payment of the bond trustee's fees in 100-cent dollars is that the bond trustee was receiving a greater percentage payment on its unsecured claims than were the trade creditors who were placed in class 3 along with the indenture trustee.  While the bond trustee is the only party with a direct contractual relationship with the debtor, it is not uncommon for (and the plan here allowed) individual bondholders to be permitted individually to vote the debt that they hold.  As a formal legal matter, however, the claim arising out of the bond issuance (including the bond trustee's claim to fees) is a general unsecured claim entitled to the same treatment as other general unsecured creditors.  Here, by providing the bondholders the same treatment afforded to other class 3 holders (on account of their claims for principal and interest under the bonds) – but paying the

---

[257] *In re Tribune*, 972 F.3d at 237-239.

bond trustee's claim for fees in full – one might say that the plan provides the obligations under the bond indenture (viewed in the aggregate) with different and better treatment than that provided to other class 3 creditors.

The Bankruptcy Code, however, requires that all claims within a class receive the same treatment – a requirement that an individual creditor within that class may enforce.[258]  But the payment of the bond trustee's fees was appropriately disclosed in the disclosure statement and no party in interest took issue with the bondholders being placed in the same class as the other commercial creditors.  In addition, during the confirmation hearing, the debtors proffered (without objection) the testimony of the balloting agent that all 14 of the non-bondholder claimants in class 3 voted to accept the plan.[259]  Accordingly, because the economic substance of the objection is that the payment of the bond trustee fees provides unequal treatment to the claims arising under the bond indenture, and because all affected creditors have consented to this disparate treatment – a result the Bankruptcy Code expressly contemplates in its classification and voting scheme – the Court concludes that the payment of up to $850,000 in reasonable fees to the bond trustee comports with the Bankruptcy Code.

---

[258] 11 U.S.C. § 1123(a)(4) ("[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall … provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest").

[259] July 21, 2025 Hr'g Tr. at 120-121.

## V.   The gatekeeping provision cannot be approved over the U.S. Trustee's objection.

The final issue to address is the U.S. Trustee's objection to the so-called gatekeeping provision contained in the plan.  The parties have resolved the dispute raised by the U.S. Trustee over the scope of the releases and exculpations provided for in the plan.  The breadth of the injunction against the assertion of claims that may be covered by those releases and exculpations, however, remains disputed.

The provision in question is § 10.8 of the plan.  It provides that:

> No Person may commence or pursue a Cause of Action of any kind against the Debtors, the Liquidating Debtors, the Exculpated Parties, or the Released Parties that could reasonably be characterized as a Cause of Action that will be or is extinguished, exculpated, or released by the Plan or otherwise will be or is subject to the Plan without the Bankruptcy Court first determining, after notice and a hearing, that such Cause of Action (a) represents a colorable claim against a Debtor, Liquidating Debtor, Exculpated Party, or Released Party and (b) has not been extinguished, exculpated, or released by the Plan or otherwise will be or is subject to the Plan.[260]

This type of "gatekeeping" provision – one that enjoins not only the assertion of claims that are released or exculpated under the plan, but also prohibits the assertion of claims that live in the same neighborhood as claims that are released or exculpated under the plan (here, a claim that "could reasonably be characterized" as a released or exculpated claim) – has been the subject of some recent controversy.

The Fifth Circuit recently clarified its position on the issue in its decision in *Highland Capital*.[261]   Relying on the *Barton* doctrine, under which bankruptcy

---

[260] D.I. 1319 § 10.8.

[261] *See In re Highland Capital Mgmt., L.P.*, 132 F.4th 353 (5th Cir. 2025).

trustees may not be sued outside of bankruptcy court without the bankruptcy court's permission, that court had previously found that bankruptcy courts may enter gatekeeping orders in limited circumstances.[262]  *Highland Capital* asserts that Fifth Circuit precedent had never authorized the use of a "gatekeeping" provision that extends beyond "the trustee or other bankruptcy-court-appointed officers[s] for acts done in the actor's official capacity."[263]  The court in *Highland Capital* accordingly concluded that the gatekeeping order entered by the bankruptcy court in that case must be narrowed so that it extended only to estate fiduciaries, and covered only acts taken in their fiduciary capacity.[264]

Even as narrowed, however, this Court does not believe there is a basis for imposing a "gatekeeping" role.  To be sure, it is settled law that estate fiduciaries may be exculpated from the assertion of claims that arise out of their exercise of their fiduciary duties.[265]  And it is customary and unobjectionable to back that exculpation by an injunction against the assertion of an exculpated claim.  The Court does not understand the authority, however, for extending the injunction *past* the scope of the exculpation and other appropriate releases of estate claims themselves, to apply to claims that "could reasonably be characterized" as such a claim.  More puzzling still,

---

[262] *See Villegas v. Schmidt*, 788 F.3d 156, 158-159 (5th Cir. 2015) (citing *Barton v. Barbour*, 104 U.S. 126 (1881)).

[263] *Highland Capital*, 132 F.4th at 359 (internal quotation and citation omitted).  In fairness, however, a case could have been made that the prior Fifth Circuit precedent on this point was less clear than the *Highland Capital* court let on.

[264] *Id.* at 360.

[265] *In re PWS Holding Corp.*, 228 F.3d at 246; *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1081-1085 (9th Cir. 2020).

the "gatekeeping" injunction arrogates to this Court not only the authority to determine whether such a claim falls within the plan's injunction but also requires a finding by this Court that the underlying claim (over which the Court may or may not have subject-matter jurisdiction) is a "colorable" claim on the merits.

Notwithstanding *Highland Capital* and the related Fifth Circuit authority (or the transcripts from oral rulings of bankruptcy courts in other jurisdictions), this Court does not believe that either the Bankruptcy Code or the *Barton* doctrine provides any substantive authority for the bankruptcy court to do anything like this. The parties have not identified any Third Circuit authority for such an injunction, and this Court is aware of none. The court put the point clearly in *Gulf Coast Health Care*. As here, the debtors there "had requested that [the court] retain sole and exclusive authority to determine whether a claim or cause of action against a released party arises from or is related to a debtor-released claim or a third-party released claim and, in doing so, authorize such party to bring the claim against the relevant release[d] party."[266] The court rejected that request. "I will sustain the U.S. Trustee's objection on this point. I see no reason to retain exclusive jurisdiction for a determination that has been requested of me. The … plan says what it says, and other courts should be entitled to exercise their authority to interpret it."[267]

This Court accordingly asked counsel for the debtors, during closing argument, whether any judge on this Court had ever granted an injunction with the kind of

---

[266] *In re Gulf Coast Health Care, LLC*, Bankr. D. Del. No. 21-11336 (KBO); May 4, 2022 Hr'g Tr. at 30.

[267] *Id.*

"gatekeeping" provision sought here. Counsel's response to that question was a polite and appropriate way of saying "yes, Your Honor, it was you, dummy."[268]  And in fairness, there is some merit to counsel's point.

In connection with the debtors' settlement with Natura, the debtors sought an order that included a gatekeeping provision.  The issue there was that the settlement resolved estate causes of action.  And the concern was over how to handle the possibility that Natura might face a claim for successor liability, as to which it can certainly be argued that such a claim actually belonged to the bankruptcy estate and was resolved in the settlement.  In response to the U.S. Trustee's objection to the proposed gatekeeper provision, this Court expressed reservations that are broadly in line with the views set forth above.  "The notion that if there's a real argument that something is an estate cause of action I retain jurisdiction to decide that question doesn't offend me.  The notion, however, that no one gets to bring a claim that's actually an individual claim before coming to me and saying pretty please I'm not really sure I have authority to do."[269]

Despite expressing those concerns, the Court went on to add that while "I am a stay-in-your-lane kind of judge and don't think I ought to be enjoining things that could properly be brought in another court, I am not concerned with the proposition that I could enter an order that says 'to the extent there is a good faith dispute about

---

[268] *See* July 23, 2025 Hr'g Tr. at 21-22 (in response to question whether "folks were aware of any case in this jurisdiction … in which any court has ever approved such a provision," counsel responded "I had time to think about it.  The answer is I think Your Honor approved a very similar provision in December").

[269] Dec. 4, 2024 Hr'g Tr. at 45 (cleaned up).

whether an action is subject to the release contained herein such actions ought to be brought before me.'"[270]   Consistent with those comments, the parties went on to submit, and this Court entered, an order stating that "no Person or Entity may commence or pursue a Cause of Action of any kind against the Debtors or Natura Releasees, as applicable, that could reasonably be characterized as a Cause of Action subject to Section 4 of the Settlement Agreement or the releases provided in this Order without the Court first determining, after notice and a hearing, that such Cause of Action is not released by Section 4 of the Settlement Agreement."[271]

With the benefit of hindsight, the Court has three reactions to the discussion at the December 2024 hearing and the language of the subsequent order. *First*, it notes that the order that the Court entered then is meaningfully narrower than what is proposed now.   The settlement order limited the scope of the "gatekeeping" provision to deciding whether an asserted claim was barred by the settlement.   The proposed confirmation order takes an aggressive step beyond that and would require the Court to make a finding that the underlying claim was "colorable" on the merits before it may proceed.

*Second*, the Court's decision in that circumstance was undoubtedly motivated by the substantial ambiguity raised by the vexing question of determining what type of claim is an "estate" claim that is resolved when the debtor grants a release, as opposed to those claims that are held and may be asserted against third parties by

---

[270] *Id.* at 51.

[271] D.I. 581 ¶ 12.

individual creditors.  This Court wrestled with that issue (in light of the Third Circuit's decision in *Emoral*) in its decisions in *TPC* and *First Guaranty Mortgage*.[272] This Court's decision to retain jurisdiction over such disputes in the settlement order in this case may well be explained by the Court's concern about imposing on another court the burden of having to make sense of the sometimes ambiguous effect of this Court's settlement order.

*Finally*, however, notwithstanding the prior point, the Court now believes that the approach taken by the court in *Gulf Coast Health Care* is the better one.  To be sure, this Court retains jurisdiction to resolve a dispute about the meaning of its order.[273]  And if a dispute were to arise in the future about whether a claim asserted in another court were actually enjoined by virtue of this Court's confirmation order, this Court would undoubtedly be willing to address the matter through a declaratory judgment action, rather than requiring another court to guess as to the meaning of this Court's order.  That said, and despite the Court having done so in the settlement order in this case, the Court now believes that the better view is that it ought not assert *exclusive* jurisdiction over that issue.  As the court said in *Gulf Coast Health Care*, to the extent another court were otherwise inclined to resolve a dispute over

---

[272] *See generally In re Emoral, Inc.,* 740 F.3d 875 (3d Cir. 2014); *In re TPC Group Inc.*, No. 22-10493, 2023 WL 2168045 (Bankr. D. Del. Feb. 22, 2023); *In re First Guaranty Mortgage Corp.*, No. 22-10584, 2023 WL 8940688 (Bankr. D. Del. Dec. 27, 2023).  This issue was also addressed more recently by a judge on this Court in *In re Aliera Companies, Inc.*, No. 21-11548 (TMH), 2025 WL 2091090 (Bankr. D. Del. July 24, 2025).

[273] *Travelers Indemnity*, 557 U.S. at 151.

94

the meaning of this Court's order, the Court does not believe that it can or should enter an injunction that would preclude that.

The settlement order, of course, is now a final and non-appealable order. It says what it says, and the Court stands prepared to enforce it. With the benefit of hindsight, however, this Court does not believe that the entry of such a gatekeeping provision is authorized by law. In order for the Court to confirm the plan, this provision will need to be modified.

## Conclusion

For the foregoing reasons, the Court concludes that various revisions to the plan and/or confirmation order need to be made before the Court may enter them. Subject to those revisions, however (none of which the Court views as a material change requiring re-solicitation), the Court finds that the plan may be confirmed. The parties are thus directed (as described above, at the end of Part II) to meet and confer with respect to a revised form of plan and confirmation order.

Dated: August 21, 2025

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE